**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF WEST VIRGINIA
Wheeling**


**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE
SHEA** and **DANIEL V. SHEA**, individually
and on behalf of a class of persons,

                    Plaintiffs,

        v.                                 **Civil Action No. 5:12-CV-114**
                                                 Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE,
INC.**, dba Title Source Inc. of West Virginia,
Incorporated,

                    Defendants.


<u>**ORDER RESOLVING MOTIONS**</u>

Pending before this Court are the following motions:

1.      Plaintiffs' Motion for Class Certification [Doc. 169];

2.      Defendant Hyett's Motion for Summary Judgment [Doc. 172];

3.      Plaintiffs' Motion for Partial Summary Judgment [Doc. 173-1];

4.      Motion for Summary Judgment [Doc. 174];

5.      Defendants Quicken Loans Inc.' and Title Source, Inc.'s Motion to Exclude

the Opinions and Testimony of Plaintiffs' Experts, Matthew Curtin, Pursuant to Rule 702

and ***Daubert*** [Doc. 176];

6.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion to Exclude

the Opinions and Testimony of Plaintiffs' Expert, Stephen McGurl, Pursuant to Rule 702

and ***Daubert*** [Doc. 178];

1

7.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence of Appraisers Petition [Doc. 201];

8.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence or Argument Related to The Home Valuation Code of Conduct or Dodd Frank Act [Doc. 203];

9.      Plaintiffs' Motion to Strike Portions of the Declaration of Sherry Dukic which Are Inconsistent with Deposition Testimony [Doc. 209].

### Hyett's Motion for Summary Judgment

This Court finds it appropriate to first address the defendants' motions for summary judgment, for the reason that, if granted, the remaining motions may be mooted.   In response to the Motion filed by defendant Richard Hyett [Doc. 172], the plaintiffs state that the Sheas and Mr. Hyett have reached a settlement of all claims and request that the Court deny the Motion as moot [Doc. 196].  Inasmuch as the motion does appear to be moot, this Court will deny the Motion as moot and, by separate order, has dismissed the claims against defendant Hyett.

### Quicken and Title Source's Motion for Summary Judgment

**I.      Providing a Value to an Appraiser**

The Motion filed by Quicken Loans and Title Source, Inc. are not so easily resolved. In their motion, the remaining defendants contend that under ***McFarland v. Wells Fargo Bank***, 810 F.3d 273 (4th Cir. 2016), the plaintiffs' claims are no longer viable.  The defendants argue that providing the appraiser with the prospective borrowers' own opinion as to property value is not unconscionable as a matter of law and in no way constitutes an

attempt to influence the appraiser's opinion.   The defendants also posit that under ***McFarland*** unconscionable inducement requires a higher standard of proof of fraud.

This Court views this Motion as a rehash of the arguments made in connection with Defendants Quicken Loans Inc. and Title Source, Inc.'s Motion for Partial Judgment on the Pleadings [Doc. 72] and Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations [Doc. 74], with the exception of the arguments that the information conveyed to the appraisers was the *borrowers'* estimate of value and that ***McFarland*** altered the landscape.

In response to the previous motions, this Court noted that the Fourth Circuit succinctly summarized the plaintiffs' allegations as follows:

> Plaintiffs complain that Quicken Loans originated unlawful loans in West Virginia and that Defendant Appraisers, which includes both the named appraisers and the unnamed class of appraisers, were complicit in the scheme.  Plaintiffs allege that, before Defendant Appraisers conducted an appraisal, Quicken Loans would furnish them with a suggested appraisal value.   Then, after purportedly conducting the appraisal, Defendant Appraisers arrived at the same appraisal value as the suggested appraisal value.   The problem with that scheme, according to Plaintiffs, is that the borrower would then close on a loan that was underwater from the beginning.

***Quicken Loans v. Alig***, 737 F.3d 960, 963 (4th Cir. 2013).

Other courts have discerned the problem with the practice of providing a "target number" to an appraiser:

> Appraisals are, essentially, an estimate of a property's market value as of a

given date.  A central component of all residential appraisals is the selection of comparable properties with which to assess the value of the subject property ("comparables").   Appraisers are supposed to select the best comparables—which typically means the geographically closest properties with the most similar characteristics, such as lot size, house size, style, and number of bathrooms—that have been the subject of sales transactions within the past year.  Appraisers also consider market conditions, including housing supply and demand in the property's neighborhood.

. . .

While accuracy and good faith should be the watchwords of appraisers, it is easy for appraisers to inflate their appraisals through their selection and analysis of comparables.  For instance, an appraiser can choose a comparable from a nicer neighborhood, ignore key features of a comparable's sales price, such as thousands of dollars of assistance with closing costs or escrowed repair funds that are not associated with the value of the property, or ignore more recent comparables that reflect a local market's turn for the worse.  An appraiser might also mislabel the number of stories in a comparable, or fail to follow up on evidence that a property had been flipped, raising doubt about the sales price's reflection of market value. For these reasons, the URAR [Uniform Residential Appraisal Report] is supposed to include sufficient information about each selected comparable and its relevant characteristics to permit meaningful review.

Appraisers may inflate their appraisals because of pressure from loan

4

officers.  An officer may mention the desired appraisal value he is seeking, ask for the appraiser to call back if she cannot hit a specific value, or send out appraisal assignments to multiple appraisers with the explanation that the assignment will be given to the first one who can find the target value. Appraisers can be made to understand that their ability to receive future assignments depends upon delivery of the desired results.

During the overheated housing market at issue here, residential appraisers felt intense pressure to inflate appraisals.  Defendants' appraisal expert, Hedden, observed that such pressure was simply part of what appraisers were faced with "on a regular basis." Defendants' appraiser witnesses acknowledged that they and other appraisers with whom they worked experienced pressure to provide "predetermined appraisal values."

In a national survey of appraisers conducted in late 2006, 90% of the participating appraisers indicated that they felt some level of "uncomfortable pressure" to adjust property valuations.  This was an increase of 35% from a survey conducted three years earlier.

*Fed. Housing Fin. Agency v. Nomure Holding America, Inc.*, 104 F.Supp.3d 441 (S.D. N.Y. 2015).

In *Spears v. Wash. Mut., Inc.*, 2009 WL 605835 (N.D. Cal. March 9, 2009), the Court noted the allegations of the complaint:

Plaintiffs bring this class action on behalf of all consumers in California who received home loans from WMB on or after June 1, 2006 with appraisals

obtained through EA or LSI.  According to the first amended complaint, home purchases in the United States have traditionally been financed through a third-party lender who retains a security interest in the property until the loan is repaid.  In order to ensure that the secured lender will recoup the value of the loan if the borrower defaults, the lender generally requires that the property be professionally appraised.  Plaintiffs allege that in June of 2006 WMB, with EA and LSI, began a scheme to inflate the appraised values of homes receiving loans in order to sell the aggregated security interests in the financial markets at inflated prices.  According to the complaint, banks like WMB changed from a business model in which they held the mortgage loans until repaid to one where they sold the loans to financial institutions.  This "paradigm shift" created an incentive for the bank to seek higher appraisals in higher volume.

The complaint describes a scheme in which WMB allegedly conspired to inflate the appraised value of property underlying their mortgage loans.  In 2006 WMB retained EA and LSI to administer WMB's appraisal program.  EA and LSI have since performed almost all of WMB's appraisals, and WMB's borrowers have become EA and LSI's largest source of business.  WMB created a list of "preferred appraisers," selected by WMB's origination staff, that it requested to perform appraisals for WMB borrowers.

2009 WL 605385, at *1.

In the trial court case in ***Brown v. Quicken Loans, Inc.***, Ohio County Circuit Court No. 08-C-36, Judge Recht issued his findings of fact and conclusions of law [Doc. 15-1].

6

With respect to the appraisal issue, Judge Recht found: (1) that the appraisal was conducted by Mr. Guida, who was formerly a defendant in this case; (2) that at the time the assignment was made, the defendants provided Guida with an estimated value of the property; (3) that there was no legitimate purpose being served by providing the appraiser with an estimated value of the property; (4) that the estimated value given to the appraiser was $262,500, nearly $200,000 more than the highest sale in the applicable area; (5) that Guida appraised the property at $181,700; (6) that the property was retrospectively appraised at $46,000; and (7) that the appraisal gave the plaintiff a false sense as to her ability to repay the loan.

Judge Recht found that, as a matter of law, the loan was induced by unconscionable conduct due to, inter alia, negligently conducting the appraisal review and failing to realize the highly inflated appraisal.  The Judge also found that the loan contained unconscionable terms, including being based upon an appraisal of $181,700 when the proper fair market value was $46,000.

On appeal, the West Virginia Supreme Court of Appeals found that based upon the appraisal and other factors, the trial court was correct in finding unconscionability.  The Court did reverse a portion of the remedy imposed by the Judge.  ***Quicken Loans, Inc. v. Brown***, 230 W.Va. 306, 737 S.E.2d 640 (2012).  Syllabus Point 3 to the decision states:

> 3.   '"The legislature in enacting the West Virginia Consumer Credit and Protection Act, W.Va. Code 46A–1–101 *et seq.*, in 1974, sought to eliminate the practice of including unconscionable terms in consumer agreements covered by the Act.  To further this purpose the legislature, by the express

language of W.Va. Code, 46A–5–101(1), created a cause of action for consumers and imposed civil liability on creditors who include unconscionable terms that violate W.Va. Code, 46A–2–121 in consumer agreements." Syl. pt. 2, ***U.S. Life Credit Corp. v. Wilson***, 171 W.Va. 538, 301 S.E.2d 169 (1982).' Syl. pt. 1, ***Orlando v. Finance One of West Virginia, Inc.,*** 179 W.Va. 447, 369 S.E.2d 882 (1988)." Syl. Pt. 3, ***Arnold v. United Companies Lending Corp.,*** 204 W.Va. 229, 511 S.E.2d 854 (1998), *overruled, in part, on other grounds,* ***Dan Ryan Builders, Inc. v. Nelson,*** 230 W.Va. 281, 737 S.E.2d 550 (2012).

230 W.Va. 306, 737 S.E.2d at 644.

The fact pattern in ***Herrod v. First Republic Mortgage Corp.***, 218 W.Va. 611, 625 S.E.2d 373 (2005) is similar. According to the West Virginia Supreme Court, "[f]ollowing the home visit, the loan brokers prepared an appraisal request form on which Mr. Young provided two figures suggesting alternative values of $118,000 and $137,000 for the Herrod home. The form was transmitted by facsimile to Mr. Jack Weaver who worked for a real estate appraisal company known as Craddock's Last Stand in Parkersburg, West Virginia. Purportedly, there was an arrangement between Mr. Weaver and First Security whereby Mr. Weaver would provide inflated appraisals in connection with loans being pursued by First Security. When the appraisal report came back, the Herrod home was valued at $118,000." 218 W.Va. at 614, 625 S.E.2d at 376.

The Court added in footnote 11 that "[t]he arrangement purportedly involved the use of two figures on the appraisal request form; one being a "deal breaker" and the other a so-

8

called "Christmas figure."  Mr. Weaver would instruct one of his appraisers to inspect the property and then someone in the home office would complete the report by providing the comparables necessary to obtain the value sought by the loan broker.

Similarly, in **Carroll v. JPMorgan Chase Bank, N.A.**, 2013 WL 17328, *1 (S.D. W.Va. Jan. 16, 2013) (Copenhaver, J), the plaintiff alleged that the defendant "solicited Plaintiff and her husband to refinance their home, and in connection therewith Aegis intentionally obtained an inflated appraisal—as was its practice—which wrongfully valued the home to be worth at least $290,000."

In **Hatcher v. Bank of America**, 2013 WL 1776091, * 1 & 4 (S.D. W.Va. April 25, 2013) (Copenhaver, J), the defendant is alleged to have arranged for an appraisal with an inflated suggested value in excess of the property's true value, as was its normal procedure.

Chief Judge Chambers of the Southern District of West Virginia also refused to dismiss a claim of unconscionability where the allegations included the overvaluation of plaintiff's home.  **Petty v. Countrywide Home Loans, Inc.**, 2013 WL 1837932, *4 (S.D. W.Va. May 1, 2013).  In accord is **Heavener v. Quicken Loans, Inc.**, 2013 WL 2444596 (N.D. W.Va. June 5, 2013) (Groh, CJ).

In its Order Denying Defendant Quicken Loans Inc.'s Motion to Strike Class Allegations [Doc. 105], this Court noted that the then state of West Virginia law required a finding of both substantive and procedural unconscionability, but noted that certain members of the Court were questioning whether both were required.  The Fourth Circuit, in **McFarland**, resolved the issue finding that only procedural **or** substantive

unconscionability is required.

This Court finds that the estimated value may have been provided by the borrower is a distinction without a difference.  According to Quicken, when a borrower applied for a loan, information was entered into Quicken's loan origination system, including an estimated home value, for purposes of developing a loan proposal.  [Doc. 206-1, Exh. A, Lyon Dep.].  The estimated value, along with a borrower's contact information, would be uploaded into Quicken's computer system AMP and then sent automatically to Quicken's sister company, TSI. [Doc. 206-1, Exh. B, Randall Dep. & Exh. C, Rankin Dep.].  TSI in turn would use this information, including the estimate of value, to generate an appraisal request form.  [Doc. 206-1, Exh. C, Rankin Dep.].  The request form along with the estimated value would be passed to the appraiser selected from a pre-approved list of appraisers through a proprietary internet based system, known as Appraisal Port.  [Doc. 206-1, Exh. C, Rankin Dep. & Exh. A, Lyon Dep.].

It is actually unclear who really provided the estimated value.  For example, both the Aligs and Sheas denied having provided such a figure to the lender.  [Doc. 206-1, Exh. D., Alig Dep. & Exh. E, Shea Dep.]; *see also* [Doc. 206-2, Exh. F., Mem. of Op. & Order in **Brown v. Quicken Loans** (Findings of Fact & Conclusions of Law) (Feb. 25, 2010) at ¶ 18 ("It is unclear as to who provided the Anticipated Property Value."); [Doc. 206-2, Exh. G, Lyon Trial Testimony Vol. 5 (Oct. 9, 2009) at 84:15-85:4 ("I do not know if [the applicant's estimated value] came from [the consumer] or came from [Quicken's mortgage banker])].

While the factual issue of who really supplied the estimated value to the appraiser might be sufficient in and of itself to defeat the defendants' motion for summary judgment,

for the purposes of this order, the Court will accept that the value was supplied to Quicken by the borrower.

A borrower's estimated value is not materially or logically distinguishable from a "target appraisal value" or "predetermined value". This Court is not aware of any industry source or other authority that has drawn such a distinction. In fact, John Brenan, the corporate designee for the Appraisal Foundation, actually testified that one of the *functions* of a borrower's estimated value *was* to serve as a "target value". [Doc. 193-7 at 231:3-234:12.]

No matter who supplied the estimated value, this Court cannot imagine any logical basis for sending an estimated value to the appraiser other than to influence his or her opinion.

This is supported by e-mails written by Quicken's executives that were uncovered by the Department of Justice in a recent investigation of Quicken, one of which stated:

> FNMA [Fannie Mae] is being dragged into a lawsuit in the state of New York over lender pressure on appraisals. I don't think the media and any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers questioning their appraised values.

[Doc. 206-2, Exh. I, Email from C. Bonkowski to H. Lovier, cc: M. Lyon (Dec. 13, 2007)].

In another e-mail uncovered by the Department of Justice, senior management at Quicken acknowledged in November of 2007 that its sister company, TSI, was receiving "a lot of calls from appraisers stating that they can't reach our requested value." Senior management's directive was to simply ask the appraisers "for the max increase available."

11

[Doc. 206-2, Exh. J, Email from D. Thomas to E. Czyzak, *et. al.*, cc: D. Wright (Nov. 27, 2007)].

The defendant appraiser in ***Quicken Loans v. Brown***, 230 W.Va. 306, 737 S.E.2d 640 (2012), and former defendant here, Dewey Guida, recently conceded after surrendering his appraisal license that Quicken was regularly and actively attempting to influence his appraisals.  Appraiser Guida testified on January 12, 2016, that any time his appraised value came in lower than the owner's estimated value, he received a telephone call from TSI asking that he change his figures.  [Doc. 169-2, Guida Dep. at 44:2-8].  Guida went on to characterize the providing of an "owner's estimated value" as a "tip-off"  [Doc. 169-2 at 40, 42-45, 104-105, 107-109].  This same scenario played out in the Alig 2007 loan, where Guida acquiesced to the requested value increase that was needed to qualify that loan. [Doc. 169-2 at 95:7-96:18, 99:5-100:18].

After an amendment to statute made Ohio's Consumer Sales Act applicable to mortgage lenders effective January 1, 2007, the Ohio Attorney General's office wasted no time and filed a number of lawsuits targeting the practice of lenders and brokers influencing appraisers by placing a "borrower's estimated value" on the appraisal order.  Ohio courts uniformly concluded that the act of providing an estimated value for a property in connection with a mortgage loan is an unconscionable act or practice in violation of Ohio law because it is an attempt to improperly influence the appraiser's independent judgment.  *See, e.g.,* ***State ex rel. Dann v. Premiere Service Mortgage Corp.***, Case No. CV-2007-06-2173 (Butler Cty. Apr. 30, 2008); ***State ex rel. Rogers v. Ace Mortgage Funding, LLC***, Case No. A0705054 (Hamilton Cty. Sept. 23, 2008); ***State ex rel. Cordray v. First Ohio***

**Banc & Lending, Inc.**, Case No. 07-CV-259 (Belmont Cty. Nov. 24, 2009); **State ex rel. Cordray v. Apex Mortgage Services, LLC**, Case No. 07-CV-261 (Belmont Cty. Mar. 10, 2009), [collectively Doc. 206-3, Exh. O].

It is undisputed that Quicken did not inform borrowers of its appraisal practices. TSI's third party software, Appraisal Port, is designed to "ensure[] that information exchanged between [TSI] and the appraiser is *not accessible to any third party.*" [Doc. 206-2, Exh. K, Petkovski Decl. at ¶ 5 (emphasis added)].  Moreover, Quicken did not produce a single appraisal request form and discarded them after providing the form to the appraiser. [Doc. 206-2, Exh. L, Petkovski Dep. at 59:18-60:8].

Quicken first contends that passing an "applicant's estimated value" on appraisal engagement letters was not improper.  However, in February, 2010, Judge Recht concluded in an Ohio County, West Virginia case styled **Brown v. Quicken Loans Inc.**, Civ. Action No. 08-C-36, that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property.  The only purpose could be to inflate the true value of the property."  [Doc. 206-2, Exh. F]. This finding supported multiple liability conclusions. *See also*, **Herrod v. First Republic Mortgage Corp.**, 218 W.Va. 611, 617-618, 625 S.E.2d 373, 379-380 (2005) (reversing a trial court's grant of summary judgment to a mortgage lender where an appraiser was provided with an estimated value).

Efforts to regulate this practice go back more than 20 years.  For  example, in 1996, the Federal Housing Commissioner issued appraisal standards to be followed in all HUD-approved mortgage transactions.  Under these standards, the appraiser was required to certify that the appraisal was not "based on a requested minimum valuation, [or] a specific

13

valuation or range of values."[1]   In 2005, all the major federal agencies with lending oversight joined in and issued an "Interagency Statement," advising in pertinent part: "the information provided [to the appraiser] should not unduly influence the appraiser *or in any way suggest* the property's value."[2]  (Emphasis added).

Quicken argues that USPAP does not forbid the practice.  Quicken ignores the fact that USPAP does not apply to lenders.   Lending standards regarding appraiser independence are separate and stronger than standards set by the appraisal industry. [Doc. 206-7, pp. 13-21, Exh. JJ, Brenan Dep. at Dep. at 280:15-281:8; 290:8-292:4 (agreeing lender restrictions pertaining to estimated values go "beyond what USPAP requires.")].

John Brenan *did not* endorse the use of estimated values under USPAP.  Instead, he acknowledged that estimated values are potentially a problem and can be used by the lender as a means to provide a target figure. (*Id.* at 233:5-235:16).  If a lender provided an estimated value, the appraiser was advised in Advisory Opinion 19 of USPAP [*See* Doc. 206-7, pp. 23-28, Exh. KK] to communicate directly with the lender to insure a full understanding that the appraiser was not "hitting a target" figure.  *Id.*  The better practice, however, and the one insuring the appraiser's independence, was to remove the estimate

---

[1][Doc. 206-7, Exh. LL, pp. 30-32, Mortgagee Letter 96-26, dated May 21, 1996 and authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner].

[2]  Office of the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, National Credit Union Administration, Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions, March 22, 2005.  Available at http://www.occ.gov/news-issuances/bulletins/2005/bulletin-2005-6a.pdf.

entirely.  [*See* id. at 241:20-242:18].

While several of the appraisers that testified in this matter denied giving in to the attempts of Quicken and other lenders at influencing them, even the defendant appraisers agree an applicant's estimated value is not a relevant data point.  In fact, the testifying appraisers distanced themselves from such figures as taboo and all agreed that this information is in no way necessary to performing an appraisal. [*See, e.g.*, Doc. 206-5, Exh. Y, Guida Dep. at 107:23-108:7; Doc. 206-7, Exh. II, Hyett Dep. at 353:7-21; 355:4-11 (figure was not relevant and serves no purpose); Doc. 206-3, Exh. N, Sneddon Dep. at 181:13-182:25 (estimated values on order forms are "inappropriate," and Advisory Opinion 19 tells appraisers that they are "delving into" a "dangerous area" and "there might be a problem" with such a form).]  Plaintiffs' appraisal expert, John Kelly, testified that USPAP required him to refuse assignments that contained an estimated value.  [Doc. 206-3, Exh. M, Kelly Dep. at 69:6-15*; see also* Doc. 206-7, Exh. MM, Lyon Dep. at 52:15 – 53:6 (agreeing estimated values were not necessary)].  In addition, appraisers like Jody Hill, who only worked for local lenders such as Wesbanco Bank and Main Street Bank, were not subject to such a practice.  [Doc. 206-6, Exh. FF, Hill Dep. at 14:19-15:6, 100:22-103:23.]

Quicken next attempts to argue that unconscionability is equivalent to fraudulent inducement and requires proof by clear and convincing evidence.  The *McFarland* Court declined to make that finding, nor did the legislature choose to equate the two concepts.  Quicken further contends that it took no affirmative acts to deceive plaintiffs or conceal any material facts from them or that its failure to disclose this practice caused plaintiffs to enter into the loan contracts.  This Court cannot agree.  Quicken "affirmatively" passed on the estimated values to TSI, who in turn passed them to appraisers, while failing to disclose this

15

conduct from plaintiffs. Finally, Quicken erroneously argues that there is no remedy for this conduct.

W.Va. Code § 46A-2-121 broadly addresses the subject of unconscionability in consumer contracts.  Both the plain language of the statute and the courts interpreting the statute are clear that W.Va. Code § 46A-2-121 recognizes two species of unconscionability, general unconscionability and inducement by unconscionable conduct.  Importantly, the inducement by unconscionable conduct claim is predicated solely on the process leading up to contract formation and entirely independent of any showing of substantive unconscionability.  *McFarland,* 810 F.3d at 283.

In *McFarland*, like here, plaintiff alleged that the defendant lender had inflated his home appraisal. 810 F.3d at 277.  However, as counsel for Wells Fargo repeatedly stressed:[1]

> There is no evidence whatsoever that the appraisal was "fraudulent" or that the appraiser was provided with an estimated value.  Nor is there evidence that Wells Fargo or U.S. Bank had any knowledge that the appraisal was anything other than a bona fide appraisal on which they could rely.  In short, this case does not involve the sort of unscrupulous conduct the West Virginia legislature sought to prevent by enacting the WVCCPA.

Appellee Br. in *McFarland* (Appeal No. 14-2126, Doc. 33 at 26.)

The Fourth Circuit was also persuaded by the West Virginia Supreme Court's decision in *Quicken Loans I*, *supra*, where the court "sustained findings of

---

[1] The defendants here are represented by the same counsel.

'unconscionability in the inducement' based entirely on conduct predating acceptance of the contract and allegations going to the fairness of the process, without regard to substantive unconscionability: a 'false promise' of refinancing, the sudden introduction of a balloon payment at closing, a negligently conducted appraisal review, and other similar factors." 810 F.3d at 284 (citing *Quicken I,* 230 W.Va. 323-324, 737 S.E.2d at 657-58). The Court further noted that unconscionable inducement was not equivalent to procedural unconscionability and should turn on a defendant's misconduct, such as "affirmative representations," and "active deceit." 810 F.3d at 286.  The Court left "to West Virginia law the precise contours of an unconscionable inducement claim".  *Id.*

According to Quicken, "the Fourth Circuit equated unconscionable inducement with fraudulent inducement." [Doc. 175, at 18.] Ignoring most of *McFarland's* analysis, Quicken simply leaps to the conclusion that an unconscionable inducement claim under W.Va. Code § 46A-2-121 is nothing more than a straw man for fraud.

This Court does not understand *McFarland* the same way.  First of all, *McFarland* makes it clear that it is the conduct of the lender that is relevant, rather than the status of the plaintiff.  810 F.3d at 286.  The conduct forming the basis of the claim here is passing a tip off figure to an appraiser without a borrower's knowledge or consent.  *McFarland* did not delve deeply into the nature of unconscionable conduct, leaving that process to West Virginia's courts. However, we can gain some understanding of what unconscionable conduct means through the facts of the *Brown* and *McFarland* cases.

In *Brown,* the plaintiffs alleged that the lender, Quicken, engaged in a pattern of unconscionable conduct with the intent of inducing them into accepting an underwater

mortgage loan.  The West Virginia Supreme Court agreed:

> With regard to unconscionability in the inducement, the circuit court in the present case concluded that the unconscionable conduct of Quicken included "[t]he false promise of refinancing; [i]ntroducing a balloon payment feature at closing; [f]ailing to properly disclose the balloon payment; [f]alsely representing that the plaintiffs were buying the interest rate down; and [n]egligently conducting the appraisal review and failing to realize the highly inflated appraisal from Guida[.]"

230 W.Va. at 323, 737 S.E.2d at 657.

The Supreme Court affirmed, concluding that "there is no merit to Quicken's contention that it did not violate West Virginia Code 46A-2-121 in this regard."  230 W.Va. at 324, 737 S.E.2d at 658.  Thus, the Court expressly found that Quicken's conduct before and during the closing was unconscionable in nature.

Quicken's conduct in **Brown** fell into two broad categories—false statements and withholding facts from the plaintiffs.  **McFarland** did not attempt to precisely define unconscionable inducement, but it did expressly identify two of the potential hallmarks of unconscionable conduct, misrepresentations and deceit.  **McFarland** did not define unconscionable inducement to mean fraud.  In fact, the lender in **McFarland** specifically argued that "unconscionable inducement requires a heightened showing akin to fraud" in arguing against certification of plaintiff's question regarding an unconscionable inducement claim.  (Appeal 14-2126, Def. Opp. to Pl. Motion to Certify Questions, Doc. No. 65-1 at 8 (Nov. 23, 2015)).  **McFarland** apparently rejected the invitation to equate unconscionable

18

inducement with fraud, and the word "fraud" never appears in its discussion of the unconscionable inducement issue.   Instead, *McFarland* offers misrepresentation and deceit as examples of conduct that could constitute unconscionable inducement--examples drawn from the facts of the *Brown* case itself.

Quicken points to a footnote in *Mt. State College v. Holsinger,* 230 W.Va. 678, 742 S.E.2d 94 (2013), for the proposition that unconscionable inducement can be equated to fraudulent conduct.  It is settled that "language in a footnote generally should be considered obiter dicta and that if [the West Virginia Supreme Court of Appeals] is to create a new point of law, it will do so in a syllabus point and not in a footnote. "   *Valentine v. Sugar Rock, Inc.,* 234 W.Va. 526, 532, 766 S.E.2d 785, 791 (2014) (quotation omitted).  Unconscionable inducement could, of course, be satisfied by demonstrating fraudulent conduct, but that is not to say that this case stands for the proposition that only fraudulent conduct will satisfy the unconscionability standard.

The facts here supporting a finding of unconscionable conduct, as in *Brown,* are simple and clear.  Quicken influenced the appraisers to meet a passed on value, and it did so while failing to disclose the practice to plaintiffs.  The CCPA must be liberally construed so as to effect its remedial purposes. *Barr v. NCB Mgmt. Servs., Inc.,* 227 W.Va. 507, 711 S.E.2d 577 (2011).  It makes no sense to extend the CCPA in the fashion proposed by Quicken so as to limit borrowers' rights to those that already exist at common law.  There is ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs' loans.

Quicken's conduct here also falls within the two examples, misrepresentation and/or

deceit, of unconscionable conduct given by *McFarland*.  Deceit is by its nature broad in scope and would encompass Quicken's conduct in the instant matter.  Deceit is defined as "a fraudulent or deceptive misrepresentation, artifice, or device used by one or more persons to deceive or trick another."  Black's Law Dictionary (5th Ed. 1979).  Deceit, then, would not only cover Quicken's attempts to prejudice or influence appraisers but also Quicken's withholding of such practice from borrowers.  As it did in the *Brown* case, Quicken possessed knowledge of the true facts of the Aligs' loan, namely that it was actively attempting to compromise the appraisal process.  Specifically, pressure was being brought to bear on the appraiser, who was expected to meet or exceed a target figure that Quicken itself had provided not once but twice (in the case of the Aligs).  By concealing these facts, Quicken meant to "deceive or trick" the plaintiffs.  Quicken's conduct was therefore unconscionable even if the definition of unconscionability was limited to the two examples given by *McFarland*.

We see this in *Brown's* treatment of the balloon note. Quicken did not secrete the balloon note or say anything at the closing to deflect the borrower's attention from it.  Instead, the balloon note simply appeared within the settlement package that was presented to the borrowers for signing.  Quicken knew it was there.  The borrowers did not know what they were walking into.  As *Brown* noted, "fraud is the concealment of truth just as much as it is the utterance of a falsehood." 230 W.Va. at 320, 737 S.E.2d at 654.  Nothing further was required to prove that the loan was, in fact, unconscionably induced as a result of concealing the balloon note.

The same logic applies here.  To repeat, Quicken had full knowledge of its practice

of providing estimated values to its appraisers for purposes of influencing their appraisals. Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers.   Quicken knew these facts.   The plaintiffs did not.   Under the analytical framework of both **McFarland** and **Brown**, this constituted unconscionable inducement.

Defendants set up four additional arguments why their conduct is not actionable. First, defendants argue there is no proof their unconscionable conduct actually induced the plaintiffs to enter into their loan agreements. It is important to again note the statutory language. A violation exists when "the agreement or transaction . . . [has been] induced by unconscionable conduct." W.Va. Code § 46A-2-121. The focus is plainly on the lender or creditor's conduct. The statute says nothing of the consumer's state of mind. If the "transaction" itself is induced or furthered by the lender's unconscionable conduct, that is enough for a violation.

Apparently, Quicken is not taking the extreme position that there is no remedy for conduct that is unconscionable *per se*.  Indeed, Quicken acknowledges in its Memorandum in Support of Summary Judgment that a practice that is illegal would be *per se* unconscionable. [Doc. 175 at n. 18 (citing **Dijkstra v. Carenbauer**, 2014 WL 791140 (N.D. W.Va. Feb. 26, 2014)].  In **Dijkstra**, this Court granted summary judgment to the plaintiff and found the closing of a loan without an attorney present to be unconscionable *per se* on account of West Virginia common law and an opinion of the Committee on Unauthorized Practice of Law.  **Dijkstra**, 2014 WL 791140, at **4-5.  The plaintiffs here are asking the Court to do what it did in **Dijkstra**: to find that based on West Virginia common law and

21

other persuasive authority identified above the lender's practices constitute unconscionable inducement.

Under West Virginia law there is no requirement to show reliance in claims involving concealment.  Logically, it would be impossible to even make such a showing:  How can anyone prove that they relied on a fact that was concealed from their knowledge?  Even the higher standard for fraudulent concealment would not require proof of reliance, but instead involves only "concealment of facts by one with knowledge, or the means of knowledge, and a duty to disclose, coupled with an intention to mislead or defraud." *Livingston v. K-Mart Corp.,* 32 F.Supp.2d 369, 374 (S.D. W.Va. 1998) (Haden, J.) citing *Pocahontas Min. Co. Ltd. P'ship v. Oxy USA, Inc.,* 202 W.Va. 169, 175, 503 S.E.2d 258, 264 (1998) (in turn explaining that "[o]bviously, one who is defrauded [by fraudulent concealment] cannot possibly take any affirmative action to indicate reliance, since he knows nothing of the deception"); *see also Adair v. EQT Prod. Co.,* 2013 WL 5429882, at *39 (W.D. Va. Sept. 5, 2013) ("the doctrine of fraudulent concealment does not focus on the actions or knowledge of the plaintiffs, but on the actions of the defendant.").

Quicken's second argument is that "appraisals are obtained for the benefit of the lender, not the borrower."  [Doc. 175, at 22].  In other words, as borrowers, plaintiffs were not justified in relying on the appraisal because it was obtained by the bank and for the bank.  This is not borne out by the record.  Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater."  The certification by the appraisers here explicitly states that others, including the borrower, can rely on the appraisal and its figures.  In November 2005,

22

Fannie Mae explained that the certification appearing on all of its appraisal forms was revised to reflect the fact that borrowers "should be able to rely on the accuracy of an appraisal report prepared by a state-licensed or state-certified appraiser and the appraiser should be held accountable for the quality of that appraisal because their reliance is customary and reasonable." [Doc. 206-7, Exh. NN at 3]. Finally, it should be noted this court itself addressed the same issue in a prior order, finding that the plaintiffs' negligence claim against one of the appraisers, i.e., Hyett, was viable because the plaintiffs were justified in relying on the appraisal he prepared. [Doc. 61].

Quicken's third argument is that it took no "affirmative action" with respect to concealing the passing of the estimated value. But in the same paragraph, it acknowledges that Quicken passed the estimated value on to TSI, who, in turn, included the estimated value on the appraiser engagement letters. [Doc. 175, at 20-21]. In fact, TSI's third party software, Appraisal Port, is designed to "ensure[] that information exchanged between [TSI] and the appraiser is not accessible to any third party, including the lender." [Doc. 206-2, Exh. K, Petkovski Decl. at ¶ 5].

Quicken's fourth argument is that the plaintiffs did not suffer any damage or detriment. Specifically, Quicken argues that plaintiffs must show that plaintiffs and other class members were actually harmed by this practice by receiving an upside down mortgage. This standard is contrary to the stated purpose of this claim, which is to provide a cause of action in situations where damages in the form of a substantively unconscionable loan are not present. For that reason, the WVCCPA provides that a person who has been subjected to unconscionable conduct may recover actual damages and the right to recover of $1,000 per violation. West Virginia Code § 46A-5-101. *See* Syl. pt. 2,

23

*Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 740 S.E.2d 562 (2013) ("under W.Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages."). Actual damages are therefore not a necessary component of the claim. In this respect this case is no different from *Dijkstra*, where this Court did not require plaintiff to prove that each individual class member had suffered actual damages due to a witness only closing.

The defendants are also not entitled to summary judgment on the plaintiffs' contract claims. West Virginia law implies in every commercial contract a covenant requiring the parties to act in good faith. *See, e.g.*, *Barn-Chestnut, Inc. v. CFM Dev. Corp.*, 193 W.Va. 565, 572, 457 S.E.2d 502 (1995). The duty of good faith imposes real obligations that are grounded in honest dealing and compliance with standards of commercial reasonableness: "The test of good faith in a commercial setting is…honesty in fact and the observance of reasonable commercial standards of fair dealing in the trade." *Barn-Chestnut*, 193 W.Va. at 572, 457 S.E.2d at 509 (interior quotes omitted).

The plaintiffs and Quicken executed a contract at the beginning of the loan application process known as an "Interest Rate Disclosure and Deposit Agreement." [Doc. 206-5, Exh. X]. Quicken argues that no part of the contract imposes any obligation on Quicken to obtain an acceptable appraisal. Under the language of the contract, Quicken undertakes to "[o]btain an appraisal." At the end of the process the lender must make a proper accounting of the deposit and credit it "toward the cost of your appraisal."

The agreement also specifically refers to an "acceptable" appraisal. This language is significant. What exactly is an "acceptable" appraisal? Because the contract is silent on

the subject, it must, under settled law, be interpreted against the lender and in favor of the borrower.  *See, e.g.*, **Auber v. Jellen**, 196 W.Va. 168, 469 S.E.2d 104 (1996) (ambiguous contract provisions, "especially those having the qualities of a contract of adhesion," must be construed against the drafter).  Furthermore, because this involves how Quicken must perform under the contract, the implied covenant also comes into play.

All of this demonstrates that the agreement in question is meant to facilitate the loan application process by having the lender, Quicken, obtain an "acceptable" appraisal, which, at a minimum, would require Quicken to deal honestly with its borrowers and in keeping with the prevailing standards of reasonableness.  Quicken has admitted that the borrower has an expectation of a fair, unbiased, and reasonable proposal.  [Doc. 206-1, Exh. B, Randall II Dep. at 99:18-100:5].  In refusing to dismiss this Count in its October 2015 Order, this Court stated: "What is clear is that the plaintiffs each deposited a sum of money with Quicken, and, in turn, Quicken agreed to obtain an appraisal of the property and process the loan application.  This Court finds that it was a necessary corollary of obtaining an appraisal that the defendant would obtain a fair, valid and reasonable appraisal of the property."  (Order Denying in Part & Granting in Part Motion for Partial Summ. J. at 7) [Doc. 107].

Inasmuch as providing a target figure to an appraiser is a practice that is universally condemned and serves no legitimate purpose, an appraisal obtained by that process cannot conceivably be an "acceptable" one.  Nor could an appraisal obtained by such a scheme be fair, valid or reasonable.  Furthermore, withholding knowledge of the true nature of the appraisal violates Quicken's duty to deal honestly.

According to Quicken, however, the language requiring an "acceptable" appraisal "appears in the disclosure portion of the document.  Under no plausible construction can this language be read as a promise by Quicken Loans to do anything."  [Doc. 175, at 25].  The language is clearly contractual in nature--it imposes specific duties that must be fulfilled in connection with the deposit and the processing of the appraisal.  For example, the lender undertakes to "begin processing your application…immediately upon the submission of your application and deposit."  The borrower "agree[s] to cooperate in the application process."  In addition, the borrower "agree[s] to notify lender of any changes in any information submitted."  These are not disclosures; they are part and parcel of the contractual undertaking.

Quicken also tries to dismiss the reference to an "acceptable" appraisal, claiming that "receipt of an acceptable appraisal clearly means an appraisal acceptable *to the lender,* not the borrower, to support the loan."  [Doc. 175, at 25 (emphasis in original)].  But this is nothing more than Quicken's own, self-serving interpretation.  The contract itself is silent.  Any appraisal Quicken obtained was intended for the benefit of both the lender and the borrower.

The Motion will be denied as to this issue.

## II.     Flat Fee for Courier Services

The plaintiffs also claim that the imposition of a flat rate for courier fees is excessive and therefore unconscionable.  Title Source charged plaintiffs a $45 flat fee for express mail and courier services provided in connection with the closings.  [Docs. 174-12, 174-17 & 174-20].  The express mail/courier fee was not paid directly to any third party because

it is charged for services provided by multiple entities.  [Doc. 174-28, ¶ 6].  Defendants claim to have set the $45 fee after conducting a market analysis to determine what other lenders in the industry charged for similar services and the average number and cost of services provided per transaction.  [Doc. 174-28].

The $45 fee compensates defendants for express mail and courier services actually performed, including, but not limited to: (i) mailing the executed closing package back to Title Source via next day air delivery; (ii) sending via overnight delivery or wiring the payoffs for the borrower's preexisting mortgage(s), third party debts, judgments, liens, taxes, homeowner's insurance, and/or cash-out proceeds to the borrower; (iii) delivering the executed deed of trust to the county for recording; and (iv) employee time in tracking deliveries, preparing documents for mailing, and scanning in executed documents.  [Doc. 174-28, ¶ 7; Doc. 174-13, Exh. A at 11].

The number and type of services provided to each borrower – which is not known until after closing – varies based on the borrowers' individual circumstances.  [Doc. 174-13, ¶ 3-4, Exh. A at 12-13].

For UPS services, Title Source receives a monthly discount that fluctuates based on volume for that month.  [Doc. 174-31, p. Dep. 32].  Plaintiffs' expert, Stephen McGurl, admitted that the exact cost of UPS services, without the end-of-month discount, is more than double the amount of the discounted charge.  [Doc. 174-32, 134-35].  In other words, had Title Source charged the exact UPS fee at the time of the shipments, plaintiffs would likely have paid well over $45.

The express mail/courier fee of $45 is disclosed to borrowers before closing on the good faith estimate (GFE) and again on the HUD-1 settlement statement.  [Doc. 174-28,

27

¶ 5; Exhs. 12, 17, 20.].  Plaintiffs received and signed these documents, agreeing to the fee in advance of closing.  [Id.].  None of the plaintiffs questioned or disputed the fee.

Plaintiffs do not dispute that Title Source *actually provided* courier services to plaintiffs in connection with their loan closings and disbursements.  The evidence shows that Title Source arranged for at least four express mail/courier services for each of the plaintiffs' loans, including sending the return package, deed of trust to the county for recording, payoffs for liens, and cash to borrowers.  [Doc. 175, at 20]. In addition, Title Source employees provided services in connection with these deliveries, such as printing labels, tracking packages and confirming delivery. [Doc. 174, at 19]. Plaintiffs have presented no evidence that the $45 fee is anything other than reasonable in light of the services actually provided by Title Source.

Likewise, plaintiffs do not dispute that it is impossible to know, prior to closing, exactly what charges will be incurred for express mail/courier services.  One may not know the exact cost of mailing something in advance – it depends on the service used, the number of packages, the size of the packages, the weight of the packages, the locations to which the packages are mailed, and other pricing considerations.  Given the impossibility of determining costs before closing, it is standard in the industry – and permitted by RESPA – to charge a flat fee for express mail/courier services.  *See, e.g., **Price v. Landsafe Credit, Inc.***, 2006 WL 3791391 *7 (S.D. Ga. Dec. 22, 2006) ("Courts have rejected challenges to the reasonableness of flat-fee price structures, even though cross-subsidization between customers is inherent in such an arrangement.").

Plaintiffs rely upon  **Dijkstra v. Carenbauer,** 2014 WL 791140 (N.D. W.Va. Feb. 26, 2014) to support their claim.  In **Dijkstra**, however, the amount of the notary's fee was set by statute.  There is no comparable statute in this case.

This Court will grant summary judgment on this claim.

### Class Certification

With regard to the issue of class certification, the plaintiff seeks certification of two classes.  This Court's ruling on the issue of courier fees obviates the need for the second class.  With respect to the first class, plaintiff seeks a class defined as follows:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and for whom Quicken obtained appraisals through an appraisal request form that included an estimate of value of the subject property.

According to plaintiffs, this case is ideally suited for class certification because it will allow resolution of distilled factual and legal issues through this superior mechanism. Presenting the legal issues on behalf of a class will allow the Court to determine, in one fell swoop on a class wide basis whether it is unlawful in West Virginia for a lender to provide appraisers with target figures.  Plaintiffs' class certification proposal thus allows for the "consolidation of recurring common issues" which "make up the heart of Plaintiffs' case," **Gunnells v. Healthplan Servs., Inc.,** 348 F.3d 417, 426 (4th Cir. 2003) (quoting **Central Wesleyan v. W.R. Grace & Co.**, 6 F.3d 177, 185 (4th Cir. 1993)), and are therefore ideal for resolution through the class action mechanism.

"A district court 'has broad discretion in deciding whether to certify a class, but that discretion must be exercised within the framework of Rule 23.'" ***Lienhart v. Dryvit Sys., Inc.***, 255 F.3d 138, 146 (4th Cir. 2001), quoting ***In re American Med. Sys., Inc.,*** 75 F.3d 1069, 1079 (6th Cir. 1996).  "[P]laintiffs bear the burden . . . of demonstrating satisfaction of the Rule 23 requirements and the district court is required to make findings on whether the plaintiffs carried their burden . . .." ***Thorn v. Jefferson-Pilot Ins. Co.***, 445 F.3d 311, 317 (4th Cir. 2006), quoting ***Gariety v. Grant Thornton, LLP,*** 368 F.3d 356, 370 (4th Cir. 2004).

In an action such as this, class certification may be granted only if the plaintiff satisfies the requirements of numerosity, commonality, typicality, representativeness, predominance, and superiority of Rule 23(a)[2] and (b)(3)[3] are met.  ***Lienhart***, 255 F.3d at

---

[2]  Rule 23(a) provides:

**(a) Prerequisites**.  One or more members of a class may sue or be sued as representative parties on behalf of all members only if:
(1)  the class is so numerous that joinder of all members is impracticable;
(2)  there are questions of law or fact common to the class;
(3)  the claims or defenses of the representative parties are typical of the claims or defenses of the class; and
(4)  the representative parties will fairly and adequately protect the interests of the class.


[3] Rule 23(b)(3) provides:

**(b)  Types of Class Actions**.  A class action may be maintained if Rule 23(a) is satisfied and if:
(3) the court finds that the questions of law or fact common to class members predominate over any questions affecting only individual members, and that a class action is superior to other available methods for fairly and efficiently adjudicating the controversy.  The matters pertinent to these findings include:
    (A)  the class members' interests in individually controlling the prosecution or defense of separate actions;
    (B) the extent and nature of any litigation concerning the controversy already begun by or against class members;

146.

"[N]umerosity requires that a class be so large that 'joinder of all members is impracticable.'  Fed.R.Civ.P. 23(a)(1).  Commonality requires that 'there are questions of law or fact common to the class.'  Fed.R.Civ.P. 23(a)(2).  The common questions must be dispositive and over-shadow other issues."  *Id.*, citing *Stott v. Haworth,* 916 F.2d 134, 145 (4th Cir. 1990).  "In a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions.'"  *Id.*, at n.4, quoting *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 609 (1997).

"Typicality requires that the claims of the named class representatives be typical of those of the class; 'a class representative must be part of the class and possess the same interest and suffer the same injury as the class members.'  *General Tel. Co. of Southwest v. Falcon,* 457 U.S. 147, 156 (1982) (internal quotation marks omitted). Representativeness requires that the class representatives 'will fairly and adequately protect the interests of the class.'  Fed.R.Civ.P. 23(a)(4). . . . [T]he final three requirements of Rule 23(a) 'tend to merge, with commonality and typicality "serv[ing] as guideposts for determining whether . . . maintenance of a class action is economical and whether the named plaintiff's claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.'"  *Broussard v. Meineke*

---

(C)  the desirability or undesirability of concentrating the litigation of the claims in the particular forum; and
(D)  the likely difficulties in managing a class action.

31

*Discount Muffler Shops, Inc.,* 155 F.3d 331, 337 (4th Cir. 1998) (quoting *Falcon,* 457 U.S. at 157 n. 13)." *Id.* at 146-47.

"In contrast to actions under Rule 23(b)(1) and (b)(2), Rule 23(b)(3) actions are '[f]ramed for situations in which class-action treatment is not clearly called for,' but 'may nevertheless be convenient and desirable.' *Amchem Prods., Inc. v. Windsor,* 521 U.S. 591, 615 (1997) (internal quotation marks omitted).  In addition to the four Rule 23(a) requirements, Rule 23(b)(3) actions such as this one must meet two requirements: predominance and superiority.  Predominance requires that '[common] questions of law or fact ... predominate over any questions affecting only individual members.'  Fed.R.Civ.P. 23(b)(3).  The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'  *Amchem,* 521 U.S. at 623. Superiority requires that a class action be 'superior to other methods for the fair and efficient adjudication of the controversy.'  Fed.R.Civ.P. 23(b)(3)." *Id.* at 147.

Plaintiffs are asking this Court to determine whether passing an owner's estimate of value constitutes unconscionable conduct under West Virginia Code § 46A-2-121. [Doc. 1-1, p. 5, Count IV].  Plaintiffs also ask this Court to address whether Quicken breached the parties' contracts by depriving plaintiffs and Class Members of the benefit of their bargain –specifically, of a fair and unbiased appraisal – based on the alleged improper appraiser influence. [Id., Count VII].

These questions present common legal issues which this Court already had occasion to analyze earlier in this order and earlier in this litigation in the context of denying Quicken's motion to strike class allegations. [*See* Doc. 105, Order Denying Def. Motion to

32

Strike Class Allegations (Oct. 15, 2015)].  In that Order, this Court observed that other courts have discerned the problem with Quicken's practice of providing a "target number" to the appraiser in connection with the loan, and discussed several decisions under West Virginia law regarding claims for inflated appraisals.  [Doc. 105, at 7-13].

It was not the first time this Court had an opportunity to study appraisal influence. In a similar case, this Court recognized the plausible "inference" created when a bank provides appraisers with suggested or estimated values of homes:

> Taken as true, these allegations create an inference that [lenders'] practice of providing estimated values of homes was for the purpose of influencing the appraiser's independent judgment. It certainly is plausible that an appraiser would seek to meet a client's suggested outcome in order to receive future business from the client.

[Doc. 169-12, *DiLoreti v. Countrywide Home Loans, Inc.,* No. 5:14-cv-76 (N.D. W.Va. Nov. 14, 2014), Order Granting Bank Defendants' Motion in Part and Denying in Part and Denying Funari's Motion for Judgment on the Pleadings, at 7].

Plaintiffs propose that if this Court finds that passing estimated values to appraisers does constitute unconscionable conduct or a breach of contract, the case will then proceed to Phase II.  During Phase II, plaintiffs propose to ask the Court to address whether a statutory penalty should be awarded for any violation of the WVCCPA, and if so, in what amount.  Under West Virginia Code § 46A-5-101, a Court may award a statutory penalty if it finds that the defendants engaged in "unconscionable conduct."  Plaintiffs also ask the Court to address whether a refund of the appraisal fees paid by class members is warranted under the CCPA or due to the breach of contract.

33

Finally, in Phase III, plaintiffs suggest that the Court address any individualized questions and permit class members who believe they have additional individual damages due to defendants' conduct to present those damages.  Trial courts have great discretion to conduct and manage litigation in an efficient and equitable manner.  Manual for Comp. Litig., at Introduction,10.13 (4th ed. 2005).  Particularly in the context of a class action, Rule 23 "allows district courts to devise imaginative solutions to problems created by… [determining] individual damages issues."  *Carnegie v. Household Int'l, Inc.*, 376 F.3d 656, 661 (7th Cir. 2004); *see also* *In re Scientific Atlantic Inc., Sec. Litig.,* 571 F.Supp.2d 1315, 1343 (N.D. Ga. 2007) (quoting *Carnegie* for this proposition and certifying class upon finding, "even if the Court ultimately concludes that aggregate damages models are not sufficiently reliable for use in this case, the Court is convinced that other viable alternatives exist to address any individual damages issues that may arise.").  Accepted methods of assessing the individual issues relating to class members include:

> (1) bifurcating liability and damage trials with the same or different juries; (2) appointing a magistrate judge or special master to preside over individual damages proceedings; (3) decertifying the class after the liability trial and providing notice to class members concerning how they may proceed to prove damages; (4) creating subclasses; or (5) altering or amending the class.

*Id*. (citing *In re Visa Check/MasterMoney Antitrust Litig.,* 280 F.3d 124, 141 (2d Cir. 2001)).

This Court used a similar process to resolve a similar class action in *Dijkstra v. Carenbauer*, No. 5:11-cv-152 (N.D. W.Va.). Specifically, in *Dijkstra*, the Court made liability findings on the class claims and awarded statutory and disgorgement damages on a class-wide basis, and then allowed for individual class members to come forward with any claims of actual damages beyond those compensable on a class-wide basis.  [*Dijkstra* Orders at Docs. 210 & 242].   The defendant in *Dijkstra* filed two separate petitions for appeal, challenging this Court's certification decisions.  Both were rejected. (*See* U.S.C.A. Case No. 13-107, petition denied Feb. 6, 2013 [*Dijkstra*  Doc. 129]; U.S.C.A. Case No. 14-386, petition denied July 31, 2014 [*Dijkstra*  Doc. 256]).

I.      **Numerosity**:

"Rule 23(a)(1) requires that the class be of sufficient size that joinder of all members is 'impracticable.'  In determining whether joinder is impracticable, a court should analyze the factual circumstances of the case rather than relying on numbers alone.  *Cypress v. Newport News Gen. & Nonsectarian Hosp. Ass'n,* 375 F.2d 648 (4th Cir. 1967).  Factors to be considered are 'the estimated size of the class, the geographic diversity of class members, the difficulty of identifying class members, and the negative impact of judicial economy if individual suits were required.'  *Christman v. American Cyanamid Co.,* 92 F.R.D. 441, 451 (N.D. W.Va. 1981);  *McGlothlin v. Connors,* 142 F.R.D. 626, 632 (W.D. Va. 1992)."  *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. 221, 237 (S.D. W.Va. 2005) (Goodwin, J.).

"Impracticable does not mean impossible."  *Hewlett v. Premier Salons, Int'l, Inc.*, 185 F.R.D. 211, 215 (D. Md. 1997) (Chasanow, J.)(quoting *Robidoux v. Celani*, 987 F.2d

931, 935 (2d Cir. 1993)).  "When a class is extremely large, the numbers alone may allow the court to presume impracticability of joinder.  *Buford v. H & R Block, Inc.,* 168 F.R.D. 340, 348 (S.D. Ga. 1996) (citing *Finnan v. L.F. Rothschild & Co., Inc.,* 726 F.Supp. 460, 465 (S.D. N.Y. 1989); *Riordan v. Smith Barney,* 113 F.R.D. 60, 62 (N.D. Ill. 1986)). There is no bright line test for determining numerosity; the determination rests on the court's practical judgment in light of the particular facts of the case. *Id.* (citing *Deutschman v. Beneficial Corp.,* 132 F.R.D. 359, 371 (D. Del. 1990))." *Id.*

There is no set minimum number of potential class members that fulfills the numerosity requirement.  *See Holsey v. Armour & Co.,* 743 F.2d 199, 217 (4th Cir. 1984) (citing *Kelley v. Norfolk & Western Ry. Co.,* 584 F.2d 34 (4th Cir. 1978)).  However, where the class numbers twenty-five or more, joinder is usually impracticable.  *Cypress v. Newport News General & Nonsectarian Hosp. Ass'n,* 375 F.2d 648, 653 (4th Cir. 1967) (eighteen class members sufficient).

Quicken has already admitted that, based on the allegations in the First Amended Complaint, "the number of members of all proposed plaintiff classes well exceeds 100." [Doc. 1].  The numerosity requirement is therefore satisfied.

## II.    **Commonality**:

Rule 23(a)(2) requires a showing of the existence of "questions of law or fact common to the class."  Rule 23(b)(3) requires that questions of law or fact common to the class predominate over any questions affecting only individual members.  The Fourth Circuit has held that "[i]n a class action brought under Rule 23(b)(3), the 'commonality' requirement of Rule 23(a)(2) is 'subsumed under, or superseded by, the more stringent

36

Rule 23(b)(3) requirement that questions common to the class "predominate over" other questions.'" **Lienhart v. Dryvit Sys., Inc.**, 255 F.3d 138, 147 n. 4 (4th Cir. 2001)(quoting **Amchem**, 521 U.S. at 609).  Because this is a class action brought under Rule 23(b)(3), this Court will analyze the two factors together in the predominance section of this opinion. See **In re LifeUSA Holding Inc.,** 242 F.3d 136, 144 (3d Cir. 2001) (analyzing the two factors together).

III.    **Typicality**:

"To satisfy the typicality requirement under Rule 23(a)(3), the 'claims or defenses of the representative parties [must be] typical of the claims or defenses of the class.' Fed.R.Civ.P. 23(a)(3).  'A sufficient nexus is established [to show typicality] if the claims or defenses of the class and class representatives arise from the same event or pattern or practice and are based on the same legal theory.'  **In re Terazosin Hydrochloride Antitrust Litig.,** 220 F.R.D. 672, 686 (S.D. Fla. 2004) (quoting **Kornberg v. Carnival Cruise Lines, Inc.,** 741 F.2d 1332, 1337 (11th Cir. 1984)); see also **In re Diet Drugs,** 2000 WL 1222042 at *43 (E.D. Pa. Aug. 28, 2000).  The class representatives and class members need not have suffered identical injuries or damages.  **United Broth. of Carpenters v. Phoenix Assoc., Inc.,** 152 F.R.D. 518, 522 (S.D. W.Va. 1994);  see also **Mick v. Ravenswood Aluminum Corp.,** 178 F.R.D. 90, 92 (S.D. W.Va. 1998)."  **In re Serzone Prods. Liab. Litig.**, 231 F.R.D. 221, 238 (S.D. W.Va. 2005) (Goodwin, J.).

"The typicality requirement has been observed to be a redundant criterion, and some courts have expressed doubt as to its utility.  **Buford,** 168 F.R.D. at 350 (citing **Sanders v. Robinson Humphrey/American Express, Inc.,** 634 F.Supp. 1048, 1056 (N.D. Ga.

1986), *aff'd in part, rev'd in part on other grounds sub nom.*, **Kirkpatrick v. J.C. Bradford & Co.**, 827 F.2d 718 (11th Cir. 1987), *cert. denied,* 485 U.S. 959 (1988)).  Some courts treat typicality as overlapping with commonality, *see* **Zapata [v. IBP, Inc.**], 167 F.R.D. at 160; *cf.* **Falcon***,* 457 U.S. at 157 n. 13 (noting that typicality and commonality 'tend to merge'); other courts equate typicality with adequacy of representation.  **Buford***,* 168 F.R.D. at 350 (citing **Alfus v. Pyramid Technology Corp.**, 764 F.Supp. 598, 606 (N.D. Cal. 1991)). Typicality determines whether a sufficient relationship exists between the injury to the named plaintiff and the conduct affecting the class, so that the court may properly attribute a collective nature to the challenged conduct.  **Zapata***,* 167 F.R.D. at 160 (citing 1 *Newberg on Class Actions* § 3.13).  A plaintiff's claim may differ factually and still be typical if 'it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.' **Id**. (quoting 1 *Newberg on Class Actions* § 3.13).  So long as the plaintiffs and the class have an interest in prevailing in similar legal claims, then the typicality requirement is satisfied.  **Buford***,* 168 F.R.D. at 351 (citing **Meyer v. Citizens and Southern Nat'l Bank**, 106 F.R.D. 356, 361 (M.D. Ga. 1985)).  The existence of certain defenses available against plaintiffs that may not be available against other class members has been held not to preclude a finding of typicality. *See* **id***.* (citing **International Molders' and Allied Workers' Local Union No. 164 v. Nelson**, 102 F.R.D. 457, 463 (N.D. Cal. 1983)).  The burden of showing typicality is not meant to be an onerous one, but it does require more than general conclusions and allegations that unnamed individuals have suffered discrimination. **Kernan***,* 1990 WL 289505, at *3 (citing **Paxton v. Union Nat'l Bank**, 688

F.2d 552, 556 (8th Cir. 1982), *cert. denied,* 460 U.S. 1083 (1983)).” **Hewlett v. Premier**

**Salons, Int'l, Inc.**, 185 F.R.D. 211, 216 (D. Md. 1997) (Chasanow, J.).

In this case, the claims of each of the putative class members arise from the same

pattern or practice on the part of the defendants - the provision of a target value to its

selected appraiser without the knowledge of the borrower.  This Court finds that the

requested class satisfies the typicality requirement.

**IV.**     **Adequacy of Representation**:

“The final requirement of Rule 23(a) is set forth in subsection (4), which requires that

‘the representative parties will fairly and adequately protect the interests of the class.’

*Fed.R.Civ.P.* 23(a)(4).  This determination requires a two-pronged inquiry: (1) the named

plaintiffs must not have interests antagonistic to those of the class; and (2) the plaintiffs'

attorneys must be qualified, experienced and generally able to conduct the litigation**.**

**Hewlett v. Premier Salons Int'l, Inc.,** 185 F.R.D. 211, 218 (D. Md. 1997).” **Serzone**, 231

F.R.D. at 238.

The defendants do not contest plaintiffs’ counsel’s ability to conduct the litigation,

nor does this Court.  The defendants have not pointed out any interests that the named

plaintiffs have that are antagonistic to the interests of the proposed class.

Accordingly, this Court finds that the named plaintiffs and their counsel are able to

fairly and adequately protect the interests of the class.

**V.**     **Predominance**

The first factor under Rule 23(b)(3) requires that the questions of law or fact

common to all class members predominate over questions pertaining to individual

members.  *In re Serzone Prods. Liab. Litig.*, 231 F.R.D. at 239.  Common questions predominate if class-wide adjudication of the common issues will significantly advance the adjudication of the merits of all class members' claims.

"The predominance inquiry 'tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.'"  *Lienhart*, 255 F.3d at 147 (quoting *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 623 (1997)); *Gariety v. Grant Thornton, LLP*, 368 F.3d 356, 362 (4th Cir. 2004).

In this case, the issues common to all class members predominate over any individual questions.  There is no dispute that the defendants provided a target value to the appraisers which they selected.  The liability phase of this case presents the following issues, which are common to all potential class members:

(1)     whether defendants' practice of passing owners' estimates of value constitutes unconscionable inducement under the CCPA;

(2)     whether defendants' breached the parties' contracts;

(3)     whether class members are entitled to statutory penalties for each violation of the West Virginia Consumer Credit and Protection Act; and

(4)     whether borrowers should receive a refund of the appraisal fees that they paid.

The common questions discussed above predominate.  To put this into perspective, either it was permissible for Quicken to send appraisal request forms with target numbers or not.  *See Dijkstra v. Carenbauer, supra,* 2014 WL 791140, at *14 (granting affirmative

judgment on class procedural unconscionability claim when defendant lender used non-attorneys to close loans and charged illegal notary fees).

If Quicken violated the law, plaintiffs will ask this Court to award statutory damages and set an amount.  These resolutions will largely dispose of this litigation.  Surely these determinations are much more straightforward than other certified classes of which the Fourth Circuit has approved.  *See, e.g., **Brown v. Nucor Corp.**, 785 F.3d 895 (4th Cir. 2015) (vacating district court's decertification of Title VII class of black steelworkers and remanding with instructions to certify the class in light of the "inherent cohesiveness of the class");  **Gray v. Hearst Communs., Inc.**, 444 Fed. Appx. 698, 702 (4th Cir. 2011) (affirming certification of advertisers' class claims for breach of contract, breach of the implied covenant of good faith and fair dealing, and unfair and deceptive trade practices against directory distributors upon finding that "the common question regarding [defendant's] distribution obligation predominates over any individual issues because the putative class members all assert injury from the same action (*i.e.* failure by [defendant] to follow its standard distribution practice), and determination of whether [defendant] breached its standard distribution obligation will resolve in one stroke an issue that is central to the validity of the class members' breach of contract claims"); **Central Wesleyan v. W.R. Grace & Co.**, 6 F.3d 177, 188 (4th Cir. 1993) (affirming conditional certification of a nationwide class of colleges and universities with asbestos in their buildings despite the "daunting number of individual issues", including the ability of each college to prove liability, differing statutes of limitation, differing asbestos products and exposures, present in the case).

Courts nationwide frequently recognize that cases involving fee overcharging are appropriate for class treatment.  *See* ***Mahon v. Chicago Title Ins. Co.,*** 296 F.R.D. 63 (D. Conn. 2013) (certifying class of persons overcharged for title insurance in connection with refinance transactions, explaining that "[t]he statutorily filed premium rates must be applied uniformly" and that in "each transaction, (i) the putative class member paid the premium charged/collected by [defendant] in exchange for a title insurance policy; (ii) [defendant] was required by law to charge a premium in accordance with its filed rates; (iii) the putative class member paid the premium charged by [defendant], which was an overcharge; and (iv) the putative class member was damaged by being overcharged for the title insurance); ***Spano v. Boeing Co.,*** 294 F.R.D. 114 (S.D. Ill. 2013) (certifying ERISA class with various subclasses alleging imposition of excessive fees, noting several times that certification was appropriate because plaintiffs had alleged that all class members had complaints concerning the excessive fees); ***Markocki v. Old Republic Nat'l Title Ins. Co.,*** 2015 WL 3421401 (E.D. Pa. May 27, 2015) (declining to decertify class claim under Real Estate Settlement Procedures Act where common question was whether defendant split a charge for settlement services not actually performed, and question predominated over any individual issues).

The issues common to the class predominate over any individual issues here.  The central issue is whether passing an estimated value constitutes unconscionable conduct or a breach of the parties' contract.  The Court can award class-wide damages in the form of statutory penalties and a refund of any fees paid.

These common questions are broad and apply to all potential class members. Accordingly, the predominance requirement is met.

## VI.    Superiority

"The superiority test of Rule 23(b)(3) requires the court to find that the class action instrument would be better than, not just equal to, other methods of adjudication. The four factors listed in this subsection (interest in controlling individual prosecutions, existence of other related litigation, desirability of forum, and manageability) are simply a guideline to help the court determine the benefit of the proposed class action. Advisory Committee's Notes to Fed.R.Civ.P. 23." **Hewlett v. Premier Salons, Intern., Inc.**, 185 F.R.D. 211, 220 (D. Md. 1997).

## A.    Interest in controlling individual prosecutions

"The first factor identified in the rule is 'the interest of members of the class in individually controlling the prosecution or defense of separate actions.' Fed.R.Civ.P. 23(b)(3)(A). 'This factor has received minimal discussion in Rule 23(b)(3) actions.' **Buford**, 168 F.R.D. at 361 (quoting 1 Newberg on Class Actions § 4.29). According to the drafters of the rule:

> The interests of individuals in conducting separate lawsuits may be so strong as to call for denial of a class action. On the other hand, these interests may be theoretic[al] rather than practical; the class may have a high degree of cohesion and prosecution of the action through representatives would be quite unobjectionable, or the amounts at stake for individuals may be so small that separate suits would be impracticable.

43

Advisory Committee's Notes to Fed.R.Civ.P. 23." *Hewlett*, at 220-21.

This case falls into the latter category, considering the likely relatively small potential individual recoveries, and fact that no other cases appear to have been filed.

## B.    Existence of other related litigation

"Under Rule 23(b)(3)(B), the court should consider the 'extent and nature of any litigation concerning the controversy already commenced by or against members of the class.'  This factor is intended to serve the purpose of assuring judicial economy and reducing the possibility of multiple lawsuits.  7A *Federal Practice and Procedure* § 1780, at pp. 568-69.  'If the court finds that several actions already are pending and that a clear threat of multiplicity and a risk of inconsistent adjudications actually exist, a class action may not be appropriate since, unless the other suits can be enjoined, which is not always feasible, a Rule 23 proceeding only might create one more action. . ..  Moreover, the existence of litigation indicates that some of the interested parties have decided that individual actions are an acceptable way to proceed, and even may consider them preferable to a class action.  Rather than allowing the class action to go forward, the court may encourage the class members who have instituted the Rule 23(b)(3) action to intervene in the other proceedings.'  *Id*. at 569-70." *Hewlett*, at 221.

This factor is, in this case, a non-factor, since this Court has been made aware of no other lawsuits against the defendants concerning this issue.

## C.    Desirability of forum

Rule 23(b)(3)(C) requires the court to evaluate the desirability of concentrating the litigation in a particular forum.  Because all of the potential class members are residents of the State of West Virginia, because the class representative and class counsel live here, and because defendant has counsel here, this forum is as good as any.

## D.    Manageability

"The last factor that courts must consider in relation to superiority is the difficulty that may be 'encountered in the management of the class action.'  Fed.R.Civ.P. 23(b)(3)(D). 'Of all the superiority factors listed in Rule 23, *manageability* has been the most hotly contested and the most frequent ground for holding that a class action is not superior.'  **Buford**, 168 F.R.D. at 363 (quoting 1 *Newberg on Class Actions* § 4.32).   Some courts have said, however, '[t]here exists a strong presumption against denying class certification for management reasons.'  *Id.* (citing **In re Workers' Compensation**, 130 F.R.D. 99, 110 (D. Minn. 1990); **In re South Central States Bakery Prod. Antitrust Litig.**, 86 F.R.D. 407, 423 (M.D. La. 1980))."  **Hewlett**, at 221.

"The manageability inquiry includes consideration of the potential difficulties in identifying and notifying class members of the suit, calculation of individual damages, and distribution of damages.  **Six Mexican Workers v. Arizona Citrus Growers**, 904 F.2d 1301, 1304 (9th Cir. 1990); **Maguire v. Sandy Mac, Inc.**, 145 F.R.D. 50, 53 (D. N.J. 1992); **Kernan** [**v. Holiday Universal, Inc.**], 1990 WL 289505 at *7 [D. Md. Aug. 14, 1990]; **In re Folding Carton Antitrust Litig.**, 88 F.R.D. 211, 216 (N.D. Ill. 1980)."  **Hewlett**, at 221-22.

In **Gunnells v. Healthplan Servs., Inc.**, 348 F.3d 417 (4th Cir. 2003), the Fourth Circuit stated:

45

First, it appears likely that in the absence of class certification, very few claims would be brought against TPCM, making "the adjudication of [the] matter through a class action ... superior to no adjudication of the matter at all." *See* 5 *Moore's Federal Practice* § 23.48[1] (1997). Thus, class certification will provide access to the courts for those with claims that would be uneconomical if brought in an individual action. As the Supreme Court put the matter, "[t]he policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights." *Amchem*, 521 U.S. at 617 (citation omitted).

348 F.3d at 426.

In this case, the plaintiff's claims are easily susceptible to resolution on a classwide basis. The plaintiff has already obtained basic class list information, and Quicken can readily supply additional details regarding the identity of class members.

In the event that the class would become unmanageable, this Court can decertify the class. *Gunnells v. Healthplan Servs., Inc.*, 348 F.3d at 426 (4th Cir. 2003); *Central Wesleyan College v. W.R. Grace & Co.*, 6 F.3d 177, 184 (4th Cir. 1993).

Likewise, in the unlikely event that damages issues would require individual inquiry, the damage issues may be bifurcated. "Rule 23 contains no suggestion that the necessity for individual damage determinations destroys commonality, typicality, or predominance, or otherwise forecloses class certification. In fact, Rule 23 explicitly envisions class actions with such individualized damage determinations. *See* Fed.R.Civ.P. 23 advisory

committee's note (1966 Amendment, subdivision (c)(4)) (noting that Rule 23(c)(4) permits courts to certify a class with respect to particular issues and contemplates possible class adjudication of liability issues with 'the members of the class ... thereafter ... required to come in individually and prove the amounts of their respective claims.'); *see also* 5 *Moore's Federal Practice* § 23.23[2] (1997) ('[T]he necessity of making an individualized determination of damages for each class member generally does not defeat commonality.'). Indeed, '[i]n actions for money damages under Rule 23(b)(3), courts *usually* require individual proof of the amount of damages each member incurred.' *Id.* at § 23.46[2][a] (1997) (emphasis added).  When such individualized inquiries are necessary, if 'common questions predominate over individual questions as to liability, courts generally find the predominance standard of Rule 23(b)(3) to be satisfied.' *Id.*" *Gunnells*, at 427-28.

"Courts have routinely rejected this argument, concluding, as we have in previous cases, that the need for individualized proof of damages alone will *not* defeat class certification.  *See* **Central Wesleyan***,* 6 F.3d at 189;  **Hill v. W. Elec. Co., Inc.***,* 672 F.2d 381, 387 (4th Cir. 1982) ('Bifurcation of ... class action proceedings for hearings on ... damages is now commonplace.');  **Chisolm v. TranSouth Fin. Corp.***,* 184 F.R.D. 556, 566 (E.D. Va. 1999) (collecting cases)." **Gunnells***,* at 429 (emphasis in original).

Quicken contends that its statute of limitations defense presents a barrier to certification.  The statute of limitations for the WVCCPA claims is provided by West Virginia Code § 46A-5-101(1), which states that no action may be brought more than one year after the due date of the last scheduled payment.  W.Va. Code § 46A-5-101(1).  Both the West Virginia Supreme Court and the Fourth Circuit have confirmed that this means that "the

statute of limitation begins to run on the date under the parties' agreement providing for the final periodic payment of the debt." Syl. pt. 6, *Tribeca Lending Corp. v. McCormick,* 231 W.Va. 455, 745 S.E.2d 493 (2013); *see also Delebreau v. Bayview Loan Serv., LLC,* 680 F.3d 412, 415 (4th Cir. 2012). The statute of limitations for the conspiracy claim is determined by the nature of the underlying conduct on which the conspiracy claim is based. Syl. pt. 3, *Dunn v. Rockwell,* 225 W.Va. 43, 689 S.E.2d 255 (2009). Breach of contract claims have a ten year statute of limitations. W.Va. Code § 55-2-6. The statute of limitations for the RMLA claim is two years from the date of closing. W.Va. Code § 55-2-12; *Fluharty v. Quicken Loans, Inc.,* 2013 WL 5963060 (N.D. W.Va. Nov. 7, 2013). Quicken has presented no compelling reason why the group of class members whose claims fall within any of these statutes of limitation cannot be determined.

Quicken's argument that individualized statute of limitations issues preclude class certification, [Doc. 185 at 17-20], ignores one important truth: while it is plaintiffs' burden to meet the requirements of Rule 23, *Thorn v. Jefferson-Pilot Life Ins. Co.,* 445 F.3d 311, 321 (4th Cir. 2006), it is *defendant's burden* to establish a statute of limitations defense. *Hanshaw v. Wells Fargo Bank,* 2015 WL 5345439, at fn. 5 (S.D. W.Va. Sept. 11, 2015) (Johnston, J.)(citing *Burgess v. Infinity Fin. Employment Servs., LLC,* 2012 WL 399178, at *5 (S.D. W.Va. Feb. 7, 2012)).

It is therefore defendants' burden to demonstrate that any loan in the class is time barred, and Quicken argues that it cannot do so because it sells the mortgage loans after origination and does not have records about them after that time. [Doc. 185 at 19]. None of the cases on which defendants rely, [Id. at 18], present a situation, like here, where a

defendant in a proposed class action failed to produce evidence supporting its own affirmative defense because of its own record keeping practices.  *See, e.g. **Hunter v. Am. Gen. Life & Acc. Ins. Co.**,* 2004 WL 5231631, \*12 (D.S.C. Dec. 2, 2004) (individualized statute of limitations issues arose because of questions about when class members had inquiry notice.)

It is not plaintiffs' obligation to discover facts about Quicken's defense.   In the absence of any such evidence, this argument must fail.  *See **Sensormatic Sec. Corp. v. Sensormatic Elec. Corp.**,* 455 F.Supp.2d 399, 425 (D. Md. 2006) (defendant failed to meet burden of proof on statute of limitations defense when it presented insufficient proof of when plaintiff was on notice of alleged tort);   ***In re Falwell**,* 434 B.R. 779, 786 (Bankr. W.D. Va. 2009) (refusing to sustain objection based on statute of limitation when defendant provided no evidence in support.)

In the event defendants produce evidence about the loans, determining which loans fall within the applicable period would ultimately prove to be a ministerial exercise.  Plaintiffs do not dispute that the statute of limitations under § 46A-5-101 is affected by certain circumstances of the loan such as acceleration.  *See, e.g., **Delebreau v. Bayview Loan Serv., LLC**,* 680 F.3d 412, 416 (4th Cir. 2012).  This is a simple task which Quicken could perform, but has not.  For example, electronic information exists from Fannie and Freddie on defaults, accelerations, discharges, and payoffs.   Defendants did not ask for this information [Doc. 193-12, at 50:2-18], but it could be used to identify and match with those loans.  Similar information is held by MERS.  [Id. at 54:8-17].  Moreover, the bulk of its loans were sold to Countrywide, JP Morgan, Bank of America or Wells Fargo.  [Id. at

49

49:15-25].   Quicken could certainly request or subpoena records from these entities. Quicken has not availed itself of these readily available sources.  Further, all the deeds of trust were recorded, so determining whether the statutes of limitation are affected by early repayment or foreclosure is simply a matter of searching public records to identify those loans that have not been either paid and released or foreclosed upon one year prior to the filing of the Complaint.

According to plaintiffs, this exercise is what the parties successfully performed in *Dijkstra*.  In that case, the Court certified the class after requesting and receiving briefing specifically on the statute of limitations issue.  After certification and judgment, the parties worked collaboratively to identify which class members' loans fit into the certified class definitions based on the limitation period.  Like Quicken here, the defendant in *Dijkstra* was an internet lender, and that defendant, LendingTree, in the same position as Quicken, was able to perform this ministerial task.

Finally, even if the defendants could present evidence regarding the class loans, plaintiffs have demonstrated that the practice of passing on estimated values to appraisers was unknown and not disclosed by defendants to borrowers, therefore tolling the statute. This was precisely the case last year in a Third Circuit decision affirming class certification. *In re Comm. Bank of N. Va. Mortg. Lending Prac. Litig.,* 795 F.3d 380, 400-405 (3d Cir. 2015).  In *Community Bank,* the defendant argued that equitable tolling was a "highly individualized inquiry that is not susceptible to common proof" and that "inquiries about equitable tolling" would predominate. 795 F.3d at 400.  The court disagreed, finding that plaintiffs had shown an "independent act of concealment with respect to each loan"

50

because material facts had been misrepresented in the HUD-1 settlement statements used in closing the loans of each class member.  *Id*. at 402.  The court therefore found that common issues predominated over individual issues as to whether applicable statutes of limitation on class members' claims were equitably tolled due to concealment.  *Id*. at 403; *see also **In re Urethane Antitrust Litig.,*** 251 F.R.D. 629, 639-40 (D. Kan. 2008) (predominance and superiority requirements satisfied upon allegations that manufacturers engaged in a horizontal price-fixing conspiracy when key issues of antitrust impact and fraudulent concealment were susceptible to common proof on a class-wide basis.)  As in ***Community Bank,*** plaintiffs and the class members assert a common theory of concealment which would uniformly toll all of their claims.

Because this Court can easily determine whether the discovery rule applies class-wide to toll class members' claims, defendant's statute of limitations argument presents no barrier to certification.  *See **Hamilton v. Pilgrim's Pride Corp.,*** 314 F.Supp.2d 630, 635 (N.D. W.Va. 2004) (under West Virginia law, the discovery rule tolls the statute of limitation until a claimant knows or by reasonable diligence should know that he has been injured and who is responsible).

This was the conclusion of the Southern District of California in ***Cohen v. Trump,*** 303 F.R.D. 376, 387 (S.D. Cal. 2014).  In ***Cohen,*** the court granted class certification of mail and wire fraud claims based on advertising for a real-estate investment seminar, over defendant Trump's arguments that individualized determinations on statute of limitations defense would be necessary.  The plaintiff had countered that the action was a "prototypical case where a statute of limitations defense does not undermine class certification because

all of the facts that Trump claims satisfy the discovery rule are the same as to all Class members." 303 F.R.D. at 387. The court agreed and recognized that discovery facts "apply to nearly all of the putative class members and constitute common proof" regarding discovery of alleged injury. *Id.; see also* **Kennedy v. United Healthcare of Ohio, Inc.,** 206 F.R.D. 191, 199 (S.D. Ohio 2002) (finding superiority and manageability satisfied and certifying class when evidence of discovery of claim "may be amenable to a common proffer.").

Rule 23(g) requires that a court certifying a class also appoint class counsel. The Rule directs a court to consider several factors, including "[t]he work counsel has done in identifying or investigating potential claims in the action; [c]ounsel's experience in handling class actions, other complex litigation, and claims of the type asserted in the action; [c]ounsel's knowledge of the applicable law; and [t]he resources counsel will commit to representing the class." Fed. R. Civ. P. 23(g)(1)(C)(i).

Proposed class counsel are qualified and able to represent the class. Bailey & Glasser in particular is well-versed in class action litigation. [*See* Doc. 169-16]. Jason Causey and the attorneys of Bordas & Bordas are also experienced consumer class action litigators. [*Id.*].

For the reasons stated above, Plaintiffs' Motion for Class Certification [Doc. 169] will be granted. This Court will conditionally certify the following class:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and
> for whom Quicken obtained appraisals through an appraisal request form that
> included an estimate of value of the subject property.

52

**Plaintiffs' Motion for Partial Summary Judgment**

In their Motion, the plaintiffs seek summary judgment on the following issues:

(1)     whether the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was unconscionable inducement under W.Va. Code § 46A-2-121 (Count IV);

(2)     whether the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was a breach of the implied covenant contained in Quicken's contract with the borrower (Count VII);

(3)     whether Quicken's routine assessment of $45 courier fees which did not reflect the actual cost of the services provided constitutes unauthorized charges under the West Virginia Consumer Credit and Protection Act ("WVCCPA") and West Virginia Residential Mortgage Lender, Broker and Servicer Act ("RMLA") such that affirmative summary judgment on Counts III (RMLA), and VI (Unauthorized Charges) is warranted; and

(4)     whether Defendants Quicken and TSI acted in concert to perform these acts such that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy claim (Count I).

This Court will not reiterate and rehash the law and facts discussed above.  With respect to the following this Court finds that, unless otherwise stated, there is no genuine issue as to any material fact and that a party is entitled to judgment as a matter of law.

1.      This Court finds that the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was unconscionable inducement under W.Va. Code § 46A-2-121;

2.      This Court finds that the act of sending an estimated or "target" value to an appraiser in connection with a real estate mortgage loan refinancing was a breach of the implied covenant of good faith and fair dealing contained in Quicken's contract with the borrowers;

3.      This Court finds that Quicken's routine assessment of $45 courier fees which did not reflect the exact, actual cost of the services provided does not constitute an unauthorized charge under the West Virginia Consumer Credit and Protection Act ("WVCCPA") and West Virginia Residential Mortgage Lender, Broker and Servicer Act ("RMLA"); and

4.      This court finds that defendants Quicken and TSI acted in concert to perform the acts above such that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy claim (Count I).

This Court has not heretofore discussed the conspiracy aspect of this case.  A civil conspiracy is:

> a combination of two or more persons by concerted action to accomplish an unlawful purpose or to accomplish some purpose not in itself unlawful, by unlawful means.  The cause of action is not created by the conspiracy but by the wrongful acts done by the defendants to the injury of the plaintiff.

*Dixon v. Am. Indus. Leasing Co.*, 162 W.Va. 832, 253 S.E.2d 150, 152 (1979).  "At its most fundamental level, a civil conspiracy is 'a combination to commit a tort.'"   *Wolfe v.*

54

*Tackett*, 2009 WL 973442, at *6 (S.D. W.Va. Apr. 9, 2009) (Copenhaver, J.)(quoting *Kessel v. Leavitt*, 204 W.Va. 95, 511 S.E.2d 720, 753 (1998)).

The undisputed evidence shows that Quicken and TSI consistently acted in concert to accomplish their unlawful purposes of providing appraisers with estimated values. Quicken's testimony is that when a borrower applied for a loan, information, including an owners' estimate of value would be generated.   [Doc. 173-11 at 20:25-21:12].   This information, along with a borrower's contact information, would be uploaded into Quicken's computer system, AMP, and then sent automatically to Quicken's sister company, TSI. [Doc. 173-11 at 30:5-11]; *see also* [Doc. 173-12 at 17:9-17].   TSI testified that it would in turn use this information, including the owners' estimate of value, to generate an appraisal request form. [Doc. 173-12 at 32:17-23].   The request form along with the owners' estimate of value would be passed to the appraiser selected by TSI to perform this practice.   [Id.]. The scheme of passing estimated values to appraisers thus involved the concerted efforts of both defendants, which happen to be owned by the same parent company.   [*See* Doc. 173-26 at 60:2-8].

While conspiracy claims against parent and child companies are generally not permitted under federal antitrust law, *Copperweld Corp. v. Independence Tube Corp.,* 467 U.S. 752 (1984), that holding is limited to the Sherman Act.   *Princeton Ins. Agency, Inc. v. Erie Ins. Co.*, 225 W.Va. 178, 185, 690 S.E.2d 587, 594 (2009).

Moreover, there is no prohibition on claims for conspiracy between or among "sister" or related companies like Quicken and TSI.   *See In re Ray Dobbins Lincoln-Mercury, Inc.,* 604 F.Supp. 203, 205 (W.D. Va. 1984), *judgment aff'd*, 813 F.2d 402 (4th Cir. 1985)

(finding "**Copperweld** is of no effect" as to conspiracy alleged between two subsidiaries and refusing to dismiss conspiracy claim against defendants with common parent); **Christou v. Beatport, LLC**, 849 F.Supp. 2d 1055, 1073 (D. Col. 2012) (refusing to dismiss conspiracy claim against "related entities" with "some common ownership").

### Defendants' Motions to Exclude the Opinions and Testimony of Matthew Curtin and Stephen McGurl

The defendants have moved to exclude the opinions and testimony of plaintiffs' expert witnesses Matthew Curtin and Stephen McGurl.  This Court did not rely upon the opinions of either witness in deciding the issues before it.  In light of the above rulings, it would appear to the Court that the Motions are moot.

### Defendants' Motion *In Limine* to Exclude Evidence of Appraisers Petition

In the above Motion, the defendants seek to exclude as not relevant an "Appraisers Petition" signed by a number of appraisers and sent to the Appraisal Subcommittee of the Federal Financial Institutions Examination Council.  The defendants argue that it is plain from the face of the Appraisers Petition that it has nothing to do with the owner's or applicant's estimate of value. Rather, the petition refers only to various categories of "pressure" that involve withholding business or refusing to pay or employ appraisers.  The defendants note that the Appraisers Petition does not even mention the owner's estimate of value, let alone complain that the practice of providing such an estimate is one of the ways in which lenders are "pressuring" appraisers.

In the 2000s, a petition was posted online at AppraisersForum.com, a general website for real estate appraisers.  The petition was signed by over 11,000 appraisers from across the country including one of the Plaintiffs' experts, Troy Sneddon.  Eventually, the

signed petition was provided to the Appraisal Subcommittee of the Federal Financial Institution Examination Council and other federal and state regulatory agencies.

The petition expressed concern over an ongoing "problem" within the mortgage industry--i.e., lenders "who, as a normal course of business, [were] apply[ing] pressure on appraisers to hit or exceed a predetermined value."  Among other things, lenders threatened to refuse payment, withhold future business, or even blacklist appraisers for failing to inflate their appraisals so as to meet or exceed the lender's target figure.  As a result, the independent judgment of appraisers was being compromised.  Furthermore, the appraisers contended that homeowners were being damaged by purchasing overvalued homes and the economy as a whole faced the prospect of "great financial loss."  The appraisers signing the petition urged regulators to "hold…lenders responsible" for this misconduct and to provide for an appropriate penalty.

As noted above, in a similar case, this Court recognized the plausible "inference" created when a bank provides appraisers with suggested or estimated values of homes:

> Taken as true, these allegations create an inference that [lenders'] practice of providing estimated values of homes was for the purpose of influencing the appraiser's independent judgment. It certainly is plausible that an appraiser would seek to meet a client's suggested outcome in order to receive future business from the client.

[Doc. 169-12, *DiLoreti v. Countrywide Home Loans, Inc.,* No. 5:14-cv-76 (N.D. W.Va. Nov. 14, 2014), Order Granting Bank Defendants' Motion in Part and Denying in Part and Denying Funari's Motion for Judgment on the Pleadings, at 7].

The petition is relevant to demonstrate that in fact pressure was being placed on appraisers to meet target values.  Rule 401 of the Federal Rules of Evidence establishes a broad, liberal test for relevancy.  Professor Cleckley has noted that "[d]eterminations of relevancy…are based on the presence of a nexus, that is, a relationship between the evidence offered for admission and a fact or issue of consequence to the case."  F. Cleckley, *Handbook on Evidence for West Virginia Lawyers* §4-1(E)(3).  The test for relevancy, in essence, is one of probability: "[W]hether a reasonable person, with some experience in the everyday world, would believe that this piece of evidence **might** be helpful in determining the falsity or truth of any material fact."  *Id.*, at §4-1(C) (emphasis in original).  Moreover, the Fourth Circuit recognizes that industry standard evidence is relevant.  *See, e.g.,* ***Advo-System. Inc. v. Maxway Corp.,*** 37 F.3d 1044, 1048 (4th Cir. 1994) ("ordinary business terms" analysis requires reference to prevailing industry standards); ***Reed v. Tiffin Motor Homes, Inc.,*** 697 F.2d 1192, 1196 (4th Cir. 1982) (industry standards are relevant to show reasonableness of design).

Here, the petition is relevant to show that appraisers understood the deleterious effects of providing any kind of target value. Indeed, the petition acknowledges that influencing appraisers was inappropriate under industry standards because it stripped appraisers of their independent judgment and resulted in a dishonest and potentially harmful process.  Furthermore, the petition is relevant because it confirms that the practice of using target figures was widely, if not universally, condemned.  For these reasons, the petition is both relevant and admissible, and defendants' motion will be denied.

**Defendants' Motion *In Limine* to Exclude Evidence or Argument
Related to The Home Valuation Code of Conduct or Dodd-Frank Act**

58

In this Motion, the defendants seek to exclude as not relevant evidence concerning the Home Valuation Code of Conduct ("HVCC") or the Dodd-Frank Wall Street Reform and Consumer Protection Act ("Dodd-Frank") on the basis that the HVCC went into effect in May 2009 and that Title Source made changes to its appraisal request forms for the specific purpose of complying with the HVCC.  Dodd-Frank was not enacted until July 21, 2010 – by which time it had been more than a year since Title Source had stopped including the owner's estimate of value on appraisal engagement letters.  In addition, defendants argue that Dodd-Frank does not address the owner's estimate of value.

The plaintiffs reply that they are not attempting to show that the defendants violated HVCC or Dodd-Frank, rather the plaintiffs contend that the fact that certain actions are prohibited by these remedial provisions is evidence of unconscionable conduct.  With the passage of Dodd-Frank in 2010, enforcement against appraiser influence finally came. *See* 15 U.S.C. § 1639e (2010).  Federal guidelines interpreting the Dodd-Frank Act expressly prohibit a lender from "[c]ommunicating a predetermined, expected, or qualifying estimate of value, or a loan amount or target loan-to-value ratio to an appraiser or person performing an evaluation." 75 Fed. Reg. 77450, 77457 (2010).

In addition, the provisions of HVCC and Dodd-Frank refute the position taken by defendants that there is some difference between sending the "owner's estimate of value" to an appraiser as opposed to a "target value."  The HVCC prohibits lenders and their appraisal management companies from "providing to an appraiser an anticipated, estimated, encouraged, or desired value for a subject property or a proposed or target amount to be loaned to the borrower."

Moreover, TSI has acknowledged that Dodd Frank banned this practice.  [Doc. 211-3, Petkovski Dep. at 96:13-97:17].  Specifically, TSI's representative testified that TSI's "Dodd-Frank Compliance and Non-Influence Certificate" states that TSI does not provide estimated values, loan amounts, or loan-to-value ratios to the appraiser, and prohibits appraiser communications with the lender-client and borrower property owner, in order to be "consistent with elements of Dodd-Frank."

For these reasons, defendants' motion will be denied.


**Plaintiffs' Motion to Strike Portions of the of Sherry Dukic Declaration**

The plaintiffs have moved to strike portions of the Sherry Dukic Declaration which are inconsistent with her deposition testimony.  While this Court did rely upon portions of Ms. Dukic's declaration in ruling on the pending motions, the Court did not rely upon the portions of the declaration which the plaintiffs seek to have stricken.  Furthermore, in light of this Court's ruling on the issue of courier fees, this declaration will no longer be relevant.  Accordingly, the Motion will de denied as moot.


**Conclusion**

For the reasons stated above:

1.     Defendant Hyett's Motion for Summary Judgment [**Doc. 172**] is **DENIED AS MOOT**;

2.      The Motion for Summary Judgment filed by Quicken and TSI, Inc. [**Doc. 174**] is **DENIED IN PART AND GRANTED IN PART**.  The claim related to providing a value to the appraiser will go forward.  The claim regarding courier fees is dismissed;

3.      Plaintiffs' Motion for Class Certification [**Doc. 169**] is **GRANTED**.  This Court will conditionally certify the following class:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and
>
> for whom Quicken obtained appraisals through an appraisal request form that
>
> included an estimate of value of the subject property.

4.      Plaintiffs' Motion for Partial Summary Judgment [**Doc. 173-1**] is **GRANTED IN PART AND DENIED IN PART**.  Specifically:

> A.      This Court finds that the act of sending an estimated or "target" value
>
> to an appraiser in connection with a real estate mortgage loan refinancing
>
> was unconscionable inducement under W.Va. Code § 46A-2-121;

> B.      This Court finds that the act of sending an estimated or "target" value
>
> to an appraiser in connection with a real estate mortgage loan refinancing
>
> was a breach of the implied covenant of good faith and fair dealing contained
>
> in Quicken's contract with the borrowers;

> C.       This Court finds that Quicken's routine assessment of $45 courier
>
> fees which did not reflect the exact, actual cost of the services provided does
>
> not constitute an unauthorized charge under the West Virginia Consumer
>
> Credit  and  Protection  Act  ("WVCCPA")  and  West  Virginia  Residential
>
> Mortgage Lender, Broker and Servicer Act ("RMLA"); and

D.      This court finds that defendants Quicken and TSI acted in concert to perform the acts above such that there is no genuine dispute of fact remaining as to plaintiffs' conspiracy claim (Count I).

5.      Defendants Quicken Loans Inc.' and Title Source, Inc.'s Motion to Exclude the Opinions and Testimony of Plaintiffs' Experts, Matthew Curtin, Pursuant to Rule 702 and *Daubert* [**Doc. 176**] is **DENIED AS MOOT**;

6.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion to Exclude the Opinions and Testimony of Plaintiffs' Expert, Stephen McGurl, Pursuant to Rule 702 and *Daubert* [**Doc. 178**] is **DENIED AS MOOT**;

7.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence of Appraisers Petition [**Doc. 201**] is **DENIED**;

8.      Defendants Quicken Loans Inc.'s and Title Source, Inc.'s Motion *In Limine* to Exclude Evidence or Argument Related to The Home Valuation Code of Conduct or Dodd Frank Act [**Doc. 203**] is **DENIED**;

9.      Plaintiffs' Motion to Strike Portions of the Declaration of Sherry Dukic which Are Inconsistent with Deposition Testimony [**Doc. 209**] is **DENIED AS MOOT**.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to all counsel of record herein.

**DATED**:  June 2, 2016.

JOHN PRESTON BAILEY
UNITED STATES DISTRICT JUDGE