**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF WEST VIRGINIA**
**Wheeling**

FILED
JUL 1 1 2017
U.S. DISTRICT COURT-WVND
WHEELING, WV 26003

**PHILIP ALIG**, **SARA J. ALIG**, **ROXANNE SHEA** and **DANIEL V. SHEA**, individually and on behalf of a class of persons,

Plaintiffs,

v.

Civil Action No. 5:12-CV-114
Judge Bailey

**QUICKEN LOANS INC.**, and **TITLE SOURCE, INC.**, dba Title Source Inc. of West Virginia, Incorporated,

Defendants.

## SECOND ORDER RESOLVING MOTIONS AND AWARDING CLASS-WIDE STATUTORY DAMAGES

Pending before this Court are the following motions:

1.      Plaintiffs' Brief on Class-wide Statutory Penalties and Motion for Summary Judgment on Class-wide Contract Damages [Doc. 293-1];

2.      Defendant's (*sic*) Motion for Summary Judgment on Certain Class Loans [Doc. 298-3];

3.      Defendants' Motion in Limine and Memorandum of Law to Exclude Prior Testimony of Michael Lyon [Doc. 301];

4.      Plaintiffs' Motion in Limine to Preclude Witnesses at Damages Hearing, and Memorandum in Support [Doc. 311];

5.      Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs'

Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 312];

6.      Quicken Loans and Title Source's Combined Motions in Limine and Memoranda of Law to Exclude Documents Cited in Plaintiffs' Summary Judgment Briefing and Damages Briefing [Doc. 325]; and

7.      Defendant's (*sic*) Motion to Decertify the Class [Doc. 327].

Before addressing the merits of the various motions, it would be beneficial to recount a portion of the history of this case.  This litigation effectively commenced on June 15, 2012, when plaintiffs filed an Amended Complaint in the Circuit Court of Ohio County individually and on behalf of a class of West Virginians who obtained mortgage loans through Quicken.  The case proceeded through several years of motion practice, a stay, and exchange of discovery.  The course of discovery included the exchange of over 15,000 pages of documents and the depositions of twenty-three witnesses.  Discovery on all aspects of the case closed on December 29, 2015 [Doc. 97].

Plaintiffs subsequently moved for class certification as well as for summary judgment on the class claims.  On June 2, 2016, this Court found that Quicken's uniform practice of providing estimated home values to appraisers constitutes unconscionable conduct under the West Virginia Consumer Credit and Protection Act ("WVCCPA") [Doc. 227].  The Court found that Quicken did so while failing to disclose the practice to plaintiffs. The Court recognized that, by "concealing these facts, Quicken deceived the plaintiffs" as understood by the Fourth Circuit in ***McFarland v. Wells Fargo Bank***, 810 F.3d 273 (4th Cir. 2016).  Moreover, the Court found "ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs'

2

loans."  The Court rejected Defendants' argument that appraisals are obtained for the benefit of the lender, not the borrower, [Id. at 22], explaining that Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater."

This Court also made findings as to intent: "To repeat, Quicken had full knowledge of its practice of providing estimated values to its appraisers for purposes of influencing their appraisals.  Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers.  Quicken knew these facts.  The plaintiffs did not.  Under the analytical framework of both *McFarland* and *Brown*, this constituted unconscionable inducement." [Id. at 20-21].

The Court also rejected any argument that plaintiffs must show actual harm to recover under the WVCCPA. [Id. at 23].  It explained that Quicken's belief that plaintiffs must show actual harm caused by its conduct to be "contrary to the stated purpose of this claim, which is to provide a cause of action in situations where damages in the form of a substantively unconscionable loan are not present.  For that reason, the WVCCPA provides that a person who has been subjected to unconscionable conduct may recover actual damages and the right to recover of $1,000 per violation.  West Virginia Code § 46A-5-101.  *See* Syl. pt. 2 *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 740 S.E.2d 562 (2013) ('under W. Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages.')." [Id].

As to the breach of contract claim, the Court analyzed the contract into which plaintiffs and Quicken entered in which Quicken undertook to obtain an acceptable

3

appraisal [Id. at 24].  The Court went on to find that an appraisal obtained by the process of providing a target figure to an appraiser is a universally condemned process that serves no legitimate purpose and "cannot conceivably be an 'acceptable' one." [Id. at 25].  Further, "[n]or could an appraisal obtained by such a scheme be fair, valid or reasonable" and "withholding knowledge of the true nature of the appraisal violates Quicken's duty to deal honestly" [Id.].

Finally, this Court also found that the "undisputed evidence shows that Quicken and TSI consistently acted in concert to accomplish their unlawful purposes of providing appraisers with estimated values" and granted affirmative summary judgment on plaintiffs' conspiracy claim [Id. at 54-55].

This Court also analyzed plaintiffs' motion for class certification and, finding all Rule 23 requirements met, certified a class defined as:

> All West Virginia citizens who refinanced mortgage loans with Quicken, and
> for whom Quicken obtained appraisals through an appraisal request form
> that included an estimate of value of the subject property.

[Id. at 61].  In doing so, the Court found that it would be able to "easily determine whether the discovery rule applies class-wide to toll class members' claims" and that therefore "defendant's statute of limitations argument presents no barrier to certification" [Id. at 51].

Defendants unsuccessfully moved for reconsideration as well as interlocutory appeal to the Fourth Circuit. [Docs. 243 & 237].

Defendants then moved for entry of a scheduling order, after which the Court held an in person status conference on November 17, 2016.  As a result of that conference, this Court issued an Order [Doc. 248] as follows:

4

- The Court noted that defendants sought additional discovery and that "defendants also seek to demonstrate that they did not engage in any sort of 'bad faith' in making a referral to the appraisers" and further "seek to demonstrate that there was no causal connection between their conduct and a biased appraisal as to damages;"

- The Court further stated that plaintiffs "contend that defendants are merely asking for a 'do-over' both on discovery and the merits arguments that they have already presented thus far" and that plaintiffs had pointed out that "defendants already have the discovery which they seek, including their lending patterns and practices, and information about individual class members' loans;"

- As a result, the Court concluded that defendants were simply asking for a period of time to go through their own loan information and glean statistical and anecdotal evidence to support their positions as well as to obtain an expert witness, and allowed defendants a period of time to go through the loan information already in their possession;

- The Court set forth the class notice procedures, including that a first class opt-out notice must be sent by December 15, 2016; and that a second notice must be sent "after the Court has ruled on statutory damages and the return of the appraisal fees, so that individual plaintiffs can estimate the amount of monetary compensation that they will receive by opting into or out of the class;"

- The Court ordered Defendants to provide plaintiffs with information as to the amount of appraisal fees by March 1, 2017;

- The Court set a hearing as to damages on April 20, 2017, with concurrent

memoranda as to class damages to be filed by April 6, 2017, understanding that if the defendants desired to call a witness on the issue of egregiousness, the Court would hear the testimony.

In January of this year, the defendants retained additional counsel, who seems determined to obtain a "do-over" of virtually every ruling in this case. On February 24, 2017, the defendants filed Quicken Loans and Title Source's Motion for Modification of Order as to Status Conference [Doc. 266]. In that motion, the defendants argue that the damages "trial" would last several days, that the issue of contract damages must be heard by a jury, that all compensatory damages had to be decided before the Court could make its determination as to the statutory penalty, and requesting the re-opening of discovery.

Despite the fact that discovery was closed, on February 24, 2017, the defendants filed interrogatories and requests for admission on the plaintiffs. In addition, on March 10, 2017, the defendants filed Second Supplemental Rule 26(a)(1) disclosures, identifying, for the first time, seven new witnesses from Quicken and TSI; two witnesses of a company identified as "FNC, Inc."; "members of the class certified by the Court on June 2, 2016"; four individuals who opted out of the class; the general categories of "West Virginia appraisers and/or individuals who conducted or were otherwise involved in appraisals for the loans in the class certified by the Court on June 2, 2016"; and Quicken and TSI employees generally who had contact with any member of the certified class. The disclosure also listed many new documents generally, including:

1.      [d]ocuments and information relating to members of the class certified by the Court on June 2, 2016 and the loans they obtained during the class period, including loan files and loan journal notes;

6

2.      records relating to the discharge, modification, acceleration, refinance, surrender, foreclosure, and/or modification of those loans, and public records concerning the class members (e.g., bankruptcy and other public filings);

3.      "Emails and other business records of Defendants which relate to the appraisal ordering and review processes, or to legal and industry requirements and guidelines";

4.      "Publicly-available documents relating to appraisals, appraisal ordering, and appraisal review"; and

5.      "Publicly-available documents relating to the discharge, modification, acceleration, refinance, surrender, foreclosure, and/or modification of loans obtained by members of the class certified by the Court on June 2, 2016, and publicly-available documents relating to the sale of any property securing those loans."

On March 30, 2017, the parties again appeared for a status conference and to address Quicken Loans and Title Source's Motion for Modification of Order as to Status Conference [Doc. 266].  Again the defendants reiterated that they wished an opportunity to present evidence on egregiousness and on the issue of harm to the class members, as well as a request for "very targeted" discovery.  The Court stated as follows:

> All right. I've carefully gone over all of this.  The determination of the statutory
>
> penalties under the Consumer Protection Act does involve evidence of intent,
>
> knowledge and harm. And the amount of penalty to be imposed by the Court
>
> should have a relationship to the egregiousness of the violation.  However,
>
> this Court believes that the egregiousness of the violation is something the
>
> Court considers based upon the actions of Quicken Loans and TSI.

7

Therefore, I will permit the defendants to present, I'll say for right now, two witnesses on the issue of their policies.  And there's arguments made about how careful they are and that's fine, I'll be glad to hear that.

The defendants make the argument that any statutory penalty must bear a reasonable relationship to the actual harm.  I think that's wrong. I think the **Vanderbilt** case[1] settles that issue.

In a footnote, the defendants argue that that's limited to five times the actual harm.  That's under **Garnes**,[2] which is a punitive damages case.  And that was in the **Brown**[3] case where the Court was considering damages for common law fraud, not damages for a violation of the Consumer Protection Act.  These are not punitive damages.  It's a statutory civil  penalty.  While there may be somewhat of a punitive element to it, they are not to be determined under the same standard as punitive damages.

The issue of a jury demand on whether the return of the appraisal fees is a request for which there will be a jury, this Court disagrees.  It's a request for equitable relief.  The return of payments or the disgorgement of payments is an equitable form of relief.  And that's backed up by both the

---

[1] **Vanderbilt Mortgage & Finance, Inc. v. Cole**, 230 W.Va. 505, 740 S.E.2d 562 (2013) ("under W. Va. Code § 46A-5-101(1) (1996), an award of civil penalties is not conditioned on an award of actual damages.").

[2] **Garnes v. Fleming Landfill, Inc.**, 186 W. Va. 658, 667, 413 S.E.2d 897, 908 (1991).

[3] **Quicken Loans, Inc. v. Brown**, 236 W. Va. 12, 40, 777 S.E.2d 581, 609 (2014).

8

*Sivolella*[4] case, S-i-v-o-l-e-l-l-a, out of New Jersey in 2013; and the ***Gerald***

***Moore and Sons***[5] case out of the Eastern District of Virginia in 1996.  The

defendants have cited ***Curtis versus Loether***, L-o-e-t-h-e-r, 1974, U.S.

Supreme Court case,[6] but it specifically does not apply to cases requiring the

defendant to disgorge funds wrongfully withheld from the plaintiff.  It does not

apply to equitable restitution.

    The defendants argue that we can't have a statutory penalty imposed

until the damages trial has been completed.  Again, this Court disagrees.  I

think that argument rests on the faulty premise that the statutory penalties

have to bear a reasonable relationship to the harm.

    On the issue of discovery, we had -- first of all, this case has been

pending for almost five years now.  We had a hearing on November 17th.

At that time it was determined what the defendant's really wanted was time

---

    [4] ***Sivolella v. AXA Equitable Funds Mgmt., LLC***, 2013 WL 4096239, at **5-6 (D. N.J. July 3, 2013) (finding that because plaintiffs were seeking disgorgement of the fees they were charged, they were not seeking "some funds" … "but rather ***the*** funds allegedly charged and retained by Defendants, and therefore, "Plaintiffs' claim is for equitable restitution and, as a result, not triable to a jury"), citing ***Nat'l Sec. Sys., Inc. v. Iola***, 700 F.3d 65, 101 (3d Cir. 2012) ("It is undisputed that restitution of ill-gotten commissions is an equitable remedy."); ***Hanwha Azdel, Inc. v. C&D Zodiac, Inc.***, 2013 WL 3989147, at *2 (W.D. Va. Aug. 2, 2013) (a claim for disgorgement of specific profits and to prevent unjust enrichment constitutes equitable restitution and would be a remedy imposed "if at all, by the court and no[t] by the jury.").

    [5] ***Gerald M. Moore & Son, Inc. v. Drewry & Assocs., Inc.***, 945 F.Supp. 117, 120 (E.D. Va. 1996), citing ***Arkadelphia Milling Co. v. St. Louis Southwestern Ry. Co.***, 249 U.S. 134 (1919).

    [6] ***Curtis v. Loether***, 415 U.S. 189, 194 (1974) ("Nor is there any sense in which the award here can be viewed as requiring the defendant to disgorge funds wrongfully withheld from the plaintiff.").

to prepare and marshal their evidence.   And there was no need for discovery.  But they wanted 150 days to prepare.  And this Court gave them 150 days.  Now less than two months before the hearing, they want massive discovery. You can call it targeted, but that's a lot of discovery.  In addition, I don't think the information sought is relevant for this hearing under the way this Court has interpreted the rules or the rulings and the law concerning the statutory damages.

Now, with regard to the issue of statute of limitations, the burden's on the defendant. If the defendant can bring evidence that the class member had actual knowledge that the defendant sent an estimate of value to the appraiser and that no payments were made within one year before June 15th, 2012, I'll boot them.  In the absence of that evidence, it's not an issue.

Transcript of Proceedings, March 30, 2017 [Doc. 277, pp. 4-7, (footnotes added)].

During the March 30 hearing, there was a discussion of witnesses and exhibits.  The defendants indicated that they wished to call nine witnesses.  The Court indicated that nine witnesses appeared to be excessive and repetitive.  The defendants countered that they could reduce the number of live witnesses to five and present affidavits of the remaining four.  It is important to note that at no time did the defendants request an opportunity to cross examine or challenge any of the witnesses or documents which were already in the record.   Furthermore, the defendants' willingness to submit affidavits discloses that, contrary to their present position, the defendants were well aware that the hearing was not intended to be a full hearing, but rather an opportunity for the defendants to present additional evidence on the issue of egregiousness.

10

The defendants identified Clint Bonkowski, A.J. Ureel, Kristine Hughes, Amy Bishop and William Banfield as the five live witnesses to be called.  Four of these witnesses, all but Mr. Banfield, had never been disclosed until March 10, 2017.  Despite the failure of the defendants to timely disclose these potential witnesses, the Court determined to allow the testimony (to the extent relevant) provided that the defendants made the witnesses available for deposition, so that the plaintiffs could discover the witnesses' expected testimony and the areas upon which testimony would be given.

The depositions were taken on April 13 and 14 in Detroit, Michigan.  During the deposition, a portion of the testimony was as follows:

Q.     Do you know where the documents came from?

A.     No.

Q.     Aside from lawyers, did you talk to anybody about the testimony that you're going to provide today?

A.     No.

Q.     So this matter has been set for a damages hearing, and you've been disclosed as a potential witness. Do you know what your expected testimony will be at that hearing?

A.     No.

Q.     Do you know any of the questions that you'll be asked at that hearing?

A.     No.

Q.     Do you know any of the issues that you'll be asked to address at that hearing?

A.     No.

Q.      Do you know how - do you know if you'll be asked to provide testimony regarding any damages that class members may have suffered?

A.      No, I don't know.

Q.      Do you know why you were asked to testify?

A.      No.

Q.      The loan documents that you reviewed, do you know why you were asked to review those documents?

A.      No.

[Doc. 289-2, p. 24].

During the deposition of Mr. Ureel, the following occurred:

Q.      What is going to be your expected testimony at trial?

Mr. Savage (defense counsel):      Well, if you know. If it's something that you know from lawyers, then you don't answer.

A.      I can't answer that.

Q.      What were you - what are you here to talk about? What knowledge or information do you have to talk about today?

Mr. Savage: Objection. He's here to answer your questions.

A.      I'm here to answer your questions.

. . .

Q.      Well, I kind of need to know what I need to ask you. So you've been designated as a potential witness at a hearing that's going to be held on May 9th.  And I'm trying to figure out - and the whole reason for all of this is to figure out what you intend to say. So what do you intend to say?

12

A.     I intend to answer the questions that are posed to me.

. . .

Q.     What do you expect - - what are the types of questions that you expect that you'll answer?

A.     I can't answer that.

[Doc. 289-3, pp. 33-34].

This Court found this type of gamesmanship to be unacceptable, being the type of conduct that the Federal Rules were adopted to prevent and remedy.  The whole purpose of the depositions ordered by the Court was so that the plaintiffs could have learned the intended testimony of the late disclosed witnesses and ameliorate the prejudice of having the witnesses disclosed so very late in the proceedings.

For those reasons, this Court excluded Clint Bonkowski and A.J. Ureel as witnesses at the hearing on May 9.  The parties had stipulated that Kristine Hughes' deposition may be used at the hearing [Doc. 294].

With respect to documents to be presented at the hearing, any document that was not disclosed to the plaintiffs by the disclosure of March 10, 2017, or before was excluded. *See* Order Granting in Part and Denying in Part Plaintiffs' Motion to Exclude Witnesses and Documents at Damages Hearing [Doc. 310].

I.     **Defendants' Motion in Limine and Memorandum of Law to Exclude Prior Testimony of Michael Lyon [Doc. 301]**

Prior to the May 9 hearing, the defendants filed Defendants' Motion in Limine and Memorandum of Law To Exclude Prior Testimony of Michael Lyon [Doc. 301].  In that motion, the defendants sought to exclude the deposition and trial testimony of Michael

13

Lyon, alleging that this Court denied the defendants the opportunity to present the testimony of Michael Lyon at the May 9 hearing and that his testimony was hearsay.  At the beginning of the May 9 hearing, this Court denied the Motion, noting that Michael Lyon was one of the nine witnesses listed by the defendants.  When the defendants reduced their list of live witnesses to five, it was the defendants who determined not to include Michael Lyon among the live witnesses, opting instead to file his affidavit (which was not done).  Defendants did, however, designate portions of Mr. Lyon's testimony for consideration [Doc. 321].

In addition, the argument that Mr. Lyon's prior testimony in deposition and trial in the *Brown* case is unavailing.  Mr. Lyon was deposed and appeared as a 30(b)(6) witness on behalf of Quicken Loans in the *Brown* case.  His statements are, therefore, the official position of Quicken.

## II.    Plaintiffs' Motion in Limine to Preclude Witnesses at Damages Hearing, and Memorandum in Support [Doc. 311]

Also prior to the May 9 hearing, the plaintiffs filed Plaintiffs' Motion in Limine to Preclude Witnesses at Damages Hearing, and Memorandum in Support [Doc. 311].  This motion sought the exclusion of Phillip Alig as a live witness.  According to the motion, after reducing the number of witnesses to five and specifically naming those witnesses, the defendants gave notice that they would also call Mr. Alig as a live witness.  In light of the fact that the witness list was set and that the defendants did not seek leave to add Mr. Alig to the list and in light of the fact that this Court had previously ruled that damage to the plaintiffs was not a issue at the hearing, this Court ruled that the defendants could not call Mr. Alig as a live witness, but could designate any portions of his deposition that they

desired.

### III.   Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs' Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 312]

In Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs' Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 312], filed May 3, 2017, the defendants seek to exclude Plaintiffs' Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 300], on the basis that at the November 17, 2016, status conference, this Court directed that such memoranda be limited to ten pages, while the challenged memorandum greatly exceeds the page limit. On May 5, the plaintiffs filed Plaintiffs' Motion for Leave to File an Amended Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 315], noting that they had inadvertently overlooked the Court's directive and instead complied with this Court's Local Rules. The motion sought leave to file Plaintiffs' Amended Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 315-1], in place of the challenged document.

This Court granted the motion on May 5, 2017, [Doc. 314], and the amended response was docketed [Doc. 315], rendering the Defendants' Motion and Incorporated Memorandum to Strike Plaintiffs' Response to Defendants' Memorandum Regarding Classwide Penalty under the WVCCPA [Doc. 312] moot.

### IV.   Quicken Loans and Title Source's Combined Motions in Limine and Memoranda of Law to Exclude Documents Cited in Plaintiffs' Summary Judgment Briefing and Damages Briefing [Doc. 325]

In this Motion, the defendants seek to exclude a number of items from consideration

by the Court in determining the amount of statutory damages to be awarded in this case for the violations of the WVCCPA.  Many of the items about which the defendants complain were not considered by the Court in determining the appropriate relief, and the Motion is moot with respect to those items.  It would appear that the cleanest way to resolve the Motion is to discuss the items which the Court did consider and the basis upon which the items were deemed admissible.

First this Court considered a number of governmental publications or directives, to which it would appear the defendants did not object, including (1) the Mortgagee Letter 96-26, authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner (May 21, 1996); (2) the letter from the Office of the Comptroller of the Currency to K. Kaiser, Chairman of The Appraisal Standards Board (July 28, 1999); (3) the 2005 "Interagency Statement" issued by the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration; and (4) the Home Valuation Code of Conduct.

The defendants object to this Court's consideration of Mortgagee Letter 2009–28, which is cited solely for the purpose of demonstrating that the letter reconfirmed the position taken in the 1996 letter concerning transmitting suggested values to an appraiser. For that purpose, the letter is certainly relevant.

In addition, the Court considered the 2007 Online Appraiser Petition, to which the defendants do object.  The Petition is not relevant for the purpose of proving that Quicken applied pressure.  Rather, the Petition is relevant to show that the appraisal industry deemed attempts to influence appraisers was inappropriate under industry standards

because it stripped appraisers of their independent judgment and resulted in a dishonest and potentially harmful process.  Furthermore, the petition is relevant because it confirms that the practice of using target figures was widely, if not universally, condemned.  For these reasons, the petition is both relevant and admissible, and defendants' motion will be denied with respect to this information.

The Court also considered the survey of appraisers referred to and considered by the United States District Court for the Southern District of New York in *Fed. Housing Agency v. Nomura Holding Amer., Inc.*, 104 F.Supp.3d 441, 461 (S.D. N.Y. 2015). Again, this survey is relevant to demonstrate the level of condemnation of the practice of providing suggested values to appraisers.

The Court also considered Judge Recht's order in *Brown v. Quicken Loans Inc.*, Civ. No. 08-C-36, Ohio County, W. Va., in which he found "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property.  The only purpose could be to inflate the true value of the property."  This order is certainly not hearsay and is relevant to show that other jurists share this Court's opinion of the propriety of sending values to an appraiser.

This Court also considered the deposition testimony of Michael Lyon, Jennifer Randle, and Jordan Petsovski.  These depositions are clearly admissible under Fed.R.Civ. P. Rule 32(a)(4)(B).  In fact, the only deposition to which the defendants object is that of Michael Lyon, which is discussed in Section III of this Order, *supra*.

Finally, this Court considered two emails among Quicken executives.  As noted by the defendants, emails do present difficulties in connection with the business records

exception to the hearsay rule.  "While properly authenticated e-mails may be admitted into evidence under the business records exception,. . . [a]n e-mail created within a business entity does not, for that reason alone, satisfy the business records exception of the hearsay rule." **United States v. Cone**, 714 F.3d 197, 220 (4th Cir. 2013) (internal quotations and citations omitted).

Rule 803(6)(B) allows for the introduction of records that are "kept in the course of a regularly conducted activity of a business." For a record to be admitted as a business record, it must be "(1) made by a regularly conducted business activity, (2) kept in the 'regular course' of that business, (3) 'the regular practice of that business to make the memorandum,'(4) and made by a person with knowledge or from information transmitted by a person with knowledge." **Id.** at 219.

In this case, the Court is considering the emails.  These emails were uncovered by the Department of Justice in its investigation of Quicken.   They represent a regularly conducted activity.  They have been kept for years in the records of the Quicken.  They deal with a subject matter clearly within the business of Quicken and TSI.  They are made by high ranking executives with knowledge of the defendants' processes and procedures.  Finally, the defendants have never questioned the authenticity of the emails.

Returning to the defendants' Motion, the following are sought to be excluded:

A.      Plaintiffs Should Be Precluded from Introducing Exhibits And Portions of the Record Related to Fees

This Court did not consider any such evidence in ruling on the award of statutory damages.

B.      Plaintiffs Should Be Precluded from Introducing Documents Related to Loans Outside the Scope of the Class

Defendants seek to exclude documents related to the Sheas' 2006 loan and the Aligs' 2011 loan, including trial testimony from ***Walters v. Quicken Loans, Inc.***, No. 11-C-1123 at 68-69 (April 19, 2015) [Doc. 293 Ex. D]; Brown Dep. at 168:18-169:10 (discussing Alig 2011 loan) [Doc. 199 Ex. EE]; Alig 2011 HUD-1 Settlement Statement [Doc. 199 Ex. P]; Alig Loan Files including 2011 HUD-1 Settlement Statement [Doc. 173 Ex. C]; and Shea 2006 HUD-1 Settlement Statements [Doc. 199 Ex. Q].

The Court did not consider any of these items in ruling on the award of statutory damages.

C.      Websites from after the Class Period Should Be Excluded

Defendants seek to exclude two articles from Quicken Loans' website from after the class period in this case—one from 2010 and the other from 2015. See Quicken Loans, Important Information You Should Know Regarding Appraisals, available at https://www.quickenloans.com/blog/important-information-appraisals (December 15, 2010) [Doc. 300 at 9]; Blog Post: Terms You Should Understand When Getting a Mortgage, available at http://www.quickenloans.com/blog/terms-you-should-understand-when-getting-a-mortgage (July 27, 2015) [Doc. 199 at 5, 22].  The Court did not consider any of these items in ruling on the award of statutory damages.

D.      Plaintiffs Should Be Precluded from Offering Regulatory Evidence Dated after the Class Period

Defendants seek to exclude Mortagee Letter 2009-28, discussed above.  This letter is relevant to show that it reconfirmed the prior opinion that suggested values should not be sent to appraisers and to dispel the argument that it was not until this letter came out that the defendants were aware of the problem.

19

E.     Plaintiffs Should Be Precluded from Introducing Deposition Testimony

Defendants seek to exclude the deposition testimony of the Aligs, Jody Hill, Philip Jackson, Troy Sneddon, and John Kelly, none of which was considered by the Court in ruling on the issue of statutory damages.

The persons whose deposition testimony was considered are or were Quicken and/or TSI employees who live more than 100 miles from the Courthouse.

F.     The Appraiser Petition Should Be Excluded

This issue is addressed above.

G.     Plaintiffs Should Be Precluded from Offering Quicken Loans' Employees' Emails

This issue is addressed above.

H.     Plaintiffs Should Be Precluded from Introducing Expert Reports

The defendants seek to exclude the expert reports of Jody Hill and Philip Jackson, neither of which were considered by the Court in ruling on the issue of statutory damages.

I.     Various Opinions by Third Parties about the Mortgage Industry Should Be Excluded

The defendants seek to exclude Michael Lewis, The Big Short: Inside the Doomsday Machine [Doc. 199 at 5 n.10] and National Community Reinvestment Coalition Executive Vice President David Berenbaum's testimony before the Senate Committee on Banking, Sub-Committee on Housing, Transportation and Community Development (June 26, 2007), available at http://www.banking.senate.gov/public/_files/berenbaum.pdf [Doc. 212 at 3 n. 4], neither of which were considered by the Court in ruling on the issue of statutory damages.

J.     Plaintiffs Should Be Precluded from Introducing Treatises And Industry Sources

The defendants seek the exclusion of several treatises and industry sources for the

truth of certain statements alleging that representations and warranties and the repurchase process did not deter improper conduct in the lending industry. See Fitch Ratings, The Impact of Poor Underwriting Practices and Fraud in Subprime RMBS Performance, http://blenderlaw.umlaw.net/wpcontent/uploads/2007/11/fitchfraud1.pdf [Doc. 300 at 10]; Patricia McCoy & Susan Wachter, Representations and Warranties: Why They Did Not Stop the Crisis, Digital Commons @ Boston College Law School (June 2, 2016), available at http://lawdigitalcommons.bc.edu/cgi/viewcontent.cgi?article=2044&context=lsfp [Doc. 300 at 11]; NCLC, Mortgage Lending §6.6.1 [Doc. 300 at 10].  This Court did not consider any such materials in reaching its statutory damage decision.

K.      Documents from Other Court Cases Should Be Excluded

This Court disagrees that the rulings and findings of courts with jurisdiction are hearsay.  This Court considered the findings of Judge Recht as noted above.  This Court also considered other cases for their legal findings.

L.      Michael Lyon's Testimony from Brown V. Quicken Loans and Nicewarner V. Quicken Loans Should Be Excluded

This issue is discussed above.

M.      Plaintiffs Should Be Precluded from Introducing Statements or Pleadings from Other Cases Against Quicken Loans

In this category, Quicken seeks to exclude plaintiffs' citation to case law involving Quicken.  Again, plaintiffs offer these cases as background and legal authority within a legal brief, for the Court to consider in making legal determinations as appropriate. The Court is able to take judicial notice of these sources, just as it took judicial notice of West Virginia statutes during the recent hearing.  It is wholly appropriate for the Court to review and rely on other decisions as it sees fit.  For example, this Court has repeatedly relied on

the decisions in the **Brown v. Quicken** litigation as support in this case. [Doc. 227 at 6-7, 10, 12, 17, 19-21].  In fact, this Court cited with approval Judge Recht's determination that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property." Nonetheless, the Court went on to independently come to the same conclusion. [Id. at 11].  Likewise, the Court may consider that the District Court for the Eastern District of Michigan found that it is plausible that lenders were on notice in 1996 that "[p]roviding to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower . . ." was prohibited by FHA regulations. *See, United States v. Quicken*, 2017 WL 930039, at **7-8.

The case law cited may also be considered in testing the credibility of Quicken's testimony that it acted at all times in good faith and engaged in conservative lending practices.  The body of case law documents a series of complaints from consumers, the government and former employees relating to inflating appraisals and predatory lending. The very existence of the present DOJ action, which alleges pursuant to the False Claims Act that Quicken knowingly approved loans that violated the Fair Housing Act (FHA) while falsely certifying compliance with those rules and submitted claims for payment when those loans defaulted, undermines Quicken's unsupported testimony at the hearing that it "does the right thing"; is economically motivated to avoid predatory conduct; or utilizes conservative policies and procedures.  Through this action, the government alleged specifically that Quicken systematically sought to influence appraisers. *See United States v. Quicken*, 2017 WL 930039, at **6-8.  The Court may of course consider the existence

22

of this action in weighing the evidence.  Indeed, the **Nicewarner** court similarly cited the DOJ action in denying Quicken's summary judgment motion.

The decisions in **Bishop v. Quicken Loans, Inc.**, 2011 WL 1321360 (S.D. W.Va. 2011); **O'Brien v. Quicken Loans, Inc.**, 2013 WL 2319248, at *6 (S.D. W.Va. May 28, 2013); and **Nicewarner v. Quicken Loans Inc.** (Cir. Ct. Kanawha Cty. W.Va. Jan. 13, 2016) all reflect consumer complaints that Quicken chose to utilize the higher of two available appraisals allegedly resulting in upside down loans.  Likewise, **Henry v. Quicken Loans Inc.**, 2009 WL 3270768 (E.D. Mich. July 16, 2009) reflects complaints by Quicken's employees regarding such things as training them to overcome consumers' objections. *See also,* **Brown I**, 230 W. Va. 306, at fn. 6 (quoting a script Quicken used to overcome objections).

The repeated complaints of this nature, which are indisputably reflected in the cited litigation, makes Quicken's self-serving overtures that it does "the right thing" difficult to believe and, therefore, may be considered for that non-hearsay purpose, as well as legal authority.

## V.      Defendant's (*sic*) Motion to Decertify the Class [Doc. 327]

Almost one year since this Court certified the class in this case, new counsel for the defendants moves to decertify the class despite the fact that no new discovery has occurred.

"[D]istrict courts have an affirmative duty to reassess their class certification rulings as the case develops, and to decertify a class or otherwise alter a certification decision as appropriate in light of developments in the case."  **Moore's Federal Practice** § 23.87 at

23-405 (3d ed.).

However, "[i]n revisiting an earlier certification decision, a court may modify or decertify, but decertification is a drastic step, not to be taken lightly." 3 *Newberg on Class Actions* § 7:37 (5th ed. 2013).  To be sure, an "order granting class certification is not an untouchable determination." *Minter v. Wells Fargo Bank*, 2013 WL 1795564, *2 (D. Md. Apr. 26, 2013).  Indeed, "an order certifying a class must be reversed if it becomes apparent, at any time during the pendency of the proceeding, that class treatment of the action is inappropriate."  *Stott v. Haworth*, 916 F.2d 134, 139 (4th Cir. 1990).  A motion to decertify is not, however, to be treated as another bite at the apple in the absence of changed circumstances.  As the United States District Court for the District of Maryland recently observed, "[t]he breadth of this obligation [to reverse certification if necessary]. . . is tempered by commentary in the Advisory Committee Notes which provide that altering certification is appropriate 'upon fuller development of the facts.'" *Minter*, *2 (citing 1996 Amendment Advisory Committee Notes).

Courts thus consistently hold that "there must be some development or change in circumstances to merit revisiting a class certification decision." *In re J.P. Morgan Chase Cash Balance Litig.*, 255 F.R.D. 130, 133 (S.D. N.Y. 2009) (citing cases).  As such, courts should be wary of motions to decertify which simply reargue certification "[i]n the absence of materially changed or clarified circumstances."  3 *Newberg on Class Actions* § 7:47 (4th ed. 2012).  That new facts or law should support a motion is a widely recognized concept.  *See Zimmerman v. Portfolio Recovery Assocs., LLC*, 2013 WL 1245552, at *5 (S.D. N.Y. March 27, 2013) (declining to decertify class when there was "no new

24

evidence concerning the nature of the class members' debts"); *Connor B. v. Patrick*, 278 F.R.D. 30, 35 (D. Mass. 2011) ("[a]llowing litigants to file a motion to decertify at any time during the litigation, even when no subsequent case law or new facts have had any impact on the original rationale, would render Rule 23(f) meaningless."); *Schell v. OXY USA Inc.*, 2013 WL 4857686, at *4 (D. Kan. Sept. 11, 2013) (denying motion to decertify class after discussing arguments presented and finding "[a]ll of these circumstances were known by the parties at the time they briefed the motion for certification.  [Defendant] has provided no new evidence or law on this element, so the court finds that the named plaintiffs still meet the adequacy of representation element."); *Kubiak v. S.W. Cowboy, Inc.*, 2015 WL 12859422 (M.D. Fla. Mar. 11, 2015) (same)*;   J.S. v. Attica Cent. Sch.*, 2011 WL 4498369, *6 (W.D. N.Y. Sept. 27, 2011) (denying motion to decertify when defendant "fail[ed] to present new facts or legal argument"); *Elias v. Ungar's Food Prods., Inc.*, 2009 WL 2581502, *5 (D. N.J. Aug. 20, 2009) (no decertification because court already rejected proposition "that an individual inquiry would be necessary for each class member"); *Connor B. ex rel. Vigurs v. Patrick*, 278 F.R.D. 30, 34, 36 (D. Mass. 2011) (denying decertification where defendants argued that plaintiffs failed to satisfy the commonality requirement because the argument was "largely identical to the argument this court rejected in its original certification order").

In addition, "[c]ourts faced with a motion to decertify must also take account of the progression of the litigation." *Jermyn v. Best Buy Stores*, 276 F.R.D. 167, 169 (S.D. N.Y. 2011); *see also Woe v. Cuomo*, 729 F.2d 96, 107 (2d Cir. 1984) (finding abuse of discretion where district court decertified the class after granting summary judgment in

part).   "Decertification is an 'extreme step,' particularly at a late stage in the litigation, 'where a potentially proper class exists and can easily be created." ***Gulino v. Bd. of Educ. of City School Dist.***, 2012 WL 6043803, at *8 (S.D. N.Y. Dec. 5, 2012) (quoting ***Woe***, 729 F.2d at 107; *see also* ***Easterling v. Conn. Dep't of Corr.***, 278 F.R.D. 41, 42 (D. Conn. 2011) ("[a] court should be wary of revoking a certification order completely at a late stage in the litigation process.").

Defendants seek to decertify the class, advancing the following arguments:

1.      The class includes borrowers with no injury and thus no standing;

2.      Numerous individual inquiries infect the contract claim;

3.      Statutory penalties cannot be awarded without individualized evidence; and

4.      Equitable tolling cannot be decided without individualized evidence.

Despite the re-assertion of these arguments, this Court remains convinced that the class certified in this case is appropriate and manageable.

Quicken's first argument is that some class members did not suffer a "concrete injury" and therefore lack standing under the Supreme Court's decision in ***Spokeo v. Robins***, 136 S.Ct. 1540 (2016).  This argument fails as a matter of law from the outset, as it is well settled that "if a class representative has standing, the case is justiciable and the proponent of the class suit need not demonstrate that each class member has standing." ***Newberg on Class Actions*** § 2:3 (5th ed.); *see also* ***Dreher v. Experian Info. Solutions, Inc.***, 856 F.3d 337 (4th Cir. 2017) ("In a class action matter, we analyze standing based on the allegations of personal injury made by the named plaintiff"), quoting ***Beck v. McDonald***, 848 F.3d 262, 269-70 (4th Cir. 2017), in turn citing ***Doe v. Obama***, 631 F.3d

157, 160 (4th Cir. 2011); *see also* **Neale v. Volvo Cars of North Am., LLC**, 794 F.3d 353, 362 (3d Cir. 2015); **Kohen v. Pacific Inv. Mgmt. Co. LLC**, 571 F.3d 672, 676 (7th Cir. 2009); **Milbourne v. JRK Residential Am., LLC**, 2016 WL 1071564, at *6 (E.D. Va. Mar. 15, 2016) (Payne, J.); **Lewis v. Casey**, 518 U.S. 343, 395 (1996) (Souter, J., concurring).

There is no question that the Aligs have standing to redress the concrete injury incurred by Quicken's conduct. In **Spokeo**, the Supreme Court addressed the injury-in-fact requirement for Article III standing. The Court's decision did not change the law of standing, and Quicken is wrong as to its application here. Instead, the Court confirmed the long-established principle that "standing consists of three elements." **Spokeo v. Robins**, 136 S.Ct. 1540, 1547 (May 16, 2016) (citing **Lujan v. Defenders of Wildlife**, 504 U.S. 555, 560 (1992)). "The plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." **Id**. The Court further confirmed that to establish injury in fact—the element primarily at issue in **Spokeo**—a plaintiff must "allege an injury that is both 'concrete' **and** 'particularized.'" **Id**. at 1545 (citing **Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.**, 528 U.S. 167, 180–81 (2000) (emphasis added in **Spokeo**)). According to the Supreme Court, a "particularized" injury "must affect that plaintiff in a personal and individual way." **Spokeo**, 136 S.Ct. at 1548. The Court agreed with the Ninth Circuit that the **Spokeo** plaintiff had suffered a particularized injury because he claimed that the defendant—an alleged credit-reporting agency that had reported false information about him— "violated his statutory rights," and his "interests in the handling of his credit information are individualized rather than collective." **Id**. (quotation omitted).

27

Further, **Spokeo** confirmed that a "concrete" injury "must actually exist." **Id**. However, a "concrete" injury may also be "intangible." **Id**. at 1549. **Spokeo** indicated two approaches for establishing that an intangible injury is "concrete." "In determining whether an intangible harm constitutes injury in fact, both history and the judgment of Congress play important roles." **Id**. First, courts should consider whether an alleged intangible harm "has a close relationship to a harm that has traditionally been regarded as providing a basis for a lawsuit in English or American courts." **Id**. (citing **Vermont Agency of Nat'l Res. v. U.S. ex rel. Stevens**, 529 U.S. 765, 775–77 (2000)). A plaintiff may therefore demonstrate that she suffered a concrete injury by showing that her injury is analogous to a harm traditionally recognized at common law.

Second, Congress may identify and "elevate to the status of legally cognizable injuries concrete, de facto injuries that were previously inadequate at law." **Id**. (citation and internal quotation marks omitted). Congress "has the power to define injuries and articulate chains of causation that will give rise to a case or controversy where none existed before" because Congress "is well positioned to identify intangible harms that meet minimum Arcticle III requirements." **Id**. Of course, state statutes may also serve to define these injuries. See **Gen. Tech. Applications, Inc. v. Exro Ltda**, 388 F.3d 114, 118 (4th Cir. 2004) ("In a diversity case, [the court] must consult state law to determine the nature of the litigant's rights and whether he is entitled to assert the claims he makes.").

Courts applying **Spokeo** in consumer credit cases have overwhelmingly found that violations of the Fair Debt Collection Practices Act ("FDCPA") provide for Article III standing even with violations far less serious than Quicken's conduct here. In **Church v. Accretive**

*Health, Inc.*, the Eleventh Circuit found Article III standing when a plaintiff alleged that defendant violated the FDCPA by not including in its debt collection letter certain disclosures required by the Act. 654 Fed. Appx. 990 (11th Cir. 2016).  The plaintiff did not allege that she suffered actual damages, but the court found she had "alleged injury to her statutorily-created right to information pursuant to the FDCPA" because that Act "creates a private right of action, which Church seeks to enforce."  *Id*. at 994.  Importantly, while "the injury may not have resulted in tangible economic or physical harm that courts often expect, the Supreme Court has made clear that an injury need not be tangible to be concrete."  *Id*., citing *Spokeo*, 136 S.Ct. at 1549.  "Rather, this injury is one that Congress has elevated to the status of a legally cognizable injury through the FDCPA," and plaintiff therefore satisfied the injury-in-fact requirement.  *Id.*

Courts around the country have been in accord when considering various violations of the FDCPA's debt collection provisions that did not necessarily give rise to actual damages.  *See Linehan v. Allianceone Receivables Mgmt., Inc.*, 2016 WL 4765839, at *7 (W.D. Wash. Sept. 13, 2016) ("The goal of the FDCPA is to protect consumers from certain harmful practices; it logically follows that those practices would themselves constitute a concrete injury");  *Prindle v Carrington Mortg. Servs., LLC*, 2016 WL 4369424, at *9 (M.D. Fla. Aug. 16, 2016);  *Larson v. Trans Union, LLC*, 201 F.Supp.2d 1103 (N.D. Cal. 2016);  *Dickens v. GC Servs. Ltd. P'ship*, 2016 WL 3917530, at **1–2 (M.D. Fla. July 20, 2016);  *Lane v. Bayview Loan Servicing, LLC*, 2016 WL 3671467, at **3–5 (N.D. Ill. July 11, 2016);  *Macy v. GC Servs. Ltd. P'ship*, 2016 WL 5661525, at **2-4 (W.D. Ky. Sept. 29, 2016);  *Daubert v. Nra Grp., LLC*, 2016 WL 4245560, at *4

(M.D. Pa. Aug. 11, 2016); *Quinn v. Specialized Loan Servicing, LLC*, 2016 WL 4264967, at *5 (N.D. Ill. Aug. 11, 2016); *Irvine v. I.C. Sys., Inc.*, 198 F.Supp.3d 1232, 1237 (D. Colo. 2016); *McCamis v. Servis One, Inc.*, 2016 WL 4063403 at *2 (M.D. Fla. July 29, 2016).

Post-*Spokeo* decisions issued within the Fourth Circuit interpreting other consumer protection statutes with statutory damage provisions are no different. For example, courts have found that the annoyance of receiving unwanted telemarketing calls is a sufficiently concrete injury to confer Article III standing. *Mey v. Got Warranty, Inc.*, 193 F.Supp.3d 641 (N.D. W.Va. 2016); *Krakauer v. Dish Network L.L.C.*, 168 F.Supp.3d 843 (M.D. N.C. 2016) (Eagles, J.) (declining to decertify classes upon finding class representative's allegations showed a "concrete injury to him and to each class member"). Courts have similarly recognized a right of privacy in one's consumer report under the Fair Credit Reporting Act. *Burke v. Fed. Nat'l Mortg. Assoc.*, 2016 WL 4249496, at *4 (E.D. Va. Aug. 9, 2016) (Hudson, J.), vacated upon parties' settlement and finding of no jurisdiction by 2016 WL 7451624 (Dec. 6, 2016); *Thomas v FTS USA, LLC*, 193 F.Supp.3d 623, 637 (E.D. Va. 2016) (Payne, J.)

The West Virginia legislature enacted the WVCCPA to "protect consumers from unfair, illegal, and deceptive acts or practices by providing an avenue of relief for consumers who would otherwise have difficulty proving their case under a more traditional cause of action." *Bourne v. Mapother & Mapother, P.S.C.*, 998 F.Supp.2d 495, 501 (S.D. W.Va. 2014) (Faber, J.) (quoting *State ex rel. McGraw v. Scott Runyan Pontiac–Buick, Inc.*, 194 W.Va. 770, 461 S.E.2d 516, 523 (1995)). The legislature created a private right

of action for violations. W. Va. Code § 46A-5-101.  This Court has found that defendants violated a section of the WVCCPA, § 46A-2-121, which prohibits unconscionable inducement of consumer loans, with respect to each class member's loan. [Doc. 227, p. 54].  In enacting this provision of the WVCCPA, the legislature recognized that West Virginia consumers have the right to consumer loans that are not unconscionably induced. Consistent with the authority above recognizing concrete, particularized harm created by statutory violations far less egregious than Quicken's conduct here, Quicken's violation of this statutorily-created, legally cognizable right creates a concrete harm to the Aligs as class representatives – and indeed as to each class member –sufficient to establish standing for each member of the class.

In addition, Quicken misinterprets this Court's findings when it represents that the Aligs' unconscionability claim relied on any individualized facts.  As this Court has already determined when it certified the class, the injury of receiving a tainted, unreliable loan as a result of Quicken's unconscionable conduct does not rely on any appraiser's individual testimony or the facts of any individual loan. Tellingly, Quicken does not cite a single case interpreting *Spokeo*, let alone one in a consumer statute case, alleging common class-wide conduct like that this Court has already found here, and where statutory damages are sought. Instead, Quicken cites pre-*Spokeo* cases where plaintiffs' proof was individualized or where class members sought actual damages which necessarily depended on individualized facts.  Plaintiffs and all class members unquestionably have standing to redress Quicken's unconscionable conduct.

Next, defendants state, in direct contrast to their position throughout this litigation and to their executed stipulation on file with the Court, that not all class members had a

contract, and some signed a different agreement from the Deposit Agreement. [Doc. 324-3, at 8]. Yet the stipulation Quicken's counsel executed and filed on March 15, 2016, stated:

> Quicken Loans stipulates that the Interest Rate Disclosures and/or Deposit Agreements for the named Plaintiffs' loans (Quicken 15, 699, 1031, 1625) are representative of the standard deposit agreements used by Quicken Loans from 2002 to the present.

[Doc. 168].

This stipulation was submitted during the class certification briefing and Quicken has never before questioned whether the contracts were uniform. The declaration contradicting the stipulation filed in March 2016 will be stricken because it contradicts evidence Quicken has already submitted in this case. While technically applicable to motions for summary judgment, defendants' conduct here is generally improper under the sham affidavit rule, a firmly established part of Fourth Circuit law. *See Rohrbough v. Wyeth Labs., Inc.*, 916 F.2d 970, 975 (4th Cir. 1990). Under the "sham affidavit" rule, "a party cannot create a genuine issue of fact sufficient to survive summary judgment simply by contradicting his or her own previous sworn statement (by, say, filing a later affidavit that flatly contradicts that party's earlier sworn deposition) without explaining the contradiction or attempting to resolve the disparity." *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999).

This Court will leave until later, if necessary, to determine whether there would exist an implied contract to receive a fair, untainted appraisal.

Defendants next argue, also for the first time, that class members' own performance under the contracts cannot be "presumed on a class basis". Defendants speculate that, if any class member attempted to influence an appraiser, it would constitute a breach of

the agreement by the borrower.  This argument is frankly illogical. Putting aside the fact that Quicken has never before raised such a defense, there is no language in the Deposit Agreement obligating a borrower to provide a fair and accurate appraisal; that obligation falls solely on the part of the lender, Quicken.  Of course, this makes sense, as it is the lender, not the borrower, who is responsible for hiring the appraiser – and from whom the appraiser can expect repeat business if expectations are met.

Quicken's remaining contract arguments were already addressed by this Court at the March 30, 2017 hearing when the Court found that plaintiffs' request for equitable relief in the form of the return or disgorgement of payments is simply an equitable form of relief. [Doc. 277, Mar. 30, 2017 Transcript at 5-6].  The issue was also thoroughly briefed in conjunction with plaintiffs' motion for summary judgment on contract damages, discussed below.   The primary flaw in Quicken's argument is that the Deposit Agreement was a separate, stand-alone contract that was independent from the loan agreements.  The status of the loans is irrelevant to the separate contract duty that this Court explained required Quicken to obtain the fair, valid and reasonable appraisals that plaintiffs and class members bargained (and paid) for but did not receive.  Instead, they received unreliable, worthless appraisals and have all been damaged, making restitution appropriate.

In sum, Quicken's position that the Court may not award a refund of the contract fees on a class-wide basis is incorrect, and there are no individualized issues bearing on predominance because this relief may be readily awarded based on class-wide data already available.

Defendants next argue that class-wide statutory penalties cannot be awarded without individualized evidence.  However, as this Court has repeatedly recognized, the

33

amount of the award of statutory penalties is dependent on the level of egregiousness of **Quicken's conduct**. [Doc. 277, pp. 4-5].  ("[T]he amount of penalty to be imposed by the Court should have a relationship to the egregiousness of the violation.  However, this Court believes that the egregiousness of the violation is something the Court considers based upon the actions of Quicken Loans and TSI"; see also [Doc. 336, May 9, 2017 Transcript at 6:22-25]; *Clements v. HSBC Auto Finance, Inc.*, 2011 WL 2976558, at *7 (S.D. W.Va. July 21, 2011) ("The amount of a [WVCCPA] penalty should have a direct relationship to the egregiousness of the violation").  This Court has already considered and rejected defendants' argument – which is still, and has always been, about actual harm.

Statutory damages may be awarded on a class-wide basis here because Quicken's conduct was uniform as to the class.  *Soutter v. Equifax Info. Servs., LLC*, 498 F.App'x 260 (4th Cir. 2012), a Fair Credit Reporting Act case, is readily distinguishable because that court recognized that the methods the defendant credit reporting agency used to collect credit information from the courts had a significant bearing on individual claims.  For example, Equifax used "at least three different means of collecting general district court records during the class period," and Soutter's claims therefore "varie[d] from any potential class plaintiff with a circuit court judgment, and from many potential plaintiffs with general district court judgments," which made proof of whether Equifax's behavior was unreasonable vary case-by-case.  In contrast, there is absolutely no difference in defendants' conduct here as to the members of the proposed classes, let alone a meaningful one.  In such circumstances, where defendant's conduct is uniform as to the class, class certification is appropriate.  *See Stillmock v. Weis Mkts., Inc.*, 385 Fed.App'x

267, 273 (4th Cir. 2010) (reversing denial of certification and finding questions of liability predominating because "the qualitatively overarching issue by far is the liability issue of the defendant's willfulness, and the purported class members were exposed to the same risk of harm every time the defendant violated the statute in the identical manner"); *Ealy v. Pinkerton Gov't Servs., Inc.*, 514 F.App'x 299, 305 (4th Cir. 2013) (same); *Ramirez v. Trans Union, LLC*, 301 F.R.D. 408, 420 (N.D. Cal. 2014) (finding typicality met and finding defendant's reliance on Soutter "misplaced" because the Soutter court found there were "meaningful differences between her claim and class claims" but that in present case the record showed that defendant's conduct was uniform as to the class).  *See also Deiter v. Microsoft Corp.*, 436 F.3d 461, 466-67 (4th Cir. 2006) (typicality does not require "that the plaintiff's claim and the claims of class members be perfectly identical or perfectly aligned.").

Quicken's argument that class members did not necessarily suffer identical harm – even if relevant as a matter of law to this WVCCPA case – would effectively preclude class certification in any consumer case.  Instead, consumer statutes allow for, and courts award, uniform class-wide penalties in such cases.  For example, the Telephone Consumer Protection Act of 1991, 47 U.S.C. § 227 ("TCPA") is a federal consumer statute which restricts telephone solicitations and the use of automated telephone equipment.  The "Do Not Call" provisions of the TCPA, like the WVCCPA, allow for statutory penalties. 47 U.S.C. § 227(b)(3)(B).  In a recent class case, *Krakauer v. Dish Network L.L.C.*, a jury awarded $400 for each call that violated the Do Not Call provisions of the TCPA.  2017 WL 2242952, at *2 (M.D. N.C. May 22, 2017).  The district court then trebled that award upon

finding that defendants had willfully and knowingly violated the TCPA. *Id*. at *12. In a prior order examining standing under Spokeo and denying defendants' motion to decertify the class, the *Krakauer* court recognized that not every class member's experience was the same: "While class members did not necessarily pick up or hear ringing every call at issue in this case, each call created, at a minimum, a risk of an invasion of a class member's privacy. *Spokeo* clarified that a "risk of real harm" was enough to show concrete injury." *Krakauer v. Dish Network L.L.C.*, 168 F.Supp.3d 843, 845 (M.D. N.C. 2016). Here, the Court's liability finding recognizes the class-wide risk that Quicken's unconscionable conduct created, and a class-wide award is consistent with that finding as well as expressly permitted by the statute.

Uniform statutory penalties are also frequently awarded under the WVCCPA, most often in a settlement class context. This Court has awarded class-wide statutory penalties not only in *Dijkstra v. Carenbauer*, 5:11-cv-152, where each class member was subject to the same unconscionable lending practice but not necessarily to the same actual harm, and in *Diloreti v. Countrywide Home Loans, Inc.*, No. 5:14-cv-00076, wherein it approved a class settlement that resolved identical allegations of appraiser influence to those here and wherein class members received the same penalty amount. [Doc. 341-1]; see also Final Orders approving settlements [Doc. 341-2], in *Archbold v. Wells Fargo Bank, N.A.*, 2015 WL 4276295 (S.D. W.Va. July 14, 2015) (approving settlement involving "per loan statutory penalty amount to settlement class members" whose loans were serviced by Wells Fargo and who were assessed and paid attorneys' fees); *Triplett v. Nationstar Mortgage, LLC*, No. 3:11-cv-238 (S.D. W.Va. Oct. 16, 2012) (approving

36

settlement involving class-wide statutory penalties awarded via pro rata distribution to class members charged unlawful late fees and to whom partial payments were returned); *Muhammad v. National City Mortgage, Inc.*, No. 2:07-0423 (S.D. W.Va. Dec. 19, 2008) (same). Moreover, the *Vanderbilt* court itself approved a uniform penalty of $2,250 for each of the ten offensive phone calls at issue in that matter. It did not require an individualized analysis of the harm resulting from each of the discrete calls, because it flatly rejected an effort to import the "reasonable relationship" analysis from punitive damages cases to civil penalties. *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 512, 740 S.E.2d 562, 569 (2013). Relying upon *Vanderbilt*, this Court has already found that any statutory penalty need not bear a reasonable relationship to the actual harm. [Doc. 277, at 5].

Courts frequently make the same class-wide penalty determinations in FDCPA cases, where statutory damages in class actions are awarded "as the court may allow" but not to exceed $500,000, or 1 per centum of the debt collector's net worth under 15 U.S.C. § 1692k(a)(2)(B). *See Miller v. McCalla, Raymer, Padrick, Cobb, Nichols & Clark, LLC*, 198 F.R.D. 503, 507 (N.D. Ill. 2001) (certifying FDCPA class, entering summary judgment on liability, and awarding the maximum allowable statutory damages to the class because defendant's "noncompliance here involved thousands of individual violations over several years: it was frequent and persistent. The nature of the noncompliance was blatant."); *Weissman v. Gutworth*, 2015 WL 3384592 (D. N.J. May 26, 2015) (approving settlement fund in FDCPA case awarding pro rata share to each class member); *Harlan v. Transworld Sys., Inc.*, 302 F.R.D. 319 (E.D. Pa. 2014) (same); *Stinson v. Delta Mgmt.*

*Assocs., Inc.*, 302 F.R.D. 160 (S.D. Ohio 2014) (same); *Garland v. Cohen & Krassner*, 2011 WL 6010211, at *8 (E.D. N.Y. Nov. 29, 2011) (same); *Bonett v. Educ. Debt Servs., Inc.*, 2003 WL 2165827 (E.D. Pa. May 9, 2003) (same). *See also Kemply v. Cashcall, Inc.*, 2016 WL 1055251, at *16 (N.D. Cal. Mar. 16, 2016) (finding members of certified class entitled to statutory penalty of $500,000 under Electronic Funds Transfer Act, 15 U.S.C. § 1693k(1) because defendant's "noncompliance with the statute was frequent and persistent."). *See also Singleton v. Domino's Pizza, LLC*, 976 F.Supp.2d 665 (D. Md. 2013) (Chasanow, J.) (approving class action settlement agreement in FCRA case involving pro rata distribution of settlement fund).

Finally, Quicken attempts to use the overwhelming evidence of notice regarding the culpability of its conduct to contend that, because it arguably had less notice earlier in the class period, class members whose loans were closed earlier should be entitled to a smaller penalty and that this determination affects predominance. This argument rests on no legal support, and plaintiffs again note that this type of argument would effectively preclude any class action where a defendant naturally became more aware of a problem as time went on. As a practical matter, Quicken never changed its conduct during the class period.

The argument also ignores the Court's findings that indications in law and industry that passing on estimated values was wrong go back more than 20 years, long before the start of the class period in 2004, beginning with the FHC appraisal standards of 1996. [Doc. 227 at 13]. Quicken has still has not come forward with any authority demonstrating this practice ever served a bona fide purpose in the industry. The best it can do is cite two

sources – Advisory Opinion 19 of USPAP issued in 1999 (discussed by this Court in its Order Resolving all Motions [Doc. 227 at 14]) and the Ameriquest enforcement action by the states attorney generals both acknowledging the substantial problems with this practice and suggesting, at a minimum, a disclaimer, which Quicken never gave, is needed to lessen the potential for corruption. This Court finds that the defendants were unaware of the Ameriquest consent decree until long after the critical period of this action.

The oft cited finding from **Brown** that "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property. The only purpose could be to inflate the true value of the property" may have been made in 2010, but it applied to a 2006 loan. The **Brown** court made that finding after listening to six days of trial testimony, including Quicken's executives and its loan level personnel.  This Court has reviewed even more testimony and made a similar finding for loans issued from 2004 through 2009.  The fact that enforcement and regulatory efforts continued throughout the class period is a distinction without a difference.

Quicken's final argument is that equitable tolling cannot be resolved on a class-wide basis.  To the extent that the burden has shifted to any class members to demonstrate that their claims were equitably tolled, this Court "can easily determine whether the discovery rule applies class-wide to toll class members' claims" and that "defendant's statute of limitations argument presents no barrier to certification." [Doc. 227 at 51-52], citing **In re Community Bank of N. Va. Mortg. Lending Prac. Litig.**, 795 F.3d 380 (3d Cir. 2015) (common issues predominated over individual issues as to whether applicable statutes of limitation on class members' claims were equitably tolled due to concealment);  **In re**

39

*Urethane Antitrust Litig.*, 251 F.R.D. 629 (D. Kan. 2008);  *Hamilton v. Pilgrim's Pride Corp.*, 314 F.Supp.2d 630 (N.D. W.Va. 2004); *Cohen v. Trump*, 303 F.R.D. 376 (S.D. Cal. 2014); *Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191 (S.D. Ohio 2002). This authority is consistent with the Fourth Circuit's decision in *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311 (4th Cir. 2006), holding that a statute of limitations defense may be resolved on a class-wide basis by looking to the record when the "defense is so dependent upon facts applicable to the entire class... that individual hearings would not be necessary." 445 F.3d at 327; *see also Minter v. Wells Fargo*, 279 F.R.D. 320 (D. Md. 2012); *Fangman v. Genuine Title*, 2016 WL 6600509, at \*7 (D. Md. Nov. 8, 2016) (Bennett, J.); *Baker v. Castle & Cooke Homes Hawaii*, 2014 WL 1669158, at \*14 (D. Haw. 2014);  *Thurman v. CUNA*, 836 N.W.2d 611, 621 (So. Dak. 2013); *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at \*17 (D. Conn. 2011); *In re NASDAQ Market–Makers Antitrust Lit.*, 169 F.R.D. 493, 520 (S.D. N.Y. 1996).

Quicken is incorrect when it suggests that the Third Circuit's decision in *Cunningham v. M&T Bank Corp.*, 814 F.3d 156 (3d Cir. 2016) or the Fourth Circuit's decision in *EQT Prod. Co. v. Adair*, 764 F.3d 347 (4th Cir. 2014) foreclose the potential to resolve equitable tolling on a class-wide basis.  *Cunningham* was not a class certification decision but a summary judgment opinion wherein the court affirmed the district court's decision that a disclosure form received, signed and dated by each plaintiff had made them aware of their claims.  It sheds no light whatsoever on the equitable tolling analysis as to class claims.  The *Adair* court found that the district court had misapplied the doctrine of fraudulent concealment by wholly ignoring the plaintiff's knowledge and

actions.  764 F.3d at 370.  It cited **Thorn** for the proposition that this inquiry can require individual evidence; it is only fair to refer to **Thorn** for its holding that in cases like this one, where the statute of limitation defense relies on common facts applicable to the entire class, certification is appropriate.

Here, those common facts applicable to the entire class are that Quicken affirmatively kept its conduct hidden from class members, [Doc. 227 at 15-16], and that there is not a single shred of evidence in the record of any class member having actual knowledge about Quicken's practice of tipping off appraisers.

## VI.    Defendant's (*sic*) Motion for Summary Judgment on Certain Class Loans [Doc. 298-3]

Defendants have also filed Defendant's (*sic*) Motion for Summary Judgment on Certain Class Loans [Doc. 298-3].  In that Motion, defendants move for summary judgment as to (1) all Class Loans where a borrower filed for bankruptcy and failed to disclose his or her West Virginia Consumer Credit and Protection Act ("WVCCPA") and breach of contract causes of action against Defendants in bankruptcy; (2) the WVCCPA claims on all Class Loans that were paid off or became fully due prior to December 27, 2010; and (3) the WVCCPA claims on all Class Loans obtained by a borrower who is deceased.

The defendants argue that those class members who filed bankruptcy and did not disclose their claims (of which they had no knowledge) in their bankruptcy cases must be dismissed.

The Third Circuit has rejected the argument that class members in bankruptcy must demonstrate standing, finding it "unpersuasive."  **In re Comm. Bank**, 795 F.3d at 397.  The

court explained, consistent with Fourth Circuit precedent, that "only named plaintiffs, and not unnamed class members, need to establish standing." *Id*. Further, in *Community Bank*, the plaintiffs had "identified a reliable, repeatable process whereby members of the putative class may be identified: consult CBNV's business records and then follow a few steps to determine whether the borrower is the real party in interest." *Id*.

The bankruptcy issue is not a unique one in class actions, and it does not defeat class certification. *See Wilborn v. Dun & Bradstreet Corp.*, 180 F.R.D. 347, 356 (N.D. Ill. 1998) (certifying class over objection that some class members' claims may have become part of a bankruptcy estate, noting that the issue does not preclude predominance because "determining whether they have exempted their claims against defendant should be a relatively straightforward matter); *Jordan v. Paul Fin.*, 285 F.R.D. 435, 464 (N.D. Cal. 2012) (same). As in *Community Bank*, a process has been identified here to determine the group of class members who filed for bankruptcy, in that Quicken has in fact already done so. The only issue that separates these class members from those who did not file bankruptcy is distribution, and the issue is not ripe. After the Court determines the amount of statutory penalties; whether class members are entitled to a refund of the appraisal fees; and whether any class members are entitled to recover actual damages, and after any appeals have been exhausted, this issue can indeed be addressed in a "straightforward" fashion. Plaintiffs' counsel indicate that they are already in contact with the Trustees regarding the most efficient and equitable way of approaching distribution.

Defendants also take the position that since the class members who filed for bankruptcy and did not list the claim in their petitions are estopped from being members

of the class, even though they were unaware of their claim at the time their petitions were filed.

There is no evidence that the debtor class members knew of their claims when they filed for bankruptcy. As discussed further below, Quicken itself concealed the passing of the estimated values. Quicken has provided no evidence that any class member was aware of Quicken's conduct or whether they had a legal claim arising from it. In such circumstances, courts refuse to apply judicial estoppel. *See Skrzecz v. Gibson Island Corp.*, 2014 WL 3400614, at *6 (D. Md. July 11, 2014) (Bennett, J.) (debtor plaintiff was not judicially estopped from asserting her civil claims because the "[p]laintiff did not have sufficient knowledge of a potential claim to deliberately omit it from her petition" when the plaintiff's "level of knowledge as to her claim for unpaid wages [was] in dispute"); *Sibert v. Wells Fargo Bank*, 2015 WL 3946698 (E.D. Va. June 26, 2015) (Hudson, J.) (judicial estoppel not applicable when "[p]laintiff did not intentionally mislead the bankruptcy court regarding his claim" and plaintiff "testified that when he filed for bankruptcy in 2011, he was unaware that he had a potential cause of action"); *Smith-Anthony v. Buckingham Mortg. Corp.*, 2009 WL 2500445 (D. Md. Aug. 13, 2009) (Quarles, J.) (refusing to dismiss case on judicial estoppel grounds when there was no evidence of intent in not including claims in bankruptcy petition). Defendants' argument that judicial estoppel may apply here is wholly unsupported by the facts.

If these class members are found to be entitled to receive a distribution and do not opt out of the class, they can petition to reopen their bankruptcy cases and allow the trustee and the Bankruptcy Court to determine the distribution of the proceeds.

Quicken next argues that summary judgment should be entered as to a second category of class members, those whose loans were paid off or otherwise became fully due on or before December 27, 2010, one year before the lawsuit was filed.  The statute of limitations is an affirmative defense which defendants bear the burden of demonstrating. ***Columbia Venture, LLC v. Dewberry & Davis, LLC***, 604 F.3d 824, 829 (4th Cir. 2010). Quicken has not met its burden here.  Instead of showing that particular class members' claims were time-barred, Quicken relies on pure conjecture, stating that "at least some" of the loans were time-barred but that it is "expensive and time-consuming for defendants to search the state and local government land records to determine if a Class Loan was paid off." [Doc. 298-4 14].  Such arguments are insufficient to shift the burden to plaintiffs.

The burden only shifts "once the defendant shows that the plaintiff has not filed his or her complaint within the applicable statute of limitations."  ***Smith v. Velotta***, 2016 WL 597743, at *3 (W.Va. Feb. 12, 2016).  This Court has already stated that: "If the defendant can bring evidence that the class member had actual knowledge that the defendant sent an estimate of value to the appraiser and that no payments were made within one year before June 15, 2012, I'll boot them.  In the absence of that evidence, it's not an issue." [Doc. 277 at 7].

This Court has already found that TSI's third-party software, Appraisal Port, "is designed to ensure that information exchanged between TSI and the appraiser is not accessible to any third party, including the lender." [Doc. 227 at 23].  The record also demonstrates that TSI discarded old appraisal order forms. [Doc. 199-3, Ex. L, Petkovski Dep. at 59:18-60:8].  This finding was confirmed at the recent evidentiary hearing through Amy Bishop's testimony:

> Q.    And they did not -- and Quicken Loans, as part of its practice, did not keep appraisal order forms in its loan files?
>
> A.    In the paper loan files?
>
> Q.    In any. In the paper, electronic, anywhere.
>
> A.    That is my understanding.
>
> Q.    Right.  And TSI didn't even keep the appraisal order forms, did they?
>
> A.    That is also my understanding.

[Doc. 336 at 76:10-17].

Ms. Bishop further testified that Quicken did not believe it was obligated to disclose to borrowers that estimated values were being shared with appraisers. [Id. at 29:15-19]. In fact, Ms. Bishop testified that this was not even "material" information that "should have been disclosed to a borrower" and is not something borrowers require as part and parcel of being what Quicken terms "very informed of the process." [Id. at 29:24:30:10].  There is no genuine dispute that Quicken concealed this practice from its customers and did so with knowledge that passing estimated values to an appraiser had been balked at by regulators and other authorities since at least 1996. [Doc. 227 at 13-14 ("Efforts to regulate this practice go back more than 20 years.")].  See also **United States v. Quicken**, 2017 WL 930039, at **7-8 (E.D. Mich. Mar. 9, 2017) (finding that lenders were on notice in 1996 that "[p]roviding to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower . . ." was prohibited by FHA regulations).

In addition, this Court has already recognized Quicken's admission that each borrower "has an expectation of a fair, unbiased, and reasonable [appraisal]." [Doc. 227

at 25, citing Doc. 206-1, Exh. B, Randall Dep. at 99:18-100:5].  This expectation would certainly also encompass an expectation that the appraisal was not based on the unconscionable and hidden practice of passing on estimated values.

In sum, the defendants have not identified a single shred of evidence in the record of any class member having actual knowledge about Quicken's practice of tipping off appraisers.  Instead, incredibly, Quicken speculates that class members should have known of their claims by reviewing case law, government investigations, or news sources about appraisal fraud generally. [Doc. 298-4 at 16-18].  Rather, it is clear that the only evidence relating to notice to class members of their potential claims is the fact, applicable to the entire class, that Quicken affirmatively kept its conduct hidden from class members. Indeed, this Court has already found that Quicken "fail[ed] to disclose this conduct [to] plaintiffs." [Doc. 227 at 15-16].  Quicken's contention that class members' theoretical knowledge of their claims is "inherently individualized and fact dependent" is thus unavailing, and further is wholly unsupported by case law in the class action arena.

This Court has already specifically rejected this "individualized" argument when it found last year that "this Court can easily determine whether the discovery rule applies class-wide to toll class members' claims" and that "defendant's statute of limitations argument presents no barrier to certification." [Doc. 227 at 51-52], citing **Community Bank**, *supra* (common issues predominated over individual issues as to whether applicable statutes of limitation on class members' claims were equitably tolled due to concealment); **In re Urethane Antitrust Litig.**, 251 F.R.D. 629 (D. Kan. 2008) (predominance and superiority requirements met when fraudulent concealment susceptible to common proof

46

on a class-wide basis); *Hamilton v. Pilgrim's Pride Corp.*, 314 F.Supp.2d 630 (N.D. W.Va. 2004) (under West Virginia law, the discovery rule tolls the statute of limitation until a claimant knows or by reasonable diligence should know that he has been injured and who is responsible); *Cohen v. Trump*, 303 F.R.D. 376 (S.D. Cal. 2014) (granting class certification of fraud claims over defendant's arguments that individualized determinations on statute of limitations would be necessary); *Kennedy v. United Healthcare of Ohio, Inc.*, 206 F.R.D. 191 (S.D. Ohio 2002) (certifying class when discovery of claim "may be amenable to a common proffer").

Consistent with the authority already cited by this Court above, Fourth Circuit law holds that a statute of limitations defense may be resolved on a class-wide basis by looking to the record when the "defense is so dependent upon facts applicable to the entire class.. . that individual hearings would not be necessary." *Thorn v. Jefferson-Pilot Life Ins. Co.*, 445 F.3d 311, 327 (4th Cir. 2006). The *Thorn* court contemplated situations where a statute of limitations defense could be resolved on a class-wide basis, including: (1) where defendant relied on mailings that it sent to all of its insureds on a particular date to argue that the class received notice outside of the applicable statute of limitations period; and (2) where the class demonstrated that the statute of limitations defense was "so patently without merit that the district court could find that the defense was not even a real 'issue' in the case." *Id*. at 327 n. 19. This case falls squarely within the type of example (1), as there is common, class-wide evidence of concealment in Quicken's failure to maintain the appraisal forms or disclose its conduct to borrowers.

Like the *Thorn* court and the other authority already recognized by this Court, courts

47

confronting the statute of limitation and equitable tolling issues in class cases where there is common, class-wide evidence find that this issue may be resolved in one fell swoop as to the entire class.  For example, in ***Minter v. Wells Fargo***, 279 F.R.D. 320 (D. Md. 2012), a case alleging that defendant lenders had developed a front organization ("Prosperity") to circumvent lending regulations, the court certified a class created specifically for the purpose of equitably tolling the statute of limitations.  In doing so, it recognized that the tolling analysis could be completed on a class-wide basis because all class members "rely on the same course of conduct perpetrated by Defendant when arguing the elements of equitable tolling, specifically that this conduct (1) concealed their claims and (2) lulled them into believing in the legitimacy of Prosperity without provoking them to make any inquiry into potential claims." *Id*. at 325-26.  In finding commonality and predominance met, the court recognized that the "test for equitable tolling relies on Prosperity's uniform and consistent course of conduct, so there is no need to inquire into transaction-specific details." *Id*. at 327.  The court rejected defendants' argument that each borrower's level of due diligence must be examined, because "due diligence is evaluated using an objective standard" and the court had already "determined that all borrowers went through generally the same uniform and consistent process when transacting with Prosperity."  *Id*.

Other courts are in accord with the ***Minter*** decision in recognizing the susceptibility of the equitable tolling issue to class-wide proof. *See **Fangman v. Genuine Title***, 2016 WL 6600509, at *7 (D. Md. Nov. 8, 2016) (Bennett, J.) (certifying class upon finding that the "named Plaintiffs have provided sufficient evidence that their individual claims are entitled to equitable tolling to proceed as representatives of the proposed class" and "issues

surrounding equitable tolling in this case are susceptible to class-wide proof because the Plaintiffs have demonstrated that it was West Town's 'pattern of practice' to not disclose the alleged kickback scheme on any class members' HUD-1 form and it was a pattern among West Town agents to receive kickbacks in the manner discussed above"); *Baker v. Castle & Cooke Homes Hawaii*, 2014 WL 1669158, at *14 (D. Haw. 2014) ("When there is no reason to suspect that potential class members have or will discover product defects at significantly different times, the presence of a statute of limitations provision, by itself, is insufficient reason to compel all potential class members to pursue their claims individually"); *Thurman v. CUNA*, 836 N.W.2d 611, 621 (So. Dak. 2013) ("constructive notice of claims accrual can be determined on a class-wide basis because the test to determine constructive notice is objective, applying a reasonable person standard. … All of the borrowers and insureds in this case went through roughly the same process to obtain their loans and credit disability insurance. Because BHFCU used a uniform process to sell credit disability insurance, changed the policy at the same time, sent out its newsletter to all of the borrowers, and sent statements to all borrowers, the claims regarding constructive notice may be decided by a jury applying the objective test to the circumstances in this case"); *In re U.S. Foodservice Inc. Pricing Litig.*, 2011 WL 6013551, at *17 (D. Conn. 2011) ("plaintiffs have produced common evidence showing that USF intended to conceal the VASPs and, therefore, it cannot reasonably be expected that the plaintiffs could have discovered the injury until they became more fully aware of VASPs existence and purpose. Therefore, common issues regarding fraudulent concealment exist and the statute of limitations does not bar certification of the RICO class"); *In re NASDAQ*

*Market–Makers Antitrust Lit.*, 169 F.R.D. 493, 520 (S.D. N.Y. 1996) (finding defendant's misrepresentations to the market, which were relevant to fraudulent concealment analysis, to be susceptible to common proof).

**VII.    Plaintiffs' Motion for Summary Judgment on Class-wide Contract Damages [293-1]**

In Plaintiffs' Motion for Summary Judgment on Class-wide Contract Damages [293-1], the plaintiffs seek class-wide damages for breach of contract in the form of disgorgement of the amounts paid by the class members for their tainted appraisals.

Quicken argues that it is entitled to a jury trial addressing the amount of damages recoverable as a result of its breach of contract.  However, in their complaint plaintiffs specifically demanded a disgorgement and restitution of all illegal fees associated with their loans [Doc. 1-1].  It is well settled that equitable relief is appropriate in breach of contract cases in West Virginia. *See, e.g., Parker v. Sayre*, 2013 WL 6153063 (W.Va. Nov. 22, 2013) (affirming summary judgment on breach of contract claim in which court had ordered equitable remedy of specific performance).  In this particular case, the plaintiffs are seeking the disgorgement of fees that were illegally collected as part of the appraisal process.

The law in West Virginia, and elsewhere, clearly provides that an order requiring the return of any illegal or ill-gotten gains is restitution, which is an equitable remedy. *See, e.g., Prudential Ins. Co. of America v. Couch*, 180 W.Va. 210, 376 S.E.2d 104, 108 (1988) (restitution is available whenever "the party who received the money has no basis for retaining it ... [and] has received money…to which he was not entitled."); see also *Gerald M. Moore & Son, Inc. v. Drewry & Assocs. Inc.*, 945 F.Supp. 117, 120 (E.D. Va. 1996), citing *Arkadelphia Milling Co. v. St. Louis Southwester Ry. Co.*, 249 U.S. 134 (1919).

Because Plaintiffs are seeking disgorgement of the appraisal fees, they are seeking a remedy akin to equitable restitution.  *See Sivolella v. AXA Equitable Funds Mgmt., LLC*, 2013 WL 4096239, at **5-6 (D. N.J. July 3, 2013) (finding that because plaintiffs were seeking disgorgement of the fees they were charged, they were not seeking "some funds" … "but rather the funds allegedly charged and retained by Defendants, and therefore, "Plaintiffs' claim is for equitable restitution and, as a result, not triable to a jury"), citing *Nat'l Sec. Sys., Inc. v. Iola*, 700 F.3d 65, 101 (3d Cir. 2012) ("it is undisputed that restitution of ill-gotten commissions is an equitable remedy."); *Hanwha Azdel, Inc. v. C & D Zodiac, Inc.*, 2013 WL 3989147, at *2 (W.D. Va. Aug. 2, 2013) (a claim for disgorgement of specific profits and to prevent unjust enrichment constitutes equitable restitution and would be a remedy imposed "if at all, by the court and no[t] by the jury.").

There is no right to a jury trial in equity.  Equitable issues are, instead, addressed solely to the court.  *Barton v. Constellium Rolled Products-Ravenswood, LLC*, 2014 WL 3696646 (S.D. W.Va. July 23, 2014) (Goodwin, J.) ("if an action will resolve 'legal rights,' the courts must provide a trial by jury; however, if an action involves only equitable rights, a jury trial is not required").  The amount of damages is a simple, straightforward calculation. The appraisals were rendered worthless by Quicken's breach and, thus, plaintiffs are entitled to a restitution of the full amount of the appraisal fees.  Indeed, independence is of foremost importance in the appraisal process. See 15 U.S.C. § 1639e (2010).  Once an appraisal is tainted by the implication of influence over the appraiser especially by the party compensating the appraiser, the resulting appraisal cannot by any established standard be fair, valid and reasonable.  Here, Plaintiffs failed to receive the

benefit of their bargain—a fair, valid and reasonable appraisal. This Court will enter judgment accordingly requiring restitution of the appraisal fees in the amount of $968,702.95. [See Doc. 293-9].

This Court may award summary judgment as to these damages. Summary judgment is appropriate where there are no disputed issues of fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). This same principle applies to damages: whenever the moving party has demonstrated that damages are undisputed and in an amount that does not require the jury or the court to resolve conflicting facts, summary judgment is proper. *See Applied Capital, Inc. v. Gibson*, 558 F.Supp.2d 1189, 1208 (D. N.M. 2007) (in a fraud case, summary judgment was appropriate where "the defrauded amount [was] a sum certain"); *Branch Banking & Trust Co. v. Tractor Co., Inc.*, 2016 WL 3676744 at *5 (S.D. W.Va. July 7, 2016) (Berger, J.) (finding no genuine issue of material fact regarding amount of damages awardable for breach of contract, over defendant's objection that a dispute of fact existed); *Mountain 1st Bank & Trust v. Holtzman*, 2012 WL 3126833, at *3 (D. S.C. 2012) (finding no genuine issue of material fact regarding amount of damages plaintiff suffered as a result of defendant's breach and awarding sum certain); *Pin State Creamery Co. v. Land-O-Sun Dairies, Inc.*, 1998 WL 34304526, at *2 (E.D. N.C. Aug. 25, 1998) (Boyle, J.) ("summary judgment is appropriate if the Court may determine [plaintiff's] damages as a matter of law"). *See also Reedy River Ventures Ltd. P'ship v. Synoptics Communications, Inc.*, 38 F.3d 1213 (4th Cir. 1994) (affirming district court's award of summary judgment on amount of damages in conversion action).

With respect to the breach of contract claim, this Court made specific findings establishing a contractual duty, a breach of said duty, and causation resulting in the consumer receiving something less and different than what was bargained for. Specifically, the Court deemed each appraisal to be unfair, invalid and unreasonable on account of Quicken engaging in a scheme to circumvent established standards of appraiser independence [Doc. 227 at 25].   In such circumstances, the only way a consumer can be made whole is to throw out the contaminated appraisal and refund the cost or obtain another appraisal on the consumer's behalf.  Of course, a second appraisal is not free and will have a similar cost, if not more due to the passage of time, to the original appraisal.

Quicken's liability for breaching its contract has already been established.  The amount of the fees collected by Quicken as a result of its breach is a sum certain that is readily calculable from the undisputed facts in the record.  The parties have agreed the amount is $968,702.95.

## VIII.   Order Awarding Statutory Damages

Based upon the evidence presented, both that in the record and that presented at the evidentiary hearing requested by the defendants, this Court must now determine the amount of the statutory penalty to be awarded the class members under the West Virginia Consumer Credit and Protection Act.

Plaintiffs bear the burden of proving damages, and must do so by a preponderance of the evidence. *See* Syl. Pt. 4, *Taylor v. Elkins Home Show, Inc.*, 210 W.Va. 612, 614, 558 S.E.2d 611, 613 (2001); *Dickens v. Sahley Realty Co., Inc.*, 233 W.Va. 150, 154

n.14, 756 S.E.2d 484, 488 n.14 (2014).  As in other statutory penalty cases (e.g., False Claims Act), plaintiffs must prove that any penalty higher than the minimum is warranted. *Cf.* ***United States ex rel. Maxwell v. Kerr-McGee Oil & Gas Corp.***, 2010 WL 3730894, at *6 (D. Colo. Sept. 16, 2010) ("[T]he evidence of misconduct by the Defendant was far from 'overwhelming.'. . . [T]he Court finds no particular reason to assess anything more than the minimum statutory penalty").

"The determination of the statutory penalties under the Consumer Protection Act does involve evidence of intent, knowledge and harm."  Chan Decl. Ex. 15, at 4:23-25; *see* ***Clements v. HSBC Auto Fin., Inc.***, 2011 WL 2976558, at *7 (S.D. W.Va. July 21, 2011) (Berger, J.) ("The amount of a penalty should have a direct relationship to the egregiousness of the violation.")***; Kidd v. I.C. Sys., Inc.***, 2014 WL 847692, at *6 (W.Va. Cir. Ct. Jan. 30, 2014) (lower penalty for telephone calls that were placed, but not heard or received by plaintiffs); ***Endicott v. Hager***, 2000 WL 35542409, at *2 (W.Va. Cir. Ct. Aug. 25, 2000) (lower penalty range because plaintiffs were not "unduly harmed" by defendant's conduct).

Courts have imposed higher penalties where the plaintiffs have proven that the defendants knew their conduct violated the law, but nevertheless proceeded in complete disregard of their legal obligations. *See* ***Vanderbilt Mortg. & Fin., Inc.***, 2011 WL 9697521, at *3 (W.Va. Cir. Ct. Aug. 15, 2011) ("Vanderbilt I") (maximum penalty based on "complete disregard" for statutory rights, where attitude conveyed "disrespect, saying 'We know what the law is in the State of West Virginia, but we do not have to follow it'"); ***Figgatt v. Green Tree Servicing, LLC***, 2012 WL 8895246, at *3 (W.Va. Cir. Ct. Aug. 23, 2012) (maximum

penalty where "[d]efendant was clearly aware of the prohibition"); *Dijkstra v. Carenbauer*, 2014 WL 12594132, at *2 (N.D. W.Va. July 16, 2014) (awarding mid-range penalty where "defendant continued to engage in this practice" after decision prohibiting the practice).

The defendants claim to have carefully researched the law of West Virginia to be certain that the state law did not prohibit the transmission of an estimated value to an appraiser.  The defendants note that "unlike other states, West Virginia never adopted a specific law prohibiting the transmittal of values to appraisers." [Doc. 295-2, p. 9]. Defendants further indicate that had West Virginia adopted a specific prohibition against such conduct, the defendants would have stopped.

The fallacy with this argument is that the defendants confuse unlawful with unconscionable.  The fact that an activity is not specifically outlawed does not prevent the activity from being unconscionable.

There was simply too much opinion and information condemning the practice of telegraphing a value to an appraiser for the defendants to hide behind "It's not illegal."

While Quicken has attempted to minimize or explain away the many sources this Court relied on in issuing its summary judgment rulings, Quicken has to this day never offered any legal or industry source that would indicate suggesting values to appraisers was considered a best or even valid lending practice.  The best Quicken can do is show that some other predatory lenders did the same.

As early as 1996, the Federal Housing Commissioner issued appraisal standards to be followed in all HUD-approved mortgage transactions.  Under these standards, the appraiser was required to certify that the appraisal was not "based on a requested minimum valuation, [or] a specific valuation or range of values." [Doc. 173-22, Mortgagee

Letter 96-26, authored by Nicholas P. Retsinas, Assistant Secretary for Housing, on behalf of the Federal Housing Commissioner (May 21, 1996)].   The District Court for the Eastern District of Michigan recently relied on this letter as constituting notice and warning to mortgagees in 1996 regarding federal condemnation of the practice sufficient to withstand a motion to dismiss.  ***United States v. Quicken***, 2017 WL 930039, at **7-8.  The court noted that the Government took the position that:

> Although the appraiser was the individual required to make the statement in the certification, this letter was sent to 'all approved mortgagees.'  Thus, those mortgagees who received the letter were clearly aware, and sufficiently warned, that an appraisal could not be based on a requested or specific valuation.

> Furthermore, the Mortgagee Letter 2009–28 not only provides that 'new requirements set forth in this mortgagee letter will be effective for all case numbers assigned on or after January 1, 2010,' but that "existing requirements will remain in effect."  Mortgagee Letter 2009–28 at 1.  In the portion entitled "Affirming Existing Requirements," the letter expressly states:

> > FHA is reaffirming these requirements. Mortgagees and third parties working on behalf of mortgagees are prohibited from:

> > * * *

> > Providing to the appraiser an anticipated, estimated, encouraged or desired value for a subject property or a proposed or target amount to be loaned to the borrower, except that a copy of the sales contract for purchase must be

56

provided.

**Id**. at 3.  This language clearly contradicts Quicken's contention that this letter prohibited value appeals for the first time in 2009 with an effective date of 2010.

2017 WL 930039 at **7-8 (emphasis added).

Three years later, in 1999, the Comptroller of the Currency concluded that providing an "owner's estimate of value," "[a]t a minimum, . . . suggests to the appraiser the value conclusion that is needed to complete the transaction."   [Doc. 173-23, Ltr. from OCC to K. Kaiser, Chairman of The Appraisal Standards Board (July 28, 1999)]

Then in 2005 all the major federal agencies with lending oversight, including the Comptroller of the Currency, Board of Governors of the Federal Reserve System, Federal Deposit Insurance Corporation, Office of Thrift Supervision, and National Credit Union Administration, expressly addressed the issue in an "Interagency Statement," advising in pertinent part: "the information provided [to the appraiser] should not unduly influence the appraiser or in any way suggest the property's value."   Frequently Asked Questions on the Appraisal Regulations and the Interagency Statement on Independent Appraisal and Evaluation Functions, March 22, 2005. Available at http://www.occ.gov/newsissuances/bulletins/2005/bulletin-2005-6a.pdf.

Because of subsequent litigation by the New York Attorney General, the industry later adopted the Home Valuation Code of Conduct, which prohibited lenders and their appraisal management companies from "providing to an appraiser an anticipated, estimated, encouraged, or desired value for a subject property or a proposed or target amount to be loaned to the borrower."  (The Home Valuation Code of Conduct (HVCC) is

available at www.freddiemac.com/.../ docs/030308 valuationcodeofconduct.pdf.  HVCC is the result of a joint agreement between Fannie Mae, Freddie Mac, Federal Housing Finance Agency, and New York state attorney general Andrew Cuomo, to improve the quality and independence of the appraisal process.  Fannie Mae and Freddie Mac dictated that all major lenders and appraisal management companies must comply with HVCC.

HVVC was released for comment in March 2008 and became effective in May 2009. Quicken continued its practice of sending estimated values to an appraiser through the comment period, after passage and until just before the effective date.

In 2007, an online petition signed by 11,000 appraisers from across the country was submitted to Congress and the Appraisal Subcommittee of the Federal Financial Institutions Examination Council, copying "[o]ther state or federal agencies with authority in the… matter."[7]  In the petition, the signing appraisers acknowledge and condemn the fact that lenders regularly "apply pressure on appraisers to hit or exceed a predetermined value."  The signing appraisers agreed that the practice produced "adverse effects on our local and national economies."  There was, they warned, "the potential for great financial loss."

In a national survey of appraisers conducted in late 2006, 90% of the participating appraisers indicated that they felt some level of "uncomfortable pressure" to adjust property valuations.  This was an increase of 35% from a survey conducted three years earlier.

---

[7] The petition appears at the following website: http://appraiserspetition.com., and is discussed in the Southern District of New York's opinion in **Nomura**, infra, 104 F.Supp.3d at  461.

*Nomura*, 104 F.Supp.3d at 461.[8]

At the state level, West Virginia was also deterring these practices and protecting consumers.  At least one West Virginia court specifically found the practice of providing an estimated value to an appraiser to be unlawful and indefensible.  In ***Brown v. Quicken Loans Inc.***, Civ. No. 08-C-36, Ohio County, W. Va., the Honorable Judge Arthur Recht found "[n]o legitimate purpose is served by providing an appraiser with an estimated value of a property.  The only purpose could be to inflate the true value of the property." [Doc. 173-24, at ¶ 50].   This finding supported several liability findings against Quicken, which (to the extent appealed) were affirmed by the West Virginia Supreme Court of Appeals ("WVSCA") in Quicken I.

Prior to Quicken I, the WVSCA condemned this very practice in ***Herrod v. First Republic Mortgage Corp.***, 218 W.Va. 611, 617-618, 625 S.E.2d 373, 379-380 (2005) by reversing a trial court's grant of summary judgment to a mortgage lender where the evidence demonstrated that its appraiser was influenced via an appraisal request form with target numbers, resulting in a consumer taking out an underwater loan. *See also **Fed. Housing Fin. Agency v. Nomura Holding Am. Inc.***, 104 F.Supp.3d 441, 461 (S.D. N.Y. 2015) (discussing the problem with lenders providing a target number to the appraiser in

_____

[8] The 2007 National Appraisal Survey was composed of 33 questions presented to "a representative group of the nation's leading real estate appraisers."  It was intended to give a comprehensive understanding of the real estate appraisal business in the second half of 2006 through 2007.  Its predecessor, conducted in 2003, "shocked the industry when 55% of appraisers surveyed indicated that they felt uncomfortable pressure to overstate property values in greater than half of their appraisals."  The component of the survey conducted in the last half of 2006 represented responses from 1,200 appraisers, and showed "an alarming increase" in the extent of pressure felt by real estate appraisers. *Id.* at fn. 12.

connection with the loan and acknowledging that "[a]ppraisers may inflate their appraisals because of pressure from loan officers.")

West Virginia's sister state of Ohio was also at the forefront. Ohio courts uniformly concluded that the act of providing the borrower's estimated value for a property in connection with a mortgage loan is unconscionable because it is an attempt to improperly influence the appraiser's independent judgment. *See, e.g.,* ***State ex rel. Dann v. Premiere Service Mortgage Corp.***, Case No. CV-2007-06-2173 (Butler Cty. Apr. 30, 2008); ***State ex rel. Rogers v. Ace Mortgage Funding, LLC***, Case No. A0705054 (Hamilton Cty. Sept. 23, 2008); ***State ex rel. Cordray v. First Ohio Banc & Lending, Inc.***, Case No. 07-CV-259 (Belmont Cty. Nov. 24, 2009); ***State ex rel. Cordray v. Apex Mortgage Services, LLC***, Case No. 07-CV-261 (Belmont Cty. Mar. 10, 2009) [collectively found as Doc. 212-3, Exh. 16]. Ohio has expressly defined unconscionable acts in connection with residential mortgages to include any attempt to corrupt or improperly influence the independent judgment of an appraiser. O.R.C. § 1345.031(10). This statute was amplified by Ohio Administrative Code 109:4-3-24, which as of January 7, 2007 deems "[i]n the case of any refinance loan …, [the act of including] on the appraisal order form … either the loan amount or any other express or implied statement of the anticipated or desired appraisal valuation of the dwelling subject to the appraisal" to be an unconscionable practice.

By Order entered June 2, 2016, this Court found that Quicken's uniform practice of providing estimated home values to appraisers constituted unconscionable conduct under the West Virginia Consumer Credit and Protection Act ("WVCCPA"). The Court found that

Quicken did so while failing to disclose the practice to plaintiffs. [Doc. 227 at 19].   The Court recognized that, by "concealing these facts, Quicken meant to 'deceive or trick' the plaintiffs" as understood by the Fourth Circuit in *McFarland v. Wells Fargo Bank*, 810 F.3d 273 (4th Cir. 2016).   Moreover, the Court found "ample evidence in the record that passing on an estimated value is an unconscionable practice that was part of the inducement for plaintiffs' loans."   This Court rejected defendants' argument that appraisals are obtained for the benefit of the lender, not the borrower [Doc. 227 at 22], explaining that Quicken itself represents to borrowers that "[t]he appraisal will protect you from owing more on your loan than your home is worth, which is known as being underwater."

The Court also made findings as to intent: "To repeat, Quicken had full knowledge of its practice of providing estimated values to its appraisers for purposes of influencing their appraisals. Quicken's Rule 30(b) witness and internal documents confirm beyond any doubt that estimated values were used by Quicken as a means of communicating targets to its appraisers.   Quicken knew these facts.   The plaintiffs did not.   Under the analytical framework of both *McFarland* and *Brown*, this constituted unconscionable inducement." [Doc. 227 at 20-21].   The Court went on to find that:

> "A borrower's estimated value is not materially or logically distinguishable from a 'target appraisal value' or 'predetermined value.'" [Doc. 27 at 11].

> "No matter who supplied the estimated value, this Court cannot imagine any logical basis for sending an estimated value to the appraiser other than to influence his or her opinion." [Id.].

> "Quicken influenced the appraisers to meet a passed on value, and it did so while failing to disclose the practice to plaintiffs."  [Id. at 19].

"As it did in the **Brown** case, Quicken possessed knowledge of the true facts of the Aligs' loan, namely that it was actively attempting to compromise the appraisal process.  Specifically, pressure was being brought to bear on the appraiser, who was expected to meet or exceed a target figure that Quicken itself had provided not once but twice (in the case of the Aligs)." [Id. at 20].

This Court has already made findings regarding the borrower's right to a fair and unbiased appraisal, and the fact that no genuine purpose is served by providing the estimated value to the appraiser.  It recognized that, "Quicken has admitted that the borrower has an expectation of a fair, unbiased, and reasonable [appraisal].  [Doc. 227 at 25].

In addition, this Court in its Order denying Quicken's motion to dismiss:

What is clear is that the plaintiffs each deposited a sum of money with Quicken, and, in turn, Quicken agreed to obtain an appraisal of the property and process the loan application.  This Court finds that it was a necessary corollary of obtaining an appraisal that the defendant would obtain a fair, valid and reasonable appraisal of the property.

[Doc. 107 at 7].

The testimony in this case was consistent with Judge Recht's conclusion that there is no legitimate purpose to passing on an estimated value.  As this Court found, "the testifying appraisers distanced themselves from [estimated value] figures as taboo and all agreed that this information is in no way necessary to performing an appraisal." [Doc. 227 at 15].  The Court further observed that Quicken executive and corporate designee Michael Lyon agreed in deposition testimony offered in July of 2008 in the **Brown** litigation that

estimated values were in no way necessary to complete the appraisal process. [Id.].

As the Court noted, this case was "not the first time it had an opportunity to study appraisal influence." [Id. at 33]. In *Diloreti v. Countrywide Home Loans, Inc.*, the Court "recognized the plausible inference created when a bank provides appraisers with suggested or estimated values of homes":

> Taken as true, these allegations create an inference that [lenders'] practice of providing estimated values of homes was for the purpose of influencing the appraiser's independent judgment.  It certainly is plausible that an appraiser would seek to meet a client's suggested outcome in order to receive future business from the client.

[Id. citing Doc. 169-12, *Diloreti v. Countrywide Home Loans, Inc.*, No. 5:14-cv-76 (N.D. W.Va. Nov. 14, 2014), Order Granting Bank Defendants' Motion in Part and Denying in Part and Denying Funari's Motion for Judgment on the Pleadings, at 7.)

This Court is not alone among West Virginia district or state courts in recognizing Quicken's rampant problem with appraisal valuation, which was happening via a number of mechanisms, and in recognizing the importance of a fair and unbiased appraisal.  Other federal district courts in West Virginia have acknowledged the severity of Quicken's appraisal-related conduct by denying summary judgment to Quicken on its appraisal practices.  For example, in *Bishop v. Quicken Loans, Inc.*,  2011 WL 1321360, at *6 (S.D. W.Va. 2011), Judge Copenhaver found that the plaintiffs had raised a question of fact as to whether their mortgage "was the product of an inflated appraisal" after Quicken issued a loan based on an appraisal that came in 36% higher than another recent

appraisal.  The *Bishop* court further noted that "Quicken Loans' reliance on the 2006 appraisals is even more suspect in light of the sister-corporation relationship between [the appraiser's] employer (TSI) and Quicken Loans."  *Id*.  *See also O'Brien v. Quicken Loans, Inc.*, 2013 WL 2319248, at *6 (S.D. W.Va. May 28, 2013) (Copenhaver, J.) (denying motion to dismiss unconscionability claim when plaintiff "alleged that inflated appraisals led him unwittingly to take out loans in excess of the value of his home and rendered him unable to refinance or sell his home.)  As the *O'Brien* court recognized, Quicken's conduct with respect to inflated appraisals "implicate[s] the onesidedness and public policy concerns that are the subject of substantive unconscionability."  *Id*.

Judge Kaufman's order in *Nicewarner v. Quicken Loans Inc.* (Cir. Ct. Kanawha Cty. W.Va. Jan. 13, 2016), provides another condemnation of Quicken's appraisal practices.  As in this case, when ordering an appraisal for Ms. Nicewarner, Quicken "communicated a target value for the home to the appraiser." (Order at 2). In denying Quicken's motion for summary judgment on Ms. Nicewarner's claim for fraud, the court found that plaintiff had presented evidence of each element of the tort, in that:

> Defendant represented to Plaintiff- including by placing the appraisals at issue in her closing packages – that in 2007 her home had a value of $141,000, and that in 2008 and 2009, her home had a value of $125,000. Defendant was responsible for reviewing the appraisal and ensuring that it met all applicable standards; however it was clear that the appraisal did not meet said standards. .. Plaintiff has further presented evidence, through her retrospective appraisals, that the misrepresentations were false.  Plaintiff

further testified that she relied on Defendant's representation as to value, and would not have entered the loans but for Defendant's representations. The appraisal itself notes that the borrower may rely on it, and such reliance is reasonable.

[Doc. 293-3 at 11-12].

Similarly, in **Robinson v. Quicken Loans Inc.**, 988 F.Supp.2d 615 (S.D. W.Va. 2013), Chief Judge Chambers found that a factual issue precluded summary judgment on plaintiff's fraud claim stemming from Quicken's misrepresentation of the value of the borrower's home. In **Robinson**, the plaintiff alleged that Quicken had misrepresented her home's value as $84,350 when in fact its value was only $33,500. 988 F.Supp.2d at 633.

Quicken's highest level executives knew that it was passing on estimated values to appraisers, in accordance with Quicken's policies and procedures. [Doc. 293-7, Hughes Dep. at 69:5-70:1, explaining that Quicken corporate officer and designee Michael Lee Lyon told her to include estimated values in order forms while working at Quicken Loans before joining TSI in July 2007]. In addition, Jennifer Randall stated in this case that Quicken was aware that estimated values were being provided to appraisers by TSI on order forms. [Doc. 212-2, Exh. 12]. Quicken's true motive in sending estimated values to appraisers was confirmed by Mr. Lyon, who during the **Brown v. Quicken** trial (discussed infra) conceded that the practice was meant to "give an appraiser an ability to see what they are going to potentially look at the property at." [Doc. 173-5, Lyon Trial Testimony Vol. 5 (Oct. 9, 2009) at 69-70].

Similarly, TSI executive and chief appraiser Jordan Petkovski acknowledged the

practice but could not provide a reasonable basis for it in his June 2014 testimony – "I wouldn't be able to say it does or does not assist [an appraiser]." [Doc. 212-5, Petkovski Dep. at 120:7-17 & 120:24-121:6) (from *Cline v. Quicken Loans Inc.*, Marshall County Civil Action No. 11-C-38].

A more revealing picture of Quicken's motives is provided by e-mails written by Quicken's executives that were uncovered by the Department of Justice in a recent investigation of Quicken, one of which stated: "I don't think the media and any other mortgage company (FNMA, FHA, FMLC) would like the fact we have a team who is responsible to push back on appraisers questioning their appraised values." [Doc. 173-10, Exh. I, Email from C. Bonkowski to H. Lovier, cc: M. Lyon (Dec. 13, 2007)].  The e-mail goes on to confirm that Quicken was well aware of the crackdown on appraisal influence in the state of Ohio in 2007 and its management predicted the same would spread to other states.  In another e-mail uncovered by the Department of Justice, senior management at Quicken acknowledged in November of 2007 that its sister company, TSI, was receiving "a lot of calls from appraisers stating that they can't reach our requested value." Senior management's directive was to simply ask the appraisers "for the max increase available." [Doc. 206-J, Exh. J, Email from D. Thomas to E. Czyzak, et. al., cc: D. Wright (Nov. 27, 2007)].

Lenders who violate the WVCCPA's prohibitions on the "collection of excess charges… illegal, fraudulent or unconscionable conduct, [or] any prohibited debt collection practice," are subject to statutory penalties and actual damages. W. Va. Code § 46A-5-101(1); see also Syl. Pt. 2, *Vanderbilt Mortg. & Fin., Inc. v. Cole*, 230 W.Va. 505, 740 S.E.2d 562 (W. Va. 2013) ("Under W. Va. Code § 46A-5-101(1) (1996), an award of

civil penalties is not conditioned on an award of actual damages."). Each violation of the CCPA creates a single cause for recovery of a single penalty under § 46A-5-101. *Stover v. Fingerhut Direct Mktg.*, 2010 WL 1050426, *8 (S.D. W.Va. Mar. 17, 2010).

For violations that occurred before 2015, which covers all of the class members' appraisals, the Court has discretion to award penalties in an amount "not less than one hundred dollars or more than one thousand dollars." W. Va. Code § 46A-5-101(1). A civil penalty imposed by the court may be adjusted for inflation since September 1, 1974, in an amount equal to the consumer price index. § 46A-5-106; *Mallory v. Mortgage Am., Inc.*, 67 F.Supp.2d 601, 609, n.5 (S.D. W.Va. 1999) (Copenhaver, J.). The penalty of $100 in 1974 adjusted for inflation to 2017 dollars is $494.12, and for $1000 is $4941.24. See Bureau of Labor Statistics CPI Inflation Calculator at http://www.bls.gov/data/inflation_calculator.htm (last visited March 28, 2017). Imposition of the maximum penalty for each class member loan does not violate the due process and excessive fines clauses of the West Virginia and United States Constitution, absent an abuse of discretion by the court awarding the penalty. *Vanderbilt*, 230 W.Va. at 514, 740 S.E.2d at 571.

The WVCCPA does not provide specific instructions as to the variables to consider in assessing the penalty amount, but guidance may be found in case law interpretation of the WVCCPA as well as in the language of the federal corollary statute, the FDCPA, and in cases interpreting it.

In *Dijkstra*, 2014 WL 12594132 (N.D. W.Va. July 16, 2014), this Court found that lender's disregard for prudent lending practices deprived class members of the opportunity

to ask questions or clarify issues at closing.   This court was unpersuaded by any argument that in some particular cases a class member may not have had questions or required the assistance of an attorney at closing; it was the fact that "LendingTree's use of a notary foreclosed the opportunity to ask questions about the documents or the terms of the loan for these class members, matters which have the potential to affect that is likely the largest investment of their lives," *id*., that constituted the CCPA violation and gave rise to the $2000 per violation penalty.   The lender's conduct in *Dijkstra*, while wrong, was less egregious than Quicken's conduct here, which deprived class members of a fair and valid appraisal in every single loan.   Quicken's conduct has corrupted the appraisal process, which rests as the foundation of any valid loan.   No class member had the opportunity to obtain a meaningful and fair appraisal when the underwriting process had these polluted the appraisals.   An unreliable appraisal can result in severe financial harm to borrowers stuck with the prospect of paying off loans on Quicken's terms or losing their homes.   And as in *Dijkstra*, it makes no difference that in some particular instances a class member may not have suffered actual  damages. [Doc. 227 at 24].

Other WVCCPA cases are also instructive.   In *Vanderbilt*, the Supreme Court upheld the circuit court's award of statutory penalties under § 46A-5-101(1) after a jury found defendant liable for several CCPA violations arising from numerous unlawful debt collection practices, including refusing to provide account records and placing numerous unsolicited calls to plaintiff's mother and third parties.   230 W.Va. at 509, 740 S.E.2d at 566.  Although the jury did not find that the plaintiff had suffered any actual damages, the circuit court awarded: (i) the maximum civil penalty of $4,583.45 for defendant's failure to

provide a statement of account upon written request, conduct the court considered "reprehensib[le]"; (ii) ten mid-range civil penalties at $2,250.00 each for the placement of repeated and unsolicited calls to plaintiff's mother and third parties despite specific requests to cease; (iii) one civil penalty of $458.34 for the use of language intended to unreasonably abuse the hearer; and (iv) an additional maximum civil penalty of $4,583.45 for unreasonable publication of indebtedness to a third party. *Id*.

On appeal, the Court found that the statutory penalty award need not be preconditioned on an award of actual damages, and that no constitutional limitation on the awardable amount of penalties within the limits of § 46A-5-101(1) applied, ultimately concluding that the total award of civil penalties of $32,125.24 was not an abuse of discretion. 230 W.Va. at 514, 740 S.E.2d at 571. *See also* **Clements v. HSBC Auto Finance, Inc.**, 2011 WL 2976558, at *7 (S.D. W.Va. July 21, 2011) ("The amount of a penalty should have a direct relationship to the egregiousness of the violation").

The **Vanderbilt** Court looked to Fair Debt Collection Practices Act (FDCPA) to assist it in analyzing due process concerns relative to the WVCCPA penalties.  The Supreme Court of Appeals recognizes the FDCPA as the "federal equivalent to the WVCCPA, and like the WVCCPA, it also allows consumers to seek actual damages and civil penalties from creditors."  **Vanderbilt**, 230 W. Va. at 511, 740 S.E.2d at 568.

Under that statute, the court may award up to $1,000 in statutory damages per plaintiff and, as under the WVCCPA, the specific amount of statutory damages falls within the court's discretion.  **Savino v. Computer Credit, Inc.**, 164 F.3d 81, 86 (2d Cir. 1998). The statute itself states that, in determining liability in a class action, the court shall

consider, among other relevant factors, "the frequency and persistence of noncompliance by the debt collector, the nature of such noncompliance, the resources of the debt collector, the number of persons adversely affected, and the extent to which the debt collector's noncompliance was intentional."  15 U.S.C. § 1692k(b)(2);  *see also Jerman v. Carlisle, McNellie, Rini, Kramer & Ulrich LPA*, 559 U.S. 573, 578 (2010) (the court must consider the provisions of § 1692k(b) in awarding statutory damages).  Therefore, awards of the statutory maximum are "typically granted in cases where the defendants' violations are particularly egregious or intimidating." *Fuentes v. Audubon Fin. Bureau, LLC*, 2013 WL 4780119, at *2 (W.D .N.Y. Sept. 5, 2013).  A high award is also appropriate if plaintiffs show that the conduct was "repeated and persistent".  *Manopla v. Bryant, Hodge & Assocs., LLC*, 2014 WL 793555, at *6 (D. N.J. Feb. 26, 2014), citing *Edwards v. Niagara Credit Solutions, Inc.*, 586 F.Supp.2d 1346, 1354 (N.D. Ga. 2008) (granting $1000 statutory damages where violation was repeated and there was evidence of a policy and practice of violation). *See also, Hutchens v. West Asset Management*, 2013 WL 1337178, at *3 (S.D. W.Va. Mar. 29, 2013) (Faber, J.) (awarding plaintiffs the maximum penalty of $1000 for only two calls).

The defendants seek to minimize their liability by arguing (1) that what they were doing was not specifically prohibited by West Virginia law; (2) that the Ameriquest consent decree shows that what they were doing was permissible; and (3) the appraisal results dispel the notion that the appraisers were affected by their actions.

This Court has already addressed the issue of illegality vs. unconscionability.  With respect to the Ameriquest action, Quicken states -for the very first time in this litigation or

any other of which the undersigned are aware - that it believed its behavior acceptable because of a settlement agreement entered into between another mortgagor, Ameriquest, and certain states represented by their respective State Attorneys General.   The agreement supported a Permanent Injunction and Final Judgment in *State of W. Va. ex rel. McGraw v. Ameriquest Mortg. Co.*, No. 06-C-519 (W. Va. Cir. Ct., Kanawha Cnty., March 23, 2006).  But Quicken has no evidence that it was even *aware* of this Judgment in a case where it was not a party.  If they were aware, one would think that they would have mentioned it before in the almost five years before now.  Amy Bishop was the *only* attorney doing compliance work for Quicken during the 2004-2009 time frame, and she was entirely unaware of this Ameriquest defense as recently as a few weeks ago when she was asked whether Ameriquest engaged in the passing on of estimated values to appraisers; Ms. Bishop testified that she "wouldn't know what Ameriquest did." [Doc. 316-3, Bishop Dep. at 14:2-11; 101:18-l02:22].

The 44 page agreement was negotiated by a steering committee, not the attorneys general, and covered a myriad of lending practices under scrutiny after complaints and investigations.  The terms of the settlement agreement themselves require any estimated value to be "accompanied by a statement it is being provided solely to assist the appraiser in determining the relative complexity of the Appraisal and that it is not a target or expected value." [Doc. 295-14 at 26].  *Quicken therefore would have been noncompliant even with this separate negotiated agreement*.  Beyond the disclaimer, Ameriquest was required to make extensive changes going forward in virtually all aspects of lending.  In addition, the Judgment itself disclaimed that it had any bearing on the conduct of others,

in that it stated it "may only be enforced by the parties" and did not confer rights to third party beneficiaries. [Doc. 295-14 at 40].  The Judgment also stated that West Virginia consumer law - which would of course include the unconscionability statute that this Court found Quicken violated - governed over any terms of the Judgment where . . . greater consumer protections" are provided.  *Id.* at 39.  The only takeaway from the Ameriquest settlement for any prudent West Virginia lender (were it paying any attention at all to this deal), should have been that the passing on of estimated values could cause them to be sued for violating the law.

Finally, the defendants argue that more than 30% of the loans had an appraisal value that deviated from the borrowers estimated value by more than 10%, which they claim would tend to show that the transmission of estimated values had no effect on the appraisers.  This argument overlooks the fact that hundreds of loans were second mortgage loans where Quicken did not make the underlying loan.  This argument also overlooks the fact that in many occasions the appraisers told the defendants that they were unable to reach the level that Quicken wanted and were told to provide "the max increase available."  The average difference between the estimated value and the appraisal value for all loans was within 5%.

Quicken ignored the overwhelming and uniform guidance of the industry when it provided appraisers with estimated home values.  This conduct was truly egregious, in that it flew in the face of prudent lending practices for the benefit of Quicken's bottom line, and at the expense of each borrower's right to a fair and unbiased appraisal.  Quicken did so for years and in conjunction with thousands of loans, and only stopped when the HVCC went into effect and Fannie Mae and Freddie Mac announced they would no longer buy

loans from those who continued with it the practice.  The nature of the conduct is deceit in the origination of what is typically the most important loan in the average consumers' lifetime – their home mortgage.

This case does not involve mere phone calls or technical violations of statute. Quicken's conduct jeopardizes the American dream of homeownership.  This conduct was frequent – it occurred on nearly every refinancing loan and was repeated as necessary with value appeals.  Quicken was also persistent in that it continued with this practice amongst ever growing industry scrutiny by regulators, appraisers, investors, consumer advocates and lawmakers.  As discussed above, this practice was fostered and condoned by the highest levels of management and motivated by greed.

Quicken's enormous wealth further weighs in favor of a higher penalty.  In *Dijkstra,* this Court recognized the reprehensibility of another lender's conduct when it failed to have attorneys present at loan closings by imposing a $2000 per loan penalty; in *Vanderbilt,* the Court affirmed the award of low-mid-max range penalties for each of the discrete debt-collection violations.  In several FDCPA cases, courts awarded the highest amount permitted to remedy phone call violations.  *See, e.g., Hutchens, supra.*  By comparison, Quicken deprived borrowers of fair and trustworthy appraisals during their loan application process via a mechanism universally condemned.  It did so repeatedly and without remorse, despite all indications that it would improperly influence appraisers' judgment. A substantial penalty will fulfill the purpose of the CCPA, which is to "protect consumers from unfair, illegal, and deceptive acts or practices."  *State ex rel. McGraw v. Scott Runyan Pontiac-Buick, Inc.*, 194 W. Va. 770, 777, 461 S.E.2d 516, 523 (1995) (internal

quotations omitted).

Based upon all the foregoing, this Court will impose a statutory penalty of $ 3,500.00 per violation on the defendants, jointly and severally, with prejudgment interest from and after June 15, 2012.

It is so **ORDERED**.

The Clerk is directed to transmit copies of this Order to counsel of record.

**DATED:** July 11, 2017.

JOHN PRESTON BAILEY
UNITED STATES  DISTRICT  JUDGE